Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

NO. 1:06-CV-11212JLT

VOLUME: 1 PAGES 1-271

- - - - - - - - - - - - - - - - - - - - - - - - *

VERMONT MUTUAL INSURANCE COMPANY,

    Plaintiff/Counterclaim Defendant

VS.

MARY E. PETIT AND FRANK PETIT, TRUSTEES OF 93A

HILLSIDE STREET NOMINEE TRUST AND DADGAR

INSURANCE AGENCY, INC.,

    Defendants/Counterclaim Plaintiffs

- - - - - - - - - - - - - - - - - - - - - - - - *

MARY E. PETIT AND FRANK PETIT, TRUSTEES OF 93A

HILLSIDE STREET NOMINEE TRUST,

    Cross-claim Plaintiffs,

VS.

DADGAR INSURANCE AGENCY, INC.,

    Cross-claim Defendant

Page 2

- - - - - - - - - - - - - - - - - - - - - - - - *

MARY E. AND FRANK PETIT, TRUSTEES OF 93A HILLSIDE

STREET NOMINEE TRUST,

    Third-party Plaintiffs

VS.

ANOWSHIRVAN DADGAR,

    Third-party Defendant

DEPOSITION OF ANOWSHIRVAN DADGAR, taken on behalf of Mary and Frank Petit, taken pursuant to Notice under the Massachusetts Rules of Civil Procedure, before Kim M. Romaine, Notary Public and Shorthand Reporter in and for the Commonwealth of Massachusetts at the Law Office of John Rossi, 18 Tremont Street, Boston, Massachusetts, on Friday, July 13, 2007 commencing at 10:15 a.m.

Page 3

APPEARANCES:

ON BEHALF OF MARY AND FRANK PETIT:

JOHN F. ROSSI, ESQ.

Law Office of John F. Rossi

18 Tremont Street

Boston, Massachusetts 02108

617/742-5400

ON BEHALF OF DADGAR INSURANCE COMPANY:

WILLIAM P. MCGOVERN, ESQ.

Tucker, Heifetz & Saltzman, LLP

100 Franklin Street

Boston, Massachusetts 02110

617/557-9696

ON BEHALF OF VERMONT MUTUAL INSURANCE COMPANY:

JAMES W. SEXTON, ESQ.

Litchfield & Cavo

6 Kimball Lane

Lynnfield, Massachusetts 01940-2682

781/309-1513

Page 4

INDEX

DEPOSITION OF:          ANOWSHIRVAN DADGAR

EXAMINATION BY MR. ROSSI .........PAGE   6

    .........PAGE  240

    .........PAGE  261

EXAMINATION BY MR. SEXTON ........PAGE  208

    ........PAGE  259

EXHIBITS

| No. | Description | Page |
|---|---|---|
| 1 | Deposition Notice | 10 |
| 2 | Dwelling Fire Application | 22 |
| 3 | Agency Agreement | 27 |
| 4 | Fire Quotation Worksheet | 51 |
| 5 | Manual | 64 |
| 6 | Application | 76 |
| 7A-7L | Notes | 80 |
| 8 | Dwelling Questionnaire | 109 |
| 9 | Document | 167 |
| 10 | Five-page Document | 188 |

Page 5

PROCEEDINGS.

MR. ROSSI:  Would you like to enter into the usual stipulations, which I consider reserving all objections, except motions to strike, and as to the form of the question until the time of trial?

MR. MCGOVERN:  Agreed.

MR. SEXTON:  Agreed.

MR. ROSSI:  What about reading and signing of the deposition?

MR. MCGOVERN:  I would like him to have an opportunity to read and sign the transcript.

MR. ROSSI:  Would you like to waive the notary requirement?

MR. MCGOVERN:  Yes.  I am willing to do that.

MR. ROSSI:  30 days after the transcript is available?

MR. MCGOVERN:  That's fine.

ANOWSHIRVAN DADGAR, the witness, having been duly cautioned and sworn, testified upon his oath as follows:

- - - - - - - - - -

Page 6

EXAMINATION BY MR. ROSSI:

Q.  Please state your full name.

A.  Anowshirvan Dadgar.

Q.  Mr. Dadgar, what is your current residential address?

A.  30 Battle Green Road, Lexington, Mass. 02421.

Q.  I don't believe we have ever met before, have we?

A.  No.

Q.  What is your current occupation?

A.  I own Dadgar Insurance Agency.

Q.  How long have you owned that company?

A.  Since 1981.

Q.  What is the current business address of Dadgar Insurance Agency?

A.  400 West Cummings Park, Suite 6725, Woburn, Mass. 01801.

Q.  How long has it been at that address?

A.  At that location, 12 years estimate.

Q.  Approximately 12 years?

A.  Yes.

Q.  Okay.  Would you please tell us your date of birth?

A.  September 10, 1955.

Page 7

Q.  How long have you been employed or involved with the insurance agent industry?

A.  I started in the insurance industry in 1979, was employed by Metropolitan Life, MetLife for two years, and in 1981 I left Metropolitan and started my own.

Q.  Was that Dadgar Insurance Agency?

A.  Yes.

Q.  Would you tell us your educational background, starting with high school, and if you graduated high school, please tell me where and when?

A.  I graduated high school in Tehran, Iran called Alborz High School in 1973.  I came to the United States.  I went to college at Eastern Nazarene College in Quincy, Massachusetts.  I graduated four years with bachelor's degree in 1979.

Q.  What type of bachelor's degree did you receive in 1975?

A.  Business administration.

Q.  Did you go on to any higher education after you graduated from Nazarene College in 1979?

A.  No, I didn't.

Q.  Have you taken any courses particular to the insurance industry at any time?

Page 8

A.  Many times.  When I started working for Metropolitan, they sent me to insurance -- well, actually they had their own insurance courses and classes in order to obtain the broker's license.  This was in 1979.  Then since then many different courses that are offered through our association, Insurance Agents Association from time to time.

Q.  Did you take any courses that were particularly focused on the issue of fire dwelling policies?

A.  I didn't take it on my own.  That was courses -- when you get your license you have to take and through with Metropolitan and that is what we did.

Q.  Can you recall the name of any of those courses?

A.  Property and casualty licensing courses.

Q.  What type of licensing do you currently have with regard to the insurance industry?

A.  I have a broker's license, property, casualty, life, accident and health.

Q.  When did you first obtain that license or licenses?

A.  In 1979.

Page 9

Q. Have you been continuously licensed since 1979?

A. Yes, I have.

Q. What were the requirements for obtaining a license when you obtained it in 1979?

A. Take the exams and pass it. Take state exams and pass it.

Q. So how many exams did you take?

A. I passed it the first time with Metropolitan.

Q. In your previous answer you said take the exams. I believe you said plural. I was wondering how many exams you took. Was it one for each subject area?

A. For life, accident and -- it was a long time ago. For life, accident and health I believe it was one exam. Property and casualty was another one.

Q. So there were two exams?

A. Yes.

Q. Have there been any exam requirements since 1999 that you had to fulfill in order to maintain your licensing?

A. No.

Q. Are there any continuing education

Page 10

requirements that you have to fulfill in order to maintain your licensing?

A. No.

Q. Other than registering on a periodic basis and I assume paying a fee, are there any other requirements that you must fulfill in order to maintain your licensing?

A. No.

Q. Are you here today as a designee pursuant to the Rule 30(b)(6) Deposition Notice that was served on your agency?

A. Yes, I am.

Q. Have you had a chance to -- let me put at this point the original 30(b)(6) Notice of Deposition before you.

MR. ROSSI: Before I do that I will mark it as Exhibit 1.

(Exhibit No. 1 marked for identification).

BY MR. ROSSI:

Q. I want to go over the portion of that notice that begins on -- may I see your copy? On page two through page four, items one through 19, I would just ask you to review that with your

Page 11

attorney, and tell me are there any issues that are outlined in one through 19 that you are not the designated person to testify to today?

A. Yes. I did review this with my attorney. I can express an opinion on everything. It's just on question numbers 14 and 15, the claims advance payment process concerning the insurance which is the subject of the present lawsuit that was between Vermont Mutual and the adjustor that Mrs. Petit had hired.

Number 15 again, the claim advance payment process concerning insurance involving the services of that for the period commencing January 1st, I'm a little vague on what number 15 is.

The claim -- basically our responsibility is to present the claim to the insurance company, and the fact that Mr. Petit had hired a public adjustor, that communication is really between the insurance company claim adjustor and her public adjustor. So 14 and 15 I am not qualified to answer you.

Q. Okay.

A. Everything else I'm fine with.

Page 12

Q. Okay. Fine. So focusing on those two, I will ask you some follow-up questions.

A. Okay.

Q. With regard to the claims advance payment process concerning the insurance which is the subject of the present lawsuit, the Petites' lawsuit, is it your contention that the Dadgar Insurance Company has no knowledge regarding that issue?

A. No. I have knowledge regarding that issue now. I do not have any knowledge of how -- what was agreed prior to us -- apparently the public adjustor requested an advance payment of $25,000, if I'm not mistaken, to the client. So that I know now.

Q. For the purpose of that issue, is there anyone at Dadgar Insurance that you feel would have more information about that than you?

A. No.

Q. Okay. With regard to issue number 15, is it the contention of Dadgar Insurance Company that it has no knowledge concerning the claims advance payment process concerning insurance involving services of Dadgar Insurance Agency and or

Page 13

Anowshirvan Dadgar for the period January 1, 2002 up to and including the present?

A. No. We know about that. We know that there was an advance payment that was going to be going out to Mary Petit.

Q. I would also just point out that as I read issue number 15, that is not limited only to the Petit claim. It's intended to cover any claim that your agency has been involved with from January 1, 2002 up to and including the present.

A. Well, advance payment, if that is your question, advance payment is a common practice of an insurance company. When the client suffers a large claim, especially when there is business income that is interrupted, there is advance payment.

Q. So you do have knowledge of that issue?

A. Yes.

Q. I just wanted to make sure on the record we didn't misunderstand how the agency was responding.

A. I understand.

Q. How many employees currently are employed at Dadgar Insurance Agency?

Page 14

A. Right now it's nine.

Q. And would you be able to tell me what are the current positions of employment at the agency?

A. The agency is basically broken down into two sections, commercial lines and personal lines. Commercial lines we have customer service reps, assistant customer service reps, clerks. For personal lines, the same way, customer service rep, assistant customer service representative and clerks. Our commercial lines is a lot larger, bigger than our personal lines. So more employees are assigned to the commercial lines.

Q. How many employees are assigned to the commercial lines portion of the agency?

A. Seven.

Q. Are they full time or part time?

A. Combination.

Q. How many of those seven employees are full time?

A. Three.

Q. Three full time?

A. Yes.

Q. Do any of those seven employees do any work on the personal lines as well?

Page 15

A. Not really, no.

Q. I notice you mentioned -- if my math is correct, there are two employees left?

A. Yes.

Q. You mentioned three different functions, if I understood you correctly, customer service rep, assistant customer service rep and clerk. So are one or more of these functions combined functions that are handled by one person?

A. Assistant and clerk are combine.

Q. With regard to the two employees that provide the work on the personal lines side of your agency, are they both full time?

A. No. One full time, one part time.

Q. Is the full-time person a customer service rep?

A. Yes.

Q. Do these nine employees include you?

A. No.

Q. Okay.

A. I'm the tenth person.

Q. So are there a total number of ten people that work at your insurance agency?

A. Including myself, yes.

Page 16

Q. What is your current business practice with regard to the handling of new business for people that are looking for fire dwelling insurance protection?

A. Either me myself or my customer service rep go over the application process, underwriting questions, and decide which market to go to to place the dwelling fire coverage, if they even qualify for the coverage.

Q. Okay. Now, what is the name of the customer service rep that works on the personal lines application process along with you?

A. Darin Pagliuca.

Q. With regard to the application process that you referred to in your previous answer, would you please tell us what that process involves in terms of functions?

A. Ask the underwriting questions, ask first how they were referred to us, how did they find out about us, then their name, their realty trust, property location. A whole bunch of underwriting questions. The age of the property, any improvements they have done to the property, value, closing date, bank, occupancy, replacement

Page 17

cost. Figuring out what the replacement cost of the property is.

And once we have all that information, we try to see where does it fit with our markets. And if there is a fit -- in this case I determined there was a fit for Vermont Mutual -- then we finish the application, either meet with the client or in Mary's case we had to either fax or mail it to her to review the information for accuracy, accept our quote, our pricing and send everything back to us.

Q. Okay.

A. That's pretty -- nothing out of the ordinary. That pretty much normal of what everyone does.

Q. When you speak with potential customers is that normally done in person or over the phone?

A. Both.

Q. When you personally start talking to someone about an insurance application, do you usually stay with that person and follow through until the application process is complete or are there occasions where you and Mr. Pagliuca would sort of shift off and take over for each other?

A. For the most part, I do all the selling. If

Page 18

there is -- especially new clients to our agency. If it's an existing client that has a lot of business with us and they have just acquired an auto or two-family or three-family or a boat, you know, those are the ones I might still get involved in talking to them, but Mr. Pagliuca is the one that really does all the talking and runs it by me before binding. I am the one who has to give the okay for binding the properties. If it's a new client to the agency, that's definitely me. It's always me. I don't have any sales people. We don't have any brokers. It's all me.

Q. So every time a potential new client contacts your agency, whether it be via telephone or Internet or otherwise, you respond personally to that inquiry?

A. If it's a new client, yes, I do.

Q. Okay.

A. Then we will put them in touch with Darin if need be.

Q. Did you follow that same process and procedure back in November 2003?

A. Yes, I did.

Page 19

Q. During the course of the process where you are speaking to the potential new customer and getting information from them, do you fill out any forms or make any notes?

A. Yes.

Q. And what is your current procedure with regard to maintaining this paperwork? Is it a form you filled out?

A. If it's -- are you talking about dwelling fire?

Q. Yes.

A. Before I fill out the dwelling fire forms, the questions that I ask the client as soon as she tells me it's one-family to four-family dwelling fire is the best type of coverage for the client as far as coverage and pricing.

Q. But my question is what type of paperwork do you fill out when you are taking that information from the potential client?

A. If it's qualified for dwelling fire, I repeat the questions that are on the application for Vermont Mutual on a note form and transfer that note to the application.

Q. Do you fill out information for every

Page 20

potential customer for dwelling fire insurance on a Vermont Mutual form?

A. Vermont Mutual is the company that we use for dwelling fire and homeowners.

Q. Is that the only company that you currently use for dwelling fire?

A. No. We have also Holyoke Mutual Insurance Company.

Q. Those two?

A. Yes.

Q. Was that also the case back in November of 2003?

A. November 2003 was just Vermont.

Q. As of November 2003 the only company that Dadgar Insurance Agency underwrote for was Vermont Mutual?

A. For dwelling fire policies.

Q. If for some reason somebody called you for dwelling fire and could not meet the criteria for Vermont, you could not service them?

MR. MCGOVERN: Objection.

A. No, I could still service them. There are other markets we could go to.

Q. What are the other markets?

Page 21

A.  We could have gone to FAIR Plan.  We could have gone to surplus markets.  There are wholesalers that through them we could get dwelling fire policies, but it wasn't a contract between us and the company.  We have to go through a wholesale area.

Q.  Was Vermont Mutual as of November 2003 the only company to your knowledge that underwrote dwelling fire insurance in Massachusetts?

A.  No.

Q.  Approximately how many companies were doing it as of then?

A.  I can't answer that. I imagine 15, 20. Maybe more.

Q.  Approximately?

A.  Yes.

Q.  Mr. Dadgar, I would like to show you a document that has been produced by your attorney in this matter. It's two pages.  The top line reads ACORD Dwell Fire Application.  I would ask if you recognize that document?

A.  Yes.

Q.       MR. ROSSI:  Can we mark that as Exhibit 2?

Page 22

(Exhibit No. 2 marked for identification).

BY MR. ROSSI:

Q.  The first term that appears on that ACORD, what does that mean?

A.  It's an organization that sends different forms of applications.  It's common in the industry that all agents use.

Q.  Now, is that a form that you normally use in your agency?

A.  For dwelling fire, if it doesn't qualifies -- if I wanted to write a dwelling fire that did not qualify for Vermont Mutual, then the other sources we will go to, we will use ACORD forms.

Q.  Okay.  Now, when you use that ACORD form, is it just that two-page form that you submit?

A.  The particular company that we might be going to, they might have a questionnaire just like Vermont Mutual that we need to get as a supplement.

Q.  Okay.

A.  If we go to FAIR Plan -- I'm not sure if you are familiar with who they are.  Massachusetts Property Insurance Underwriting Association.

Page 23

It's an organization that offers homeowner dwelling fire or insurance coverage in general to people who cannot obtain coverage through, let's say, Vermont Mutual or a number of insurance companies for various types of reasons.  For underwriting reasons, for example, for claim history reasons and what have you.  They have their own application as well.  If you go through a wholesaler to offer dwelling fire, we use this ACORD application along with whatever supplement they send us.

Q.  The times that you use this ACORD form of application, approximately how often is there a questionnaire that accompanies it?

A.  Almost all the time.

Q.  In your agency do you maintain copies of questionnaire forms for companies other than Vermont Mutual that underwrites dwelling fire insurance?

A.  We maintain it.  It's very easily also accessible online or the particular wholesaler we go to, he might have five or six different companies that he offers dwelling fire to.  He will send us his standard questionnaire and we

Page 24

fill his or hers.  We do maintain somewhat but it's really no use to maintain those because it's different sources we go to at different times.  They might have updates or revisions or changes.  We ask them to send it to us.

Q.  When you say that it is easy to obtain them online, is it easy for the general public to obtain these online?

A.  You have to be an agent.

Q.  So is it your normal practice to go online and download these questionnaire forms if and when you need them?

A.  We usually have a good relationship with a lot of the underwriters.  We will call them or the wholesalers.  We will call them and say we have dwelling fire with this specification, would you send us the appropriate questionnaire that you want or we even send the application and then he will send us back the questionnaire and then we call the client back with additional questions.

Q.  You mentioned that you are under contract with Vermont Mutual as an agent?

A.  Yes.

Q.  How long have you been under contract with

Page 25

them?

A. I don't recall exactly. I have to refer to my contract but it's been a while. At least probably ten years. Maybe longer.

Q. Do you have a copy of that contract at your agency?

A. I have it at my agency, yes. I thought my attorney produced them for you.

Q. Could be. Has that contract been changed from time to time throughout the approximately ten years that you have had a contractual arrangement with Vermont Mutual?

A. I don't recall. My recollection is always the same.

MR. MCGOVERN: It's the first document produced in the initial disclosure.

MR. ROSSI: Thank you.

BY MR. ROSSI:

Q. How is Dadgar Insurance Agency compensated for its services?

A. Commission.

Q. Who pays the commission?

A. The insurance companies.

Q. Was that the case back in November of 2003?

Page 26

A. Yes.

Q. And with regard to those commissions, what was your arrangement with Vermont Mutual Insurance Company as of that time with regard to fire dwelling policies?

A. It was we will place the coverage with them, collect the premium from the client, send it to them and they will give us a commission.

Q. And what was the percentage of commission you received as of November 2003 from Vermont Mutual on fire dwelling policies?

A. I believe it's 20 percent. It was 20 percent.

Q. Has that changed at any time?

A. I don't think so.

Q. So that's current?

A. That current.

Q. That's currently the case?

A. Yes.

Q. I would like to show you a document that is three pages. With your attorney you can review that. I ask you if that is the copy of the agency agreement that Dadgar Insurance Agency has in effect with Vermont Mutual?

A. Yes, it is.

Page 27

Q. That's complete? In other words, it's a three-page contract?

A. I believe so.

MR. ROSSI: Can we mark that as Exhibit 3?

MR. SEXTON: Let the record reflect it's a three-page document dated June 15, 1997 entitled Agency Agreement. The first two pages comprise the agreement and the third page comprises a commission schedule.

MR. ROSSI: I have no objection?

(Exhibit No. 3 marked for identification).

BY MR. ROSSI:

Q. When Dadgar Insurance Agency places insurance through a broker other than a company that it has a direct relationship with, such as Vermont Mutual, is the commission structure upon which it receives payment different?

A. Yes, it is.

Q. What is the difference?

A. Ten percent.

Q. So what if you are unable to place someone with Vermont Mutual but can find them something

Page 28

in one of the other markets, you receive a 10 percent commission rather than 20?

A. It depends. FAIR Plan, if I am not mistaken, is about 11 or 12 percent. Maybe higher. I don't remember. If you go through the wholesalers it's usually 10 percent.

Q. Was that the case also back in November of 2003?

A. I believe so.

Q. Okay. Approximately what percent of the fire dwelling coverage that your agency places is through Vermont Mutual currently?

A. I would not be able to answer that. To give you an idea, our mix of commercial, personal line business is probably 90 percent commercial lines and 10 percent personal lines which is homeowners, dwelling fire and auto. I can't tell you what percentages of my dwelling fires are with Vermont Mutual or how much they are. I really don't know.

Q. Would you say more than 50 percent of your personal lines of dwelling fire insurance is with Vermont Mutual?

A. More than 50? Could you repeat the question

Page 29

to make sure I understand what you are asking me?

Q. By the way, if you don't understand any of my questions, tell me. I will be happy to try to clarify it.

A. You are asking me if we write hundred dwelling fire policies, more than 50 of them are with Vermont Mutual, is that what you are asking me?

Q. Yes.

A. I would say yes.

Q. Would you say it is approximately 90 percent?

MR. MCGOVERN: Objection.

A. I would not be able to say. I know it's more than 50 percent, but I don't know if it's 90 percent or 100 percent or 80 percent. I wouldn't know that.

Q. Okay. Now, what is the business practice that your agency employs currently to monitor its receipt of commissions earned?

MR. SEXTON: Objection.

A. Basically with the commissions that we receive from the insurance companies every month there is a statement that comes. We check the statement.

Q. Now, what mechanism do you have in place at Dadgar Insurance Agency to make sure that those

Page 30

statements are accurate?

A. There is really not a mechanism. There is really none.

Q. Okay.

A. We take I believe the insurance company statements that they send us.

Q. Does Dadgar Insurance Agency maintain any accounting records of its own that would reflect how much insurance it has issued in the course of --

A. Yes.

Q. What type of system is it that you have for that?

A. It's an accounting system.

Q. Is it manual or electronic?

A. Our accounting system is different than our agency management system. My wife handles that. It's Quick Books. It goes to -- we have an -- all the commissions that have come in are recorded from which companies. Then we will on a monthly basis, along with our expenses and everything, we will send it to our accountant.

Q. Now, you testified earlier that with regard to the services that your agency provides for

Page 31

Vermont Mutual it will also bill the customers?

A. We don't bill the customers if we write with Vermont Mutual. With the application we will ask them either for a down payment or if you choose the full premium to make the check payable to Vermont Mutual.

Q. So Vermont Mutual bills for its own premiums directly?

A. Yes.

Q. Are there occasions where your agency bills the customers for the premiums as they are due directly rather than having the customer billed through the insurance company itself?

A. Are you talking about Vermont Mutual or are you talking about --

Q. Any company.

A. We have agency billings, yes.

Q. With regard to your agency billing process, what accounting mechanism does your agency use to effectuate that?

A. It's called choices. We have that on a monthly statement. We send the bills to the company and company sends us invoices once a month on the accounts that we have through

Page 32

billing the clients.

Q. Is this done through an independent contractor or in house?

A. We do it in house. Mostly myself.

Q. This is an electronic system?

A. Yes.

Q. Would this system tell you the total amount of business billed in the course of a year other than Vermont Mutual business?

A. No, it won't. I just use the system for invoicing the client. Basically the individual clients.

Q. Does this system maintain balances in terms of accounts receivable from the clients?

A. On a monthly -- client by client, yes. As a whole, no.

Q. What records does the Dadgar Insurance Agency have to indicate the amount of earnings it obtains in the course of a year?

A. Accounting records. Everything at the end of the month is communicated to the bookkeeper, who is my wife, who in turn sends those to our accountant.

Q. Is this an electronic system or paper?

Page 33

A. It's Quick Books I think it's called.
Q. So when your agency receives a payment, a commission payment from Vermont Mutual, is that entered on the Quick Books system of your agency?
A. Yes, it is. We enter it.
Q. With regard to that entry in the Quick Books system, what information is made as part of that entry?
A. I have to ask my wife. It's basically Vermont Mutual commission, received this much this month.
Q. Is Vermont Mutual a subcategory in that system?
A. I don't follow.
Q. Are you familiar with the Quick Book system?
A. No, I am not.
Q. So you are not familiar with class entries or category entries?
A. It's my wife and my mother-in-law do that.
Q. What is your wife's name?
A. Helen.
Q. Is she a full-time employee at your agency?
A. No, she is not.
Q. Does she work at the agency?
A. She is part time.

Page 34

Q. Where are the computers located with regard to the Quick Books system, are they at your agency or in your home?
A. At my agency.
Q. Are all receipts of the Dadgar Insurance Agency entered into the Quick Books system?
A. Yes, they are.
Q. Now, when you take an application from a potential client and then submit it and get them insurance, what records does the Dadgar Insurance Agency maintain with regard to that insurance coverage once it's acceptable by the insurance company?
A. Copies of everything; application, policy, communication, faxes, checks. Everything.
Q. Now, are those papers kept in paper format?
A. Yes.
Q. Do you have an electronic system that monitors the names of your customers?
A. Yes, I do.
Q. What is the name of that system?
A. It's called Applied system. It's an agency management system.
Q. What does that Applied system agency

Page 35

management system do for your agency? What functions does it have?
A. It has, if you will, a client's folder, each client's folder on the computer. So pretty much whatever we have hard copy on a file we have it on the Applied system.
Q. Okay. Now, on the Applied system, is that data maintained on the hard drive of your own computer or the network of your own computer in house or is it maintained by some company outside?
A. It's kept in house.
Q. What type of a media do you have? Do you have a network server that it's kept on?
A. Yes.
Q. What type of network server is that?
A. It is with Applied.
Q. Do you know the name of the hardware of the server that you use at Dadgar Insurance Agency?
A. No.
Q. Does Applied also provide the hardware?
A. We bought everything from Applied, software and hardware.
Q. Do you know if the brand name of the hardware

Page 36

is Applied as well?
A. No. I don't think so but I don't remember what it is.
Q. Are there times where you make an inquiry through the Applied system by property address rather than customer name?
A. Very rarely.
Q. You have the ability to do that if you so desire?
A. We have the ability to do that, yes.
Q. You can do that either by street address, city and town?
A. It's very difficult to get it, but we have had instances that clients have called and have not left their name. They have referenced property location. We have a tough time with locating it but it is doable, yes.
Q. Okay.
A. Street address and town.
Q. How about zip code, can you do it that way?
A. I have to ask. I don't know.
Q. Certainly there are times when a new customer calls and says you may have insured this or Vermont Mutual may have insured this before, we

Page 37

just it took over and we would like to get insurance on it. If need be, can you get information about that property by location?

A. No. I have to call Vermont Mutual. If they tell me Vermont Mutual used to insure this before and it's a new customer to us, I have to -- I usually make the call to my underwriter.

Q. What if your agency had previously insured the property?

A. Then we could find out who we insured it for, what was the history on the property and so on.

Q. You can do that by property address?

A. No. We can but it's extremely difficult. It's a lot easier to do it by name.

Q. Does the Applied system also have a mechanism for categorizing the type of insurance that you're underwriting?

A. I'm sure it does. You are asking me a lot of technical questions that I usually don't get involved in. CSRs at the office, they can answer these better or I can get back to you on that.

Q. Who do you believe would be most knowledgable at Dadgar Insurance Agency about the use and capacity and specs of the Applied system?

Page 38

A. Kris Hennessy.

Q. H-E-N-N-E-S-S-Y?

A. Yes.

Q. What is Kris's position?

A. She is an assistant customer service and also more of a technical person with computers. My IT person, if you will.

Q. Now, at Dadgar Insurance Agency is there more than one terminal where you can input data or retrieve information from the Applied system?

A. We have nine stations.

Q. When you are completing the application for a potential client, is any information inputted into the Applied system at that time before coverage is issued?

A. Again, not at that time. If it's dwelling fire again you are talking about, no. It's all on paper. If it is going to go to one of these sources other than Vermont Mutual, for example, then it would be computerized. Probably we have the ability to do it on the computer because ACORD form is on the computer, but I do not have Vermont Mutual's application on the computer. It's handwritten.

Page 39

Q. With regard to a Vermont Mutual issued policy, what is the first step that your agency performs with regard to entering information in the Applied system?

A. When the client agrees to bind with us, send back the signed -- it would be our proposal. When we send the proposal maybe to the client, that is when we have established in Applied a potential client. We send the proposal with the application information and if they agree, then all the client's information will be put into the computer.

Q. At the time you send out the proposal, what information is put into the Applied system?

A. We are talking about dwelling fire again?

Q. Yes. For the time being, assume all my questions are regarding fire dwelling private lines coverage.

A. Okay. I don't get involved too much in entering the information in the computer in the Applied system. I have my CSRs doing that.

Q. I don't want you to guess. I do not want you to feel as though I'm asking you to guess.

A. I do feel that way.

Page 40

Q. If you don't know the answers to any of my questions, would you please tell me? Let me say something on the record. I should have mentioned this at the beginning. I apologize. As I said earlier, if you don't understand any of my questions, would you please tell me and give me an opportunity to clarify it for you? I would be happy to do that. Also, if I should ask you anything that you either don't know the answer to or don't remember the answer to, I do not want you to guess. I would prefer that you tell me you don't know or you don't remember. If there is someone else that knows about this issue more than you do at Dadgar, tell me that and we will be happy to perhaps follow up with that person.

A. Okay.

Q. Is your agency limited in terms of geographic area as to where it takes business for personal lines fire dwelling insurance?

A. Yes.

Q. What are the limitations of that area?

A. Pretty much Massachusetts.

Q. Are there any areas of Massachusetts where you do not do business?

Page 41

A. Well, Cape Cod, for example, recently, last year, year and a half, coastal -- we do business but some of the companies that we represent, it's not desirable locations or areas for them because of the wind or flood or hurricane issues.

Q. Okay.

A. But we don't limit. I will service. We do business in Massachusetts if we can.

Q. In the answer to my last question you used the term some of the companies that you do business with or represent. In the area of personal lines fire dwelling, is there any company other than Vermont Mutual that you represent?

A. Holyoke Mutual.

Q. That was --

A. There was one more. Tower Insurance Company is another one.

Q. Okay.

A. We recently signed on this.

Q. How long have you been representing Holyoke Mutual Insurance Company in personal lines fire dwelling insurance?

A. About a year and a half, two years.

Q. How about Tower Insurance?

Page 42

A. Less than a year.

Q. Okay.

A. These are all commercial insurance. We write a lot of commercial with them, but we do have the ability to write homeowner and fire dwelling as well.

Q. Is there any reason why you write mostly commercial as opposed to personal with Holyoke?

A. They have good programs. We have made the target market for us. It's restaurants and real estate.

Q. Okay. With regard to personal lines fire dwelling coverage, do they pay the came coverage as Vermont Mutual?

A. I think so.

Q. Would that apply to both Tower and Holyoke as well?

A. I've got to look it over but I'm pretty sure.

Q. Is there any difference in their underwriting requirements at Holyoke Mutual as compared to Vermont Mutual that you are aware of?

MR. MCGOVERN: Objection.

A. I don't remember. I can't answer that question right now. I have to reference.

Page 43

Q. Did you represent any companies that as of November 2003 would underwrite personal lines fire dwelling protection for income properties of one to three units that rented to students?

A. No. On 2003?

Q. Yes.

A. No, I don't. I didn't.

Q. Did you provide any insurance for customers that owned such properties during 2003?

A. I am sure I did.

Q. How did you obtain that insurance for them?

A. We have a few different options. One is, as I mentioned, FAIR Plan Massachusetts Property Insurance Underwriting Association. The other option would have been the wholesalers that offer dwelling fire. The third option would be not to write a dwelling fire. To write a commercial policy with a surplus market wholesaler. It would have been more expensive.

Q. How much more expensive would it have been as compared to the Vermont Mutual policy?

A. Probably one and a half to two times more if you are writing it commercially with a surplus market.

Page 44

Q. Are you aware of any insurers issuing coverage in Massachusetts for personal fire dwelling insurance that would insure student occupied residences that were income, not owner occupied with one to three units?

A. No, I am not.

Q. And that was the case as of 2003?

A. That would have been the case as of 2003.

MR. SEXTON: I'm sorry. Did you ask him personal lines?

MR. ROSSI: Yes.

A. FAIR Plan is a Mass. property insurance underwriter. They would have written it in 2003. They would write it now. As far as any insurance other than FAIR Plan, I already explained who and what they are. No, I am not aware and I wasn't aware of that.

Q. As of November 2003, when a customer contacted your agency with student occupied income property, what did you tell them?

A. For dwelling fire policy?

Q. Yes. Personal lines?

A. I would tell them that I either go to FAIR Plan or I go to a wholesaler for dwelling fire or

Page 45

insure it commercially with another wholesaler, whichever pricing and coverage suits them. We would have probably gone to two or three sources and got back to them with different options.

Q. What percentage of your fire dwelling insurance business, whether it be personal or commercial lines, is for property that exists in Boston?

A. I would not know.

Q. Is it a large percent of your business?

A. No.

Q. Okay.

A. I know it would not be, no.

Q. You are familiar with Mary Petit?

A. Yes.

Q. How long have you known her?

A. Since 2003 when she became a client of mine.

Q. How did you come to get her as a client?

A. I believe she called me.

Q. Do you know whether or not that was the result of a referral or how was it that she came to call you?

A. I believe it was a referral by a gentleman named Larry Brown, if I'm not mistaken.

Page 46

Q. Who is Larry Brown?

A. I believe he is a mortgage broker or a property manager.

Q. Have you ever met Mr. Brown?

A. Not that I recall, no.

Q. Have you ever spoken to Mr. Brown prior to today?

A. I believe in 2003 either on the phone or by fax we communicated.

Q. Had you communicated with him prior to the referral of Mary Petit to your office?

A. I do not recall.

Q. Was this the first time Mr. Brown referred anyone to your office?

A. I do not recall.

Q. Does your agency maintain records of referral sources?

A. Usually -- I mean, we are such a niche targeted market. Our referrals are either from associations that have endorsed us or from an existing client. We write on the folder who it came from. That's pretty much it. Nothing in an organized fashion where the referral came from.

Q. As part of the business planning of Dadgar

Page 47

Insurance Agency, don't they from time to time review the sources of their new business?

A. Can you ask that again?

Q. Sure. As part of the marketing strategy of the Dadgar Insurance Agency, did they from time to time review the sources of their new business?

A. The referral and where they came from? We don't really spend that much time on reviewing it, no. We just know where we generate new business.

Q. If an individual such as Mr. Brown refers you a new customer, do you send him any sort of thank-you note or acknowledgment?

A. No. I have not done that in the past, no.

Q. Do you make note of it on the file folder itself?

A. Well, in Mary Petits' folder there is a mention of Mr. Brown, and there is some kind of fax on the inspection that either came from Mr. Brown or Mary. So there is a name in there. I just didn't dig into it too much or I don't recall exactly who Mr. Brown was.

Q. Once again, I'm asking the procedure followed by your insurance agency with regard to

Page 48

referrals. The only means of maintaining a record identifying a referral source is that you write their names on the file folder?

A. Pretty much.

Q. There is nothing entered into your Applied system about referrals?

A. I don't think so.

Q. Do you have any knowledge as to why Mr. Brown referred Mary Petit to your agency given the fact that the property is in Boston and you're in Woburn?

A. I don't have any knowledge why but I -- we do get referrals from mortgage brokers and property managers because they associate us, our agency, with an agency that writes property insurance. By the same token, we write a lot of restaurant insurance so I do get restaurant owners referred to us by Mass. Restaurant Association. So we don't question that part of it too much. We just tag them and that's it.

Q. Does Dadgar Insurance Agency insure any properties that are in the vicinity of 93A Hillside Street currently?

A. I wouldn't know. I have to check.

Page 49

Q.  Are you familiar with the area of 93A Hillside Street?

A.  Well, now I am.  I know it's in Boston.  It's near Northeastern.

Q.  At the time you took the application for Mrs. Petit, what did you know about the area of 93A Hillside Street?

A.  Basically what Mrs. Petit told me in my questions:  Where it is, how old it is, when were any updates done, occupancy, value, mortgage, closing dates.  The inspection also.  That was big.  We received by fax seven or eight pages worth of inspection.  Whether this is what Mr. Brown or Mary Petit sent us, I don't recall.  I have to look at the file, but there was eight or nine pages of inspection that Mrs. Petit had ordered an inspection company to do.  So we reviewed that as well.  Between that and the answers Mr. Petit gave us, we were comfortable to write a dwelling fire policy with Vermont Mutual.

Q.  Do you recall any information that came from Mr. Brown concerning 93A Hillside Street at the time you made the referral to your agency?

A.  As I said, I am not sure if the inspection was

Page 50

sent by Mr. Brown or Mrs. Petit.  It could have come from him but I wouldn't know.

Q.  If I wanted to find out how many properties your agency insured as of November of 2003 in the 0212 zip code area, was your agency using Applied system at that time?

A.  In 2002 and 2003 we had Applied system, yes.

Q.  Are there any other means by which you kept track of where your properties that your insureds owned, that your clients owned were located?

A.  No.  Our means of accessing this information is the client's name mostly.  We enter everything by client's name in Applied.  That name is given a code so it could be a person that has eight different locations but it's the same name, hence same code.

Q.  What is the Massachusetts dwelling fire quotation worksheet?

A.  Is it Vermont Mutual's that you are referring to or just --

Q.  Let me show you a document that has been produced by your agency.

A.  It's a rating system software that we have.

Q.  So that is not a Vermont Mutual software?

Page 51

A.  It's Vermont Mutual's rates.  It's the software that we have that quotes Vermont Mutual or Commerce, for example, for auto insurance and so on.

(Exhibit No. 4 marked for identification).

BY MR. ROSSI:

Q.  The information on the Massachusetts dwelling fire quotation worksheet, is that maintained by your agency after the quote is sent out?

A.  We keep a copy of it like that.

Q.  Do you keep electronic data?

A.  No.

Q.  So you use the software to do the calculations and then you print out a hard copy and you only maintain the hard copy?

A.  Yes.

Q.  With regard to the earnings that your agency receives in the course of a year, does Vermont Mutual issue a 1099 form to your agency?

A.  I don't remember.

Q.  Do they --

A.  Some companies do; some don't.  I don't remember.

Page 52

Q.  Do they issue some sort of a tax form indicating how much they claim they paid your agency in the course of a year?

A.  I don't recall.  We represent so many different companies.  I have to refer to my books or last year's taxes or prior taxes to see or ask my accountant if he has anything.

Q.  Who is your accountant?

A.  Felix Betro.  Betro and Company.

Q.  B-E-T-R-O?

A.  Yes.

Q.  Where is Betro and Company located?

A.  Foxboro.

Q.  How long have Betro and Company been Dadgar Insurance Agency's accountants?

A.  Probably ten years.  I'm guessing.

Q.  Does Dadgar Insurance Agency receive annual reports or financial statements from Betro and Company?

A.  Yes.

Q.  Do those financial statements have breakdowns by lines or customer or insurance companies as to the source of its income?

A.  They don't break down the insurance companies,

Page 53

no.

Q.  Okay.

A.  They give us a typical financial statement.

Q.  When you say typical, that may vary from company to company?

A.  Typical to my business.

Q.  What sort of a breakdown do those financial statements have concerning the sources of Dadgar Insurance Agency's income?

A.  Just gross commission. We make a commission. We are an insurance agency. Our own source of income is receiving commissions. We do not charge hourly. We don't charge for anything. It's all commission.

Q.  What about lines of coverage? Say, personal versus commercial, do you get a breakdown of how much you have earned with commercial versus personal?

A.  Not really, no. I know personal is very small versus commercial.

Q.  How do you know that?

A.  Because I know how much we write commercial versus personal.

Q.  What percentage of the business that you write

Page 54

is personal?

A.  I would say probably 10 percent.

Q.  Okay.

A.  It's 10, 15 percent. I'm guessing.

Q.  What percentage of the insurance you write is for property as opposed to restaurants?

MR. MCGOVERN: Objection.

A.  It's a tough one. I don't remember.

Q.  Is most of the commercial insurance that you write for restaurants?

A.  No. Property, restaurants and other things, but that's where our focus is is real estate property and restaurant.

Q.  That is why I asked if you knew what percentage was restaurant.

A.  To break down the restaurant versus property, it's a tough one. I couldn't say.

Q.  Certainly your agency maintains records with that information, doesn't it?

A.  We know who are restaurant clients are, who our property clients are, but to have a breakdown of how much is restaurant, no, we don't keep that.

Q.  With regard to your current practices at

Page 55

Dadgar Insurance Agency, what do you do if you take an application for someone who you can't get insurance for or who decides not to bind with your company?

MR. SEXTON: Objection.

MR. MCGOVERN: Objection.

A.  I don't follow the question.

Q.  Let me break it down. Do you have a current business practice with regard to potential insurance customers that submit an application but do not purchase insurance from your agency or through your agency?

A.  They give me an application, we give them a proposal and they don't buy insurance from us, is that what you are saying?

Q.  Yes.

A.  Well, we really don't have a procedure. Maybe a phone call about was it coverage, was it pricing, was it you don't like me. That sort of thing. Beyond that, we don't pursue it too much.

Q.  Do you maintain records for some period of time with regard to those situations?

A.  If it was entered into the Applied system for the commercial part, pretty much everything is

Page 56

entered. When I say everything, a big chunk of applications that we do is entered into Applied. If we are going to shop it around usually it's on a history. If they don't end up buying it we have a date that the client wanted to for us to by their closing date, if you will. If it doesn't happen on that date, if we have not heard from them, we will call back, write a letter inquiring about it and then put it into history. In Applied I know there is an area that we put it into history rather than current active clients.

Q.  Okay.

A.  Really it's used for following up if next year they come to us.

Q.  So you maintain data at the insurance agency concerning most customers or potential customers that don't actually purchase their insurance through your agency?

A.  Correct.

Q.  For how long is that data maintained?

A.  I believe it's two or three years.

Q.  So if, for example, someone like Mary Petit who had student occupants on her premises had a discussion with you and decided after that, well,

Page 57

we are going to go somewhere else for our insurance either because your rates were high or you didn't have a coverage they were looking for, you would maintain her information in the Applied system at least for some period of time?

MR. MCGOVERN: Objection.

A. I don't think I will because it's personal lines versus commercial lines. At that point probably it wasn't even entered in Applied because it was dwelling fire policy. Because of the fact she is brand new to us, she was not an existing client, there is no history with me and her, probably not.

Q. What is it you call the section of Applied that you put the customers in that don't get the policy?

A. History.

Q. So if I were to look through the history section of the data in the Applied system I would not see any personal lines potential customers?

A. Well, you have to come up with a name to look at the history. We can't press a history button and it brings up all the clients and the history. We have to come up with a name of a client to

Page 58

look at the history.

Q. So on the Applied system it's your understanding that if I just wanted to see all the data in the history section it would not be able to produce that?

A. All the data of all my clients?

Q. Of the history that had been stored in history.

A. For a particular client, yes, you can. If it's stored, you give me who the client is and look at the history of that client, of course you can.

Q. But the Applied system would not be able to break down those names for which no insurance was ever issued?

A. If you had entered it it can. If you give the name and we had entered that name that we didn't get anywhere with this person, yes.

Q. But if we didn't know the name and we just wanted to know the names of people that did not buy insurance from you that are in that system --

A. I don't think we can access that.

Q. Okay. You are not sure of that, are you?

A. I am pretty sure of that.

Page 59

Q. Okay.

A. In the history, I'm pretty sure if that person is not a client, they never became a client and it's in the -- if we entered them and it's in the history, I have to have a name to access it. I can't press history on people who didn't buy insurance and access that, no.

Q. Okay. Now, with regard to customers that you do provide personal lines fire dwelling insurance for, the term of that coverage is generally one year?

A. Dwelling fire policy is one year.

Q. After that one year when you review them, do you take another application from them?

A. If it is with a company like Vermont Mutual or Holyoke Mutual, it's automatically renewed by the company. What our practice is when we get close to the renewal date or expiration date we will send them a standard letter saying your insurance is coming up for renewal, if there are any changes in exposure, let us know so on and so forth. If it is written with Mass. FAIR Plan, Mass. FAIR Plan has a renewal offer which is in the form of application they send to the client

Page 60

and cc us and we will follow up and make sure it's done properly. If it's written on a commercial policy or dwelling fire policy with a surplus line wholesaler, then it has to be another application. Coverage and pricing needs to be proposed. The same process as the first policy term, yes.

Q. With regard to the wholesalers, they might find other companies for the next year?

A. It's a different world than ours. They are always negotiating with different companies. They might have a better or worse offer next year. That is why we shop it with them every year rather than letting it renew.

Q. In the case of Vermont Mutual Insurance Company, when you issue a renewal for them what happens?

MR. SEXTON: Objection.

A. I do not issue a renewal for them. Vermont Mutual renews the policy.

Q. I didn't phrase that as artfully as I should have. With regard to Vermont Mutual Insurance Company, when you have customers that are undergoing renewal with them, what does your

Page 61

agency do with regard to that process?

A. Well, as I mentioned, prior to the policy getting renewed, two months or 45 days prior to the policy being renewed, we will forward a letter to the client advising them that the policy is going to be renewed with Vermont Mutual; are there any changes in coverage, in exposure since last we talked or communicated that you want to make. Otherwise, the policy will renew, you will get the bill, directly pay it. Otherwise, call us with any questions or concerns.

Q. Other than that process is there anything else that your agency does?

A. For dwelling fire policies?

Q. Yes.

A. No. Unless there are changes in the industry. If the dwelling fire policy is down the Cape and many companies, including Vermont Mutual, they decided not to renew a lot of Cape properties so we remarket it but other than that, no. It's pretty much all we can do.

Q. Since Ms. Petit first did business with the Dadgar Insurance Agency, how many renewals has

Page 62

her 93A Hillside property had with regard to her fire dwelling coverage?

A. Well, her first policy term with us started in 2003. So it's renewed once in '04, '05, '06 and I think it's a November policy so '07 renewal hasn't -- or was it in March? It's three or four years.

Q. During that three or four years, how many applications for insurance have you obtained from her?

A. It's renewed automatically.

Q. My question is how many applications have you obtained from her?

A. Just one on the first year.

Q. How many questionnaires?

A. Just that one on the first year. The letters that we sent to her on the renewal and we didn't get a response back.

Q. Now, is that because that is the procedure that Vermont Mutual wants to follow with regard to the renewal of its customers, if you know?

MR. SEXTON: Objection. I don't see how he can testify as to what Vermont Mutual knows. You had the opportunity to depose one

Page 63

full day of questioning of Vermont Mutual's witnesses. I understand there will be another day.

BY MR. ROSSI:

Q. If you know?

A. Vermont Mutual, as far as I know, that's the procedure they have for renewal. I shared it with you. Our procedure is to send that renewal. It's the agency procedure to send that renewal letter prior to the renewal date.

Q. Has your agency received any written communications or electronic communications from Vermont Mutual concerning their procedure for renewal of existing customers?

A. I'm sure originally when we signed up with them, in their manuals there is such procedures.

Q. Are those the same manuals that you produced in this case?

A. I believe so.

Q. What is the purpose of those manuals, by the way?

MR. SEXTON: Objection. What manuals?

MR. ROSSI: The manuals we just

Page 64

talked about, the Vermont procedure manuals.

A. When we first signed up with the company -- I mean, you can even access those online. Every company sends you the manuals to familiarize the new agent they have appointed with their procedures. It's a lot of underwriting stuff in there. It's a lot of -- I'm sure it touches upon renewal procedure. I've not really sat down recently and read this whole thing.

Q. I will show you the manual. It's been previously marked as Exhibit 6 in the Vermont Mutual Melendy deposition that was taken on July 11th. I would like to ask you if that is the manual you are referring to with regard to fire dwelling insurance with Vermont Mutual?

A. I think it was produced in '06, if I'm not mistaken. So I don't have the one that would have given us 2003. This is probably the most recent one.

Q. Okay.

(Exhibit No. 5 marked for identification).

BY MR. ROSSI:

Q. When this policy -- is it fair to state that

Page 65

this manual gets updated from time to time by the insurance company?

A. Yes. I think you mean -- you will see some of this stuff in here, like zip codes, territory changes. Yeah, it's fair to say that.

Q. Now, when it is updated do they send you an entirely new manual or do they just send some new replacement pages and say, take out the old, insert the new?

A. Again, this is a guess on my part. I believe they send just the revision pages to update.

Q. Okay. Now, when you produced this copy of this manual for this litigation was this a book that you actually had or did you download these pages from the Internet?

A. I don't remember how this was produced.

MR. MCGOVERN: I don't remember either.

MR. ROSSI: If you don't know you don't know.

BY MR. ROSSI:

Q. Do you consult with this manual from time to time at your agency?

A. Not really. From time to time, yes, but I

Page 66

mean, everything is the rating system, the underwriting guidelines. Underwriters are available to answer questions. Originally when we received this, when we signed up with them we will go through it and we probably update all the changes or revisions. But nowadays everything is a click of a button away really, especially when you are talking about dwelling fire policy. We will do the application, do the underwriting process. If there are any questions, any concerns, we communicate with our underwriters. It's on software so it's very rarely.

Q. But this manual is intended to be the complete story as of the time it's written as to the policy and procedures of the insurance company?

MR. SEXTON: Objection. I don't see how Mr. Dadgar can testify as to what --

MR. ROSSI: I have no objection to an objection, but I don't want you to say anything inadvertently that might feed an answer to the witness.

MR. SEXTON: I don't see how he can testify as to what Vermont Mutual intended to put into that manual.

Page 67

MR. ROSSI: What I would ask you to do, Jim, is make your objection without going into the liturgy of it. If you are correct about that, the judge will exclude it from the transcript, and we get the benefit of having an answer without the benefit of that language.

MR. SEXTON: That's fine, John, but if I have an objection based on the fact that he has no personal knowledge and he's incompetent to testify as to --

MR. ROSSI: We reserved those until the time of trial. I would suggest it's out of order right now.

MR. SEXTON: I will object based on the form of the question as well.

A. Can you please repeat the question?

Q. Yes. Would you agree with me that the program manual is intended to indicate the current policies and procedures of the insurance company with regard to underwriting and pricing?

MR. SEXTON: Objection to the form.

A. I can't talk to what their intention is.

Q. What is your understanding in the industry though? You have been in the insurance industry

Page 68

for quite a number of years.

A. Right.

Q. And program manuals, policy program manuals are generally an existing product within the industry, isn't it?

A. Yes.

Q. They are generally produced by insurance companies?

A. Yes.

Q. The reason that they are produced by insurance companies is so that agents will be aware of what the policies and practices of the company are concerning underwriting and pricing?

A. It's a tool for that purpose.

Q. So that, for example, in this policy you would know that Vermont Mutual does not insure properties in Barnstable County. If you didn't know it you could look in that manual and find that out, correct?

A. I don't know. To be honest with you, I can't answer that question. Usually if Barnstable County becomes an eligible county prior to updating the manual, we have already received a lot of information and a heads up on it. So by

Page 69

the time we get the insert to change the manual we have already known about it. So I would not go to this manual to get or figure out if Barnstable is eligible or not. We would have known that way prior.

Q. But at some point that is in the manual too?

A. It should be. If they don't write in Barnstable County they should probably send us an insert that we are not writing. It's temporary. The history of insurance companies, in general, the underwriting mode and criteria for counties and things change. So it should get updated from time to time.

Q. For example, in the first few pages of that manual they have the dwelling fire underwriting requirements and restrictions. There are about 17 of those.

A. Okay.

Q. Wouldn't you expect those to be all of the requirements and restrictions that the company would have if they produce a list like that?

MR. SEXTON: Objection.

MR. MCGOVERN: Objection.

A. Again, I can't answer that question for the

Page 70

company. I'd like to say at least we do a more complete job gathering information, communicating with both the client and the underwriter than just this source.

Q. I'm sure you may. I'm just asking you once again about the manual as a tool. Would you agree with me this is generally recognized in your industry as being the manual that tells what the current policies and practices of the company are, particularly the company you're at, as of the time it's written?

A. Okay.

Q. Is that fair?

A. Yes.

Q. So with regard to Vermont Mutual and this program manual, it contains, for example, breeds of dogs that it will not underwrite coverage for, doesn't it?

MR. SEXTON: Objection.

A. Yes. That changes from time to time also. How soon they update the manual, if they even bother doing that, I don't know.

Q. If they changed their criteria on breeds of dogs today, it may take them some time before it

Page 71

gets into the manual?

A. Exactly.

Q. But eventually it's in there?

MR. SEXTON: Objection.

A. Eventually? I can't answer that. It should be. I have not really referred to this manual for these particular things that you are asking me like the breed of dogs or Barnstable County. Because of that, I can't answer that. I am not answering for Vermont Mutual.

Q. I'm not asking you to answer for Vermont Mutual. I am asking you simply to answer it. This is a document you produced?

A. Yes.

Q. From your agency?

A. Yes.

Q. I assume it's a record that you maintain for some reason in your agency?

A. Yes.

Q. And you determined it's relevant to the issues that were articulated in our Rule 34 production of documents.

A. Fine.

Q. I'm assuming if you had possession of it in

Page 72

your agency that you have some reason that you have possession of it.

MR. SEXTON: Objection.

A. Yes.

Q. Is that a fair and accurate statement?

MR. MCGOVERN: Objection.

A. Reason being, you asked for it; we provided it to you.

Q. Let's go before that though. The reason that you have it to produce is that you maintain it in your agency?

A. It is in our agency.

MR. MCGOVERN: Objection.

MR. SEXTON: Objection.

BY MR. ROSSI:

Q. For what reason do you keep these program manuals? Are they tools for your trade?

A. It was basically given to us by the insurance company. Not just Vermont Mutual. Any company that you do business with, they have some sort of manual. As an agent or agency, we hardly ever refer to these manuals because each case is different, and we deal with each particular case or situation either online or by picking up the

Page 73

phone and talking to the underwriter and so on.

Q. So why do you keep this in your agency then, given what your last response was?

A. Because it was theirs. It was given to us.

Q. How many of these manuals do you have for companies other than Vermont Mutual?

A. Pretty much all of them have manuals.

Q. How many?

A. Every company that we do business with. Vermont Mutual, we've represented them for over ten years. Commerce, I've represented them for 15 years, for example. 15, 20 years I represent them. Maybe 15 years. I don't know where their manual is but I know they gave me a manual 15 years ago which I can access online. This Vermont Mutual manual I can access online.

Q. How many written manuals do you have in your office other than this one?

A. We just signed up a year and a half ago with Holyoke Mutual so I have their brand new manual fresh off the press. Again, all that information with all of that is online. Whether they choose to give one to us or not is theirs.

Q. So with regard to -- may I see Exhibit 1

Page 74

please? Directing your attention to request 2J, the insurance underwriting documents regarding the insurance underwriting process for all fire dwelling insurance that was issued by your agency since January 1, 2002 to the present, I'm assuming this manual would fall under that request.

MR. ROSSI: Is that what you intended it to be, Mr. McGovern.

MR. SEXTON: Objection.

MR. MCGOVERN: Objection.

MR. ROSSI: Well, we have your response here. Your response produced these in response to production for communications. We can go that route. My question is why did you produce the one for Vermont Mutual and not those for other insurance companies as well, given the nature of the request which was for all dwelling fire protection issues since January 1, 2002?

MR. SEXTON: Objection. I'm sorry. Is that a question to the witness.

MR. ROSSI: To Mr. McGovern.

MR. MCGOVERN: So you're asking me?

MR. ROSSI: Let's go off the record.

Page 75

(Discussion off the record).

(Break taken).

BY MR. ROSSI:

Q. I want to focus your attention now on the specific questionnaire and application that you used for Mary Petit.

A. Okay.

Q. I suppose I should have pulled those out. I apologize. I think I have them here. I think you testified earlier, Mr. Dadgar, that you would have been the person that spoke to Mary Petit with regard to the application and the questionnaire process?

A. Yes, I was.

Q. Do you recall the conversation or conversations that you had with Mary Petit regarding the application that was taken for her property at 93A Hillside Street?

A. Somewhat.

Q. Do you recall whether that conversation was in person or on the phone?

A. On the phone.

Q. Do you recall whether or not anyone else was participating in that conversation other than you

Page 76

and Mrs. Petit?

A. Not that I know of.

Q. I would like to show you a document that has been previously marked in another deposition as Exhibit 3. That was the deposition of Vermont Mutual. I ask if you can recognize that document?

A. Yes, I do.

Q. Is that the application for insurance that was filled out by you with regard to the 93A Hillside Street property?

A. Yes, it was.

Q. Is that your writing that appears on the document?

A. Yes, it is.

MR. ROSSI: At this time I would like to mark that as Exhibit Number 6.

(Exhibit No. 6 marked for identification).

BY MR. ROSSI:

Q. With regard to the application form that you filled out, was that a blank form? When that was a blank form is that a document that you had in paper format your office or did you download

Page 77

that?

A. No. It's a blank form.

Q. Is there one or two sides to that page?

A. I believe there is a questionnaire that will follow that page.

Q. Would that be on the original that you had in your office? Would that be on the backside or on a separate piece of paper?

A. It would -- I don't remember.

Q. Okay. I'm asking you only because we have only marked the application for this series of questions. We have the questionnaire as a separate exhibit. I just wondered. Vermont Mutual wasn't sure when you did this if you had two pages, front and back.

A. I believe it's two separate pages.

Q. Okay. Now, is that your handwriting that appears in the blank spaces throughout this document?

A. Yes, it is.

Q. So is this information that you wrote in when you had your telephone discussion with Mary Petit?

A. This was information that later on I

Page 78

transferred from the notes I had written on a separate piece of paper.

Q. Okay.

A. That's my style of filling these applications.

Q. I'm going to put before you what has been produced by your attorney and designated as client file and ask if you can locate the handwritten notes that you took during the course of your conversation with Mary Petit?

A. Okay. You're talking about the original conversation that I had with Mary Petit, right?

Q. Yes.

A. Okay. These are all my handwritings in the initial conversation with Mary Petit.

Q. So those pages which you've partially pulled up to the top of the group, those are the ones?

A. Yes.

Q. These are all regarding your initial conversation with her?

A. When you say all, a lot of them are repetitive copies that went back and forth between me and her either by fax or original mail.

Q. I'm seeing among the documents that you have designated a copy of the application which is

Page 79

signed by Mary Petit, a copy of the questionnaire signed by Mary Petit, another copy of the application not signed by Mary Petit and I wonder if -- it's not identical to but similar to that which is Exhibit 6. It does not have the incoming stamp of Vermont Mutual, the scanning stamp of Vermont Mutual or the approved stamp on it.

I see another copy. It appears to have fax identification information at the top of the fire application, another copy of the questionnaire that has fax information at the top, Commerce Insurance Company residential replacement estimating form, a fax cover sheet of Dadgar Insurance Agency addressed to Mary Petit dated November 4, 2003, another copy of the dwelling fire application, another copy of the questionnaire, neither of which are signed, handwritten notes on a plain white piece of paper, a facsimile from Dadgar Insurance Agency to Mr. Bill Brown dated October 24, 2003 and another copy of the dwelling questionnaire. Are those all the documents you designated?

A. Yes.

Page 80

Q. And do you recall when your first conversation with Mary Petit was?

A. I imagine we have to look at those dates on the documents that you have, but I imagine maybe a week, two weeks prior to binding the policy.

Q. Okay.

MR. ROSSI: What I think I'm going to do then is ask that we mark each of these documents individually as Exhibit 7 with sub-designations of A, B, C, D and so forth.

(Exhibit Nos. 7A-7L marked for identification).

BY MR. ROSSI:

Q. Do you recall what you said to Mrs. Petit and what she said to you during the first time you spoke to her on the telephone?

A. I wrote notes on that.

Q. I can put Exhibits 7A through L before you and ask you to tell me which notes are you referring to?

A. Exhibit 7J.

Q. May I see that please? Thank you. Okay. What was it that you told her during that conversation and what did she say to you?

Page 81

A. Basically I'll have the application and the ACORD for Vermont Mutual. Once I learned it's a three or four-family dwelling, our first route will be or our first option will be if it qualifies for a dwelling fire policy. I would have had the Vermont Mutual application and questionnaire next to me. Based on that, I ask questions that I take notes on. Where are you purchasing, where is the location, inspection, occupancy, purchase price, renovations done to the property, updated construction. A whole bunch of questions that I have written down here.

Once we have the comfort level that it does qualify for Vermont Mutual dwelling fire, I transfer that information into an application, quote it on a rating system that we discussed earlier and propose it. So I imagine the conversation that took place that very first time, it was basically whatever I have on my notes here.

Q. **Do you have any independent memory of that conversation?**

A. It was four years ago. No, I don't.

Q. **Okay. So you don't have a specific memory of**

Page 82

what you said to her or what she said to you?

A. Other than the notes that I took, no, I don't know exactly what format we talked about it other than that the questions that I asked and the answers.

Q. **Did you write all these notes simultaneously with the conversation or was it after the conversation?**

A. No. Pretty much with the conversation.

Q. **Are there any parts of these notes that you wrote after the conversation was completed?**

A. I don't recall.

Q. **Okay.**

A. I wouldn't know. I wouldn't have -- it's Bill Brown's phone number here. I don't know if I wrote that during the conversation or after the conversation.

Q. **Okay. Let's go through what you wrote here. It says 93A Hillside Street Nominee Trust, care of Mary E. Petit and Frank Petit, 1607 Casey Key Drive, Punta Gorda, Florida, 33950, telephone 941/505-2830, fax 941/505-2009. Up to that point do you have a memory as to whether or not Mrs. Petit gave you that information?**

Page 83

A. Definitely Mrs. Petit gave me that information, yes.

Q. **Now, 93A Hillside in Boston, Mass. 02120, I notice you have an arrow pointing upwards and it says Mission Hill.**

A. Yes.

Q. **Of what significance was that?**

A. She must have told me it's either Boston or Mission Hill, and when she gave me the zip code for rating purposes, when we put that into the rating stuff it will be either -- the zip code would have clarified it.

Q. **So do you know if that is something she told you or if you put it in after?**

A. She must have told me that. All of this is during that conversation.

Q. **What does D circled indicate?**

A. It's for ratings software for Vermont Mutual rating purposes. I believe they have A through D depending on what the zip code will be.

Q. **So that is to designate that the zip code designates a D rating for policy premium purpose?**

A. Yes.

Q. **How did you obtain that information? You**

Page 84

certainly didn't get that from Mrs. Petit, did you?

A. No. That's my notes to myself.

Q. **So is that an item that was not written during the conversation?**

A. It was written during the conversation because I was very familiar with 02120 zip code and that it would probably be D.

Q. **Is that because you have underwritten property in this area before?**

A. I had rated property. See, when we rate dwelling fire it was basically the writing part of it when we rate dwelling fire applications. At the time that I used to do a lot of these ratings, whenever we came to Boston, you know, there was like eight different areas: Mission Hill, Boston, Hyde Park, Jamaica Plain. They all fall into this so-called Boston. There was A through D. Sometimes we had to even -- originally I remember I had to even call my underwriter to say this Boston address with this zip code, which one do we use. They clarified it for us. I must have associated 02120 when Mary gave me the zip code, and in my mind I said

Page 85

that's a D. That's how it happened.

Q. Okay. On the left column it says three-family and I can't read what you wrote below three-family.

A. Three-family, wood frame, new vinyl siding, age 1920's, no students, update, roof is pitched. This is another question and we asked is it pitched or flat roof. That is an underwriting question. This was geared to qualify this risk, whether it belongs to Vermont Mutual or a regular admitted company we should go to or FAIR Plan or surplus lines for it which we earlier discussed. But these are the questions that we would have asked from her. We transfer this information into these applications.

Q. What does update mean here in the left column?

A. Any updates means the property is built in 1920. When is the last time the roof was either changed or repaired, electrical system, plumbing, heating, any updates to the property, any renovations to the property. That is what that means. What year it was done.

Q. Okay. Now, with regard to each of the items that you've written below 1920's, update you

Page 86

have --

A. Roof. It says pitched.

Q. Siding, new -- can't read that.

A. New decks. Detectors maybe. New detectors. Smoke detectors.

Q. Okay. Is that everything in terms of updates that she told you during the conversation?

A. Yes, it is. Basement sealed, waterproofing 2003, plumbing new.

Q. You are sure it was Mary Petit that told you all this?

A. Absolutely.

Q. Okay. No students, tell me what you remember about your discussion with Mary Petit about the issue of students.

A. To qualify, to decide whether to go with Vermont Mutual or not, that's the big deal with them, student occupancy, age and condition of the property. I asked her if there is any student occupancy and she said no. That is why I have no.

Q. She told you that when you first spoke with her?

A. Right.

Page 87

Q. You have a specific memory of that?

A. Absolutely. It's written right here.

Q. Well, you said earlier you don't remember the conversation, but you are judging by what you have written here. I'm asking you do you have a specific memory as you sit here today of Mary Petit telling you there were no students in the property?

A. She must have said that because otherwise we would not have written that for Vermont Mutual.

Q. Must have is not answering my question. Do you have a specific memory of her telling you there were no students in that property as you sit here today?

A. A specific memory in our conversation, no, I don't have a specific memory of the conversation, but the format that we ask the questions and she answered.

Q. Okay. So you do not have a specific memory of Mrs. Petit telling you there were no students in the property when you first spoke with her?

A. No. By the same token --

Q. That's my question.

A. -- i have a memory that the roof was -- the

Page 88

electrical circuit breakers and the smoke detectors were hard wired.

Q. Sure.

A. No specific memory.

Q. That's because your memory is not clear today as to what was said during that conversation, would you agree with that?

MR. SEXTON: Objection.

MR. MCGOVERN: Objection.

BY MR. ROSSI:

Q. Would you agree that your memory is not clear today as to what was discussed?

A. My memory is clear.

MR. MCGOVERN: Objection.

A. My memory is clear today what was discussed. You are asking me if I remember it specifically, exactly word by word. No, I don't. But I know I asked the questions and I know she answered the questions.

Q. The reason you know that is because of what you have written here on Exhibit 7J?

A. Yes.

Q. But for 7J, you would have no memory of that call, is that correct?

Page 89

MR. SEXTON: Objection.

MR. MCGOVERN: Objection.

A. I remember talking to Mary Petit.

Q. Can you tell me exactly what she said regarding students residing in that building, if anything?

A. She said there are no students residing in that building.

Q. You have a specific memory of her saying that as you sit here today?

A. Specific memory, no. Again, how do you define a specific memory? This conversation took place four years ago. I do not have a specific memory.

Q. Okay.

A. I have -- this is my style or our process of filling out these applications and qualifying the prospects for where to go to for insurance.

Q. Okay. For what reason did you write Bill Brown's name in the lower right-hand portion of your notes?

A. Maybe she gave me the phone number for Bill Brown to get the inspection. Bill Brown referred me. He will be sending the inspection to you. I don't know. She probably -- this is -- this page

Page 90

here, this exhibit here is conversation I had with Mary Petit. The fact that Bill Brown's phone number is here is probably because she gave it to me to write it here.

Q. Do you have any independent memory aside from this form of filling out the application for Mary Petit's property?

A. What do you mean independent memory?

Q. Aside from what you've written on the form here, do you have an independent memory of your own as to filling out her application?

A. Filling out her application is basically the questions that is on this form.

Q. Do you have any memory of doing that? Do you personally remember filling out the application?

A. I know I did that because it's my handwriting.

Q. Do you remember doing that?

A. If I remember where I was sitting down, what I was wearing, what temperature.

Q. I asked if you remember filling out the form?

MR. SEXTON: Objection.

A. I don't follow the question.

Q. Do you remember actually filling out the form?

MR. SEXTON: Objection.

Page 91

MR. MCGOVERN: Can we take a break for a minute?

MR. ROSSI: Sure.

(Break taken).

BY MR. ROSSI:

Q. Mr. Dadgar, did you have an occasion to talk with your attorney during the break?

A. Yes.

Q. Are you ready to go forward now?

A. Yes.

Q. With regard to the discussion you had with Mary Petit, what did you discuss with her regarding Bill Brown?

A. I don't recall that at all, what discussion took place with Mary Petit about Bill Brown. It is established that Bill Brown recommended us to Mary Petit. Whether or not it was Bill Brown that faxed us the nine-page inspection report on this property or it was Mary Petit I do not know.

Q. Do you recall doing anything with regard to contacting Bill Brown after your initial conversation with Mary Petit?

A. I believe a call must have come to our office from Bill Brown. Maybe he was looking for an

Page 92

insurance binder or some information, and I recall sending a fax to Bill Brown telling him where we stand with Mary Petit's case.

Q. Okay. With regard to the call that you believe you may have gotten from Mr. Brown, did you personally take that call?

A. I don't recall. It was speculation on my part. I don't remember that at all.

Q. So is it fair to say that your personal memory of that transaction is not clear today?

MR. SEXTON: Objection.

MR. MCGOVERN: Objection.

A. No, it's not fair to say that. We were talking about Bill Brown. We were not talking about the transaction.

Q. Well, when I say transaction, I'm talking about the interaction that you had with Mrs. Petit and or Mr. Brown concerning the application process.

MR. MCGOVERN: Objection.

BY MR. ROSSI:

Q. Would you agree that your memory as to the specifics of these interactions is not clear today?