Page 93

MR. SEXTON: Objection.

MR. MCGOVERN: Objection.

A. I don't agree to that.

Q. Did you talk to Mr. Brown?

A. I am talking about Mrs. Petit.

Q. My question was -- please listen to the question because the transcript may not know whether you understand the question or not unless you tell us. With regard to your interactions with Mrs. Petit or Mr. Brown regarding the application process of the 93A Hillside Street, would you agree with me that your memory is not clear today?

MR. MCGOVERN: Objection.

A. My memory is clear because you have all these documents in front of me. I'm looking at those. I know what took place.

Q. Is that the only reason you believe your memory is clear is because you have documents?

A. No. I don't know how to answer that question.

Q. I'm just asking about your memory. Do you have a clear memory of your interactions with Mrs. Petit and Mr. Brown during the application process?

Page 94

A. Somewhat.

MR. SEXTON: Objection.

BY MR. ROSSI:

Q. With regard to your memory concerning your interactions with Mr. Brown, at this time do you feel you have a clear memory as to those interactions?

MR. SEXTON: Objection.

MR. MCGOVERN: Objection.

A. I don't recall.

Q. So you don't recall what those interactions were?

A. I don't recall.

Q. Do you recall all of your interactions with Mary Petit with regard to the application process for 93A Hillside Street?

A. We had two or three telephone conversations, fax, memos going back and forth and mail, regular mail.

Q. Do you remember the contents of those two or three telephone conversations?

A. This was one of them.

Q. When you say this was one of them, you are referring to Exhibit 7J?

Page 95

A. Yes. Which was the first conversation we had.

Q. How long were you on the phone with her that day?

A. I don't recall. ?

MR. SEXTON: Objection. Which day?

MR. ROSSI: The day that he took notes of 7J.

A. I don't remember. Usually this process is probably a good ten minutes.

Q. Do you have a memory of being on the phone with her for ten minutes that day?

A. I do not have a memory. I don't recall how long I was on the phone with her that day.

Q. Do you have a memory of what questions she asked of you during that conversation?

A. She wanted insurance for a three-family that she was purchasing. So I imagine I asked most of the questions.

Q. That was not my question. My question was do you recall any questions that she had during that conversation?

A. No, I don't.

Q. Do you recall anything that she said to you during that conversation other than what you've

Page 96

written down in Exhibit 7J?

A. I don't recall other than she will be waiting for a price quote from me.

Q. Do you recall anything that she said other than what you've written down in 7J?

A. No, I don't remember.

Q. Okay. Is it your contention that what you have written down in 7J is the complete content of your phone call with Mary Petit on that day?

MR. MCGOVERN: Objection.

A. Probably.

Q. When you say probably, is it --

A. It could be --

Q. You have to let me finish the question before you answer. When you say probably, that may insinuate to some folks some degree of indefiniteness of your answer.

A. Let me be clear.

MR. MCGOVERN: Objection. Wait for a question.

MR. SEXTON: Objection.

BY MR. ROSSI:

Q. With that in mind I will ask you again. Are you contending that what you've written down in

Page 97

Exhibit 7J is the complete content of the conversation you had with Mary Petit on that day?

MR. MCGOVERN: Objection to the form. You can answer.

A. For the most part, yes. There could have been Mary telling me the inspection is coming. I don't recall if I received the inspection on this location prior to this or after our conversation. When I say probably, that's what I'm referring to.

Q. I notice there is no date on Exhibit 7J. Is there any way that you can tell me when those notes were written in terms of date?

A. It would definitely be prior to binding the policy back in March of 2003. I don't know the exact date.

Q. Now, after you had this first conversation with Mary Petit what did you do?

A. I would have --

Q. Once again, when you say would have, that tells me you don't have a memory.

A. I don't remember.

Q. Okay.

A. I could have gone to lunch after I had that

Page 98

conversation. It was four years ago. I am trying to answer you as specific as I can.

Q. I appreciate that. What I'm asking you to do is just answer my questions. Once again, if you don't remember, simply tell me you don't remember.

A. I don't remember.

Q. Do you remember the next thing you did with regard to the application process for Mary Petit?

A. Again, I have to say I would have but I don't remember.

Q. Do you remember who you spoke with next?

A. No, I don't.

Q. Do you know whether or not after you had this conversation with Mary Petit you ever spoke with Mr. Brown?

A. I don't remember.

Q. Do you know whether or not after this conversation with Mrs. Petit you ever communicated with Mr. Brown in any way?

A. I don't recall.

Q. Do you recall whether or not after this initial conversation you ever communicated again with Mary Petit in any way?

Page 99

A. Yes, I did.

Q. When was the next time you communicated with her?

A. I have to look at the exhibits.

Q. For the time being I'm asking you based on your memory. Do you have a memory of that?

A. No. I don't have a memory for that, no. ?

MR. SEXTON: Objection.

BY MR. ROSSI:

Q. Do you have a memory when the next time was that you spoke or communicated with Mary Petit after your initial conversation?

A. I know we did but I don't know exactly when.

Q. Do you have an approximation as to when?

A. Again, it would have been probably very shortly after because I would have quoted the risk and called her back or sent her a fax of some sort, somehow communicating this is the price for this property.

Q. Do you have a memory of doing that with Mary Petit?

A. I don't have a memory of doing that. I know it was done.

Q. Do you have a memory as to the means by which

Page 100

it was done, whether it was over the phone or by fax or otherwise?

A. If it was a quote, it would have probably been by fax.

Q. Do you recall having any conversation with Mary Petit about that quote?

A. I don't recall.

Q. With regard to that quote, is that something you sent to her before or after you sent her the application for her review?

A. It would have been prior to the application for review. She has to approve the pricing first.

Q. When did you fill out the application that you eventually sent to Mary Petit for her review?

A. It would have been -- I don't recall. I do not want to speculate so I don't remember.

Q. When did you fill out the questionnaire that you sent to her?

A. It would have been that same time as the application but I don't recall.

Q. Did you have any conversation with Mary Petit about the quote before you sent the application or questionnaire to her?

Page 101

A. I don't recall but I must have.

Q. With regard to that conversation, do you have any memory whether it was over the phone or e-mail or through the mail?

A. It was definitely not e-mail. It was either by fax or telephone conversation.

Q. You don't remember which?

A. I know we had both. I know we had conversation on the telephone at least one more time after this initial conversation. I know we had communication by fax and regular mail as well.

Q. With regard to the fax, I know you have testified you've sent her the quote. With regard to your conversation with her regarding that quote, do you recall whether she contacted you or you contacted her?

A. I'm sorry. Please repeat that again.

Q. Yes. With regard to any communication you had with Mary Petit regarding the quote that you indicated would have been sent to her, do you recall if she contacted you or you contacted her concerning that discussion?

A. I don't recall who contacted who.

Page 102

Q. Do you recall anything that was said or written about that quote in terms of that communication with Mary Petit?

A. No. I don't recall, but all the hard copy communication is here.

Q. Is it your contention and the contention of Dadgar Insurance that all conversations that you've had with Mary Petit are documented by either written note or somehow?

MR. MCGOVERN: Objection.

A. I don't recall.

Q. You said you believe you had more than one conversation with Mary Petit?

A. Yes.

Q. How soon after your first telephone conversation with her was your second conversation with her?

A. I don't recall.

Q. Are there any notes that you took with regard to the second conversation?

A. Yes, there is because it was followed up by fax or letter to offer that this is the quote and this is the application with instructions what to do.

Page 103

Q. Were there handwritten notes in the same or similar format that are contained in Exhibit 7J?

A. No. I don't think so. Other than maybe the fax memo that I sent her. I have to see.

Q. With regard to the second telephone conversation that you had with Mary Petit, do you recall whether it was you that called her or she that called you?

A. I don't recall who called who.

Q. Are you certain that that second conversation was with Mary Petit?

A. Yes. Absolutely.

Q. What was said during that conversation?

A. I don't recall what was said. I can speculate what was said. It was about the premium. This is what your premium is. Do you want to pursue it.

Q. On what do you base that speculation?

A. Because of what we have in file and what you have exhibited, the fax and letter process, Mary is sending us the check, so on, issuing the policy. Vermont Mutual issuing the policy, binding the policy.

Q. Your contention is that your second

Page 104

conversation with Mary Petit involved the amount of the premium?

MR. SEXTON: Objection.

A. I'm speculating that. There was no other reason to call her. She asked for a premium, how much it will cost. We sent her a quote, told her a quote or faxed her a quote.

Q. Did you have any conversations over the phone with Mary Petit after your second discussion with her?

A. I don't recall.

Q. Is it possible that you had a conversation with her afterward?

A. Yes.

Q. And did you have any other form of communication with Mary Petit after your second phone call to her during which you speculate you were discussing the amount of the premium?

MR. SEXTON: Objection.

MR. MCGOVERN: Objection.

A. If we did, it's all by fax or letter that we sent.

Q. Okay. Do you recall communicating with anyone else other than Mary Petit --

Page 105

A. No, I don't.

MR. MCGOVERN: Wait for him to finish the question.

BY MR. ROSSI:

Q. -- at any time after your first telephone conversation with her?

MR. MCGOVERN: About this insurance?

MR. ROSSI: Yes.

A. I don't recall.

Q. Okay. If you can, on a scale of one to ten, one being virtually no memory and a ten being complete clear memory, how would you rate your memory as to your conversations with Mary Petit concerning the application process in 2003?

MR. SEXTON: Objection.

MR. MCGOVERN: Objection.

A. It's a difficult question to answer because of the fact if all this information was -- if all of these things had not happened, Mary Petit would not be one of many clients, not necessarily dwelling fire client, one of many clients that I have. By me right now, sitting here with you and for the last maybe month or two going over all of these depositions and files back and forth, I

Page 106

have a pretty clear memory. I reference all these things and it comes up, comes back at you. That's the best I can answer.

Q. So having done all that, reviewing documents for the last however long you've been doing it, as you sit here today at this deposition, how would you rate your memory as to the content of your conversations with Mary Petit with one being virtually no memory and ten being complete crystal clear memory?

MR. SEXTON: Objection.

MR. MCGOVERN: Objection.

A. I can't answer you.

Q. Okay. You are aware of Mrs. Petit's contention that she discussed the issue of students with you and told you that there were students residing in the premises at 93A Hillside Street?

A. I am aware of her claim, yes.

Q. And it is her contention that she had a specific discussion with you regarding the questionnaire that you filled out for her concerning that issue.

A. That's what she claims.

Page 107

Q. Right. She is alleging that when she discussed this issue with you it was after she had received the application from you. Are you aware of her allegation?

A. Say that again.

Q. She is alleging when she had this discussion with you it was after she had received the application for insurance or questionnaire I should say from you. Are you aware she is alleging that?

A. I guess I am.

Q. Were you aware of that before I just asked you that question?

A. I'm sorry. Say that again. I don't understand the question.

Q. Are you aware Mrs. Petit is alleging that when she received the application and questionnaire from you that you filled out that she called you to discuss the issue of student occupancy? Are you aware she is alleging that?

A. I am aware, yes.

Q. Do you have any memory of that conversation?

A. Memory of the original conversation with Mary?

Q. Of the conversation where she --

Page 108

A. No. Absolutely not.

Q. You have to let me finish. Do you have any memory of a conversation that Mrs. Petit alleges she had with you concerning the issue of student occupancy after she received the filled out questionnaire and application from you?

MR. SEXTON: Objection.

MR. MCGOVERN: Objection.

A. I am not aware.

Q. Are you contending that conversation never took place?

A. Yes, I am.

MR. ROSSI: It's after one o'clock. Let's break here.

(Lunch break taken).

BY MR. ROSSI:

Q. Mr. Dadgar, I'm going to show you a document that we have already marked in the Vermont Mutual deposition as Exhibit 5 and ask if you can identify that?

A. This is the dwelling fire questionnaire, Vermont Mutual's.

Q. Okay. Is that your writing that appears on that?

Page 109

A. Yes, it is.

MR. ROSSI: Let's mark that as Exhibit 8 please.

(Exhibit No. 8 marked for identification).

BY MR. ROSSI:

Q. With regard to the dwelling questionnaire, is it your contention that you filled this out during your first -- as a result of your first conversation with Mrs. Petit?

A. Yes.

Q. And had you met Mrs. Petit before you filled this out?

A. No.

Q. Had you seen the property before you filled it out?

A. No.

Q. Had you received a plot plan or any information about the property at the time you filled this out other than what she told you over the phone?

A. I'm not sure if I had received the inspection report, the nine-page inspection report that was faxed to me prior or after I had filled it out.

Page 110

Q. Okay.

A. Probably I received that prior. I'm just guessing.

Q. Now I wanted to go through the items in the questionnaire with you.

A. Sure.

Q. Starting at the first is the insured's name, and I'm sure that information you got from Mrs. Petit, correct?

A. Yes.

Q. That is the 93A Hillside Street Nominee Trust?

A. Yes.

Q. The location of the property I assume is the address of the property?

A. Yes.

Q. Is that information you also received from Mrs. Petit?

A. Yes, I did.

Q. Okay. Policy number none. I'm assuming that the policy number is not something you would have gotten from Mrs. Petit at any time, is it?

A. Correct. The policy is not issued yet.

Q. It says if applicable?

A. Yes.

Page 111

Q. Then question number one, "Is the insured known to you?" What did you write?

A. Yes.

Q. How long had you known the insured as of the time you wrote in yes?

A. I don't know how long it took between my first conversation and when I filled it out but for that period.

Q. So as of the time you put yes in on this questionnaire had you ever met Mrs. Petit?

A. No.

Q. Had you ever done business with her before?

A. No.

Q. How about Frank Petit, had you ever met him as of the time you filled this out?

A. No.

Q. Had you ever done business with him?

A. No.

Q. Had you ever done business with the 93A Hillside Street Nominee Trust?

A. No.

Q. What is it that you knew about the insured as of the time you wrote yes in here?

A. I had a conversation with her and asked all

Page 112

these questions from her. So I am the one who is doing this application.

Q. So this was based on a one ten-minute conversation you had with her?

MR. MCGOVERN: Objection.

A. I'm sorry. I don't follow the question.

Q. You testified, I think, that the conversation you had with her where you got the information you inserted in Exhibit 7J lasted about ten minutes or would have lasted about ten minutes.

A. I estimate it at that, yes.

Q. So other than that one conversation, what is it about Mrs. Petit, what interaction had you had with Mrs. Petit as of the time you entered yes?

A. Well, I don't know Mrs. Petit personally. She called our office, I telephone interviewed her, asked all the questions about herself, her nominee trust, the property location and the property.

Q. Did you have any understanding as of that time, Mr. Dadgar, of what information Vermont Mutual was seeking by asking this question on their questionnaire, question one, "Is the insured known to you"?

Page 113

MR. SEXTON: Objection.

A. I can't answer for Vermont Mutual. I'm filling out this application. I answer the application to the best of my ability.

Q. So is it your contention that a woman who you've never met but had one telephone conversation is known to you for the purposes of this questionnaire?

A. Again, it's not my contention of that. We talked extensively about her property. Whether or not you are implying it took ten minutes or longer, that was an estimate on my part but I did talk to her. I did ask her questions about the property itself. I probably had reviewed -- I'm not sure I had reviewed the nine-page inspection of this property. We did send someone out to take a photo of the property. So given all that, my answer is yes.

Q. Well, I'm asking you about question one only, "Is the insured known to you?" Not the property. I just want to make sure the record is clear. As of the time you wrote the answer yes on this, you had had one conversation with Mrs. Petit on the phone?

Page 114

A. Maybe two conversations. I don't recall at what point I did this application. The fact that I filled it out, it must be after the original conversation and after the fact that she accepted our proposal, our pricing. That is when we fill out this application to send it to her with a fax or letter saying here is the appropriate application, review it, make any changes, sign it and send it back to us with the check.

Q. So you had two telephone conversations with her as of the time you wrote yes on item number one?

A. Maybe. I don't recall.

Q. Is there anything else you knew about her at that time?

A. Not that I recall.

Q. Now, did you receive any communication from Vermont Mutual as to what they considered the appropriate criteria with regard to answering question one?

A. I don't recall, no.

Q. Have they ever sent you a letter or manual or an e-mail with regard to any guidance as to what they considered the appropriate way of answering

Page 115

question number one?

A. I don't recall that.

Q. Okay.

A. Hasn't been an issue.

Q. Do you have any knowledge as to why they asked that question in the questionnaire?

MR. SEXTON: Objection.

A. I don't have knowledge why they are asking that question.

Q. In the industry, do you have any knowledge as to why this would be a question to be found on a dwelling questionnaire for any company?

A. We have a comfort level that we have underwritten the case as well. I imagine that is what the reasoning behind this question in the industry is.

Q. I want to see these exhibits, if I may. Now, on the ACORD dwelling fire application that we have marked as Exhibit 2 there is a question of how long you have known the applicant.

A. Okay.

Q. Are you familiar with that question?

A. I have seen it, yes.

Q. Do you have any understanding as to why it

Page 116

would be of significance in the insurance industry in an application to know how long the agent has known the applicant that is applying for insurance?

A. Generally speaking, I imagine the intention of this question for the underwriter is do you write other properties for this candidate. Are they an existing client. Are you comfortable with this person based on what you have underwritten based on questions. They want to have that comfort level. If I answered this no, it would not make any difference to the insurance company versus yes. So it's really a personal preference, how comfortable we are with the person we have interviewed with the property we have underwritten.

Q. With regard to the Vermont Mutual dwelling questionnaire that we marked here Exhibit 7L or the one we just marked as Exhibit 8, do you recall ever answering question number one no?

A. I don't recall. The fact that I have filled out the Vermont Mutual application, I've decided to go to Vermont Mutual on a person, that means I have interviewed the person, I've asked the

Page 117

questions, I have looked at the property, I asked the underwriting questions about the property. I imagine that is my style. It's a personal preference that I choose to answer it.

Q. Based on your experience as an insurance agent under contract with representing Vermont Mutual for approximately ten years, do you know whether or not it would have made any difference in any of the terms of the insurance underwriting decision if no was inserted there rather than yes?

MR. SEXTON: Objection.

A. I can't talk for them, but I do not think it would make any difference.

Q. On what do you base that opinion?

A. Because of the fact that a lot of -- I don't know. I don't know what I base it on. I really don't think it's relevant. It's more of a comfort level for the underwriter probably to see if we have done our due diligence asking the questions underwriting the property.

Q. Have you ever discussed this issue with an underwriter at Vermont Mutual?

A. Not that I recall.

Page 118

Q. Are you aware of what they would consider an appropriate comfort level with regard to this question?

MR. SEXTON: Objection.

A. I'm not aware.

Q. Is it your contention that question one in the Vermont Mutual dwelling questionnaire is irrelevant with regard to the issue of underwriting or issuing dwelling insurance?

MR. MCGOVERN: Objection.

A. I don't think it's irrelevant, no. Otherwise, they would not have asked the question. To me, it's more about me than the -- have I interviewed the person, have I done my underwriting, so on.

Q. Have you ever taken an application of insurance where the information for the questionnaire was provided to you by any person other than the insured?

A. I'm sorry. Say that again.

Q. Have you ever taken an application or questionnaire for insurance information from any person other than the insured?

A. Not that I recall.

Q. So every time you have ever filled out a

Page 119

dwelling questionnaire for any fire dwelling insurance coverage you have always spoke to the insured to get that information?

A. I am positive. I'm pretty sure that's the case, yes.

Q. And it's your contention that if you have a telephone conversation with the insured where you ask them questions about the property that that suffices in terms of your knowledge of this person to enable you to answer this yes?

MR. SEXTON: Objection.

A. By the same token, somebody can come to my office and buy an auto insurance policy or a homeowner policy. We don't ID them. It's not a bar. The fact that somebody -- the legitimacy of the person is recognized, especially in this case. Once a -- it was Bob Brown, the person who referred us. Bill Brown refers her. The fact that we get a nine-page inspection report from them and the fact that she calls my office, had a 10 or 15 minute conversation with me, answering the questions, establishes a fax number and address that we can communicate with and sends the check, these are all -- that is how we

Page 120

establish the legitimacy.

Q. I'm not asking you that. I'm asking you are you contending that just having a conversation with someone where you take the information that is required in the application and questionnaire constitutes such knowledge of that person so as to answer question one yes?

MR. SEXTON: Objection.

MR. MCGOVERN: Objection.

A. No, I'm not contending that.

Q. Well, what information or interaction did you have with Mrs. Petit other than taking the information from her that was included in the application that we have marked as Exhibit 7L and the questionnaire that is Exhibit 8?

MR. SEXTON: Objection.

MR. MCGOVERN: Objection. Asked and answered. Go ahead.

A. I'm sorry. You are asking me how do I believe the information she is telling me is correct?

Q. No. I didn't ask that. I said what knowledge did you have of Mrs. Petit other than the information that you obtained from her during the telephone conversation you had when you filled

Page 121

out the application?

A. I didn't know Mrs. Petit before, so I had no prior knowledge of who she is.

MR. SEXTON: I will object to the question.

A. That's the business we are in.

Q. What is that?

A. We are in the insurance sales business. We sell insurance. People call our office for insurance. We didn't treat Mrs. Petit any different than anybody else who calls our office for insurance.

Q. So when somebody simply calls your office and gives you information over the phone about the property they are wishing to insure, do you contend that that is sufficient knowledge of the person so as to answer number one in the questionnaire yes?

MR. SEXTON: Objection.

MR. MCGOVERN: Objection.

A. No.

Q. What additional information about Mrs. Petit did you have when you answered this question?

MR. SEXTON: Objection.

Page 122

MR. MCGOVERN: Objection.

A. Mrs. Petit herself I didn't, but I had information about the property. I saw a nine-page inspection of the property.

Q. Well, let's clarify this. My question is about number one. Question number one is, "Is the insured known to you?" Question two is, "Is the property known to you?"

A. Okay.

Q. I'm only asking you about question one, "Is the insured known to you?"

MR. SEXTON: Objection.

A. No.

Q. Would you agree with me that she was not known to you as of the time you wrote yes in this questionnaire?

MR. SEXTON: Objection.

MR. MCGOVERN: Objection.

A. When I filled out this application I answered, "Is the insured known to you?" I answered it yes. It's my belief that Mrs. Petit was known to me.

Q. What did you know about her?

MR. SEXTON: Objection.

Page 123

MR. MCGOVERN: Objection.

A. Her address, her name, her telephone number. She is buying this property in this location. It's not --

Q. Did you know anything else about her?

MR. MCGOVERN: Let him finish his answer.

A. It's not either mine or Vermont Mutual's underwriting process to do a police check on her.

Q. My question is not --

MR. MCGOVERN: Let him finish his answer.

MR. ROSSI: We can't have an ongoing uncontrolled narrative either.

BY MR. ROSSI:

Q. My question was what did you know about it, not what the underwriting process was?

A. That's all I needed to know.

Q. Is that all you knew about her?

MR. SEXTON: Objection.

MR. MCGOVERN: Objection.

A. I knew enough to answer the question yes and go on determining she and the -- the property qualifies for Vermont Mutual dwelling fire.

Page 124

Q. When you say you knew enough to answer the question yes, what about Mrs. Petit did you know?

MR. SEXTON: Objection.

MR. MCGOVERN: Objection. Asked and answered.

A. I did not know.

Q. What did you know?

MR. MCGOVERN: Objection.

MR. SEXTON: Objection. How many times are you going to ask him, John?

MR. ROSSI: Until I get a full answer, a straight answer.

MR. MCGOVERN: You've interrupted his answer. Are you going to allow him to answer this question again?

A. Please repeat the question.

Q. As of the time you answered this question yes and your contention was that you knew enough about Mrs. Petit at that time, what in fact did you know about Mrs. Petit?

MR. SEXTON: Objection.

MR. MCGOVERN: Objection.

A. I knew enough underwriting information which is on this application, on this questionnaire and

Page 125

on my application to suffice writing yes to this question.

Q. Of the underwriting information that you referred to, what specifically about Mrs. Petit did you know?

MR. SEXTON: Objection.

MR. MCGOVERN: Objection.

A. She exists. She is a live person. She is married to Frank Petit. They live in Florida. This is her phone number. She is in the process of buying this four-family or three-family dwelling.

Q. Did you know anything else about her?

MR. SEXTON: Objection.

MR. MCGOVERN: Objection.

A. I don't think so.

Q. What about Frank Petit, what did you know about Frank Petit at the time you answered this question yes?

MR. MCGOVERN: Objection.

A. That he was Mary or is Mary Petit's husband.

Q. Did you know anything else?

A. No.

Q. What did you know about 93A Hillside Nominee

Page 126

Trust at the time you answered this yes?

A. I asked underwriting questions about the property. We took pictures of the property.

Q. I'm not asking about the property though. I'm asking about the trust, Hillside Street Nominee Trust.

A. I believe the trust is the property. That property's name is 93A Hillside Street Nominee Trust.

Q. Under insured's name you wrote 93A Hillside Street Nominee Trust, Mary E. and Frank Petit.

A. Yes.

Q. With regard to the entity, the trust entity, what did you know about that?

A. That it exists and Mary and Frank Petit are the trustees. That is what they told me.

Q. Was there any information about either the 93A Hillside Street Nominee Trust, Mary E. or Frank Petit that you knew of as of the time you wrote yes to question number one?

MR. SEXTON: Objection.

MR. MCGOVERN: Objection.

A. Other than what I have here, no.

Q. Now, with regard to question number two, which

Page 127

asks if the property is known to you, you also answered that yes, is that correct?

A. Yes.

Q. That was as of November 4, 2003?

A. Correct.

Q. Now, had you visited the property as of that date?

A. I had not personally, but I do have a photographer that goes and takes pictures for us for the property that we will be insuring. And Vermont Mutual is one of the companies that they do want photos accompanying the application.

Q. So did you have that photograph as of the time you answered this question?

A. I believe -- I don't remember. I know we have it. Whether or not we took the photograph, probably we did.

Q. Do you recall when you got the photograph?

A. No, I don't.

Q. So it's possible that you did not have the photograph when you answered question two yes?

MR. SEXTON: Objection.

A. Yes.

Q. So with regard to question number two, had you

Page 128

seen the appraisal of the property or the inspection of the property?

A. I had seen the inspection. I'm pretty sure I seen the inspection of the property.

Q. When did you receive that?

A. It was very early stages of conversations with Mrs. Petit. Whether it was -- I don't know. I don't remember who faxed me that, if it was Mr. Brown or Mrs. Petit, but it would have been very early stages.

Q. Do you have a document reflecting the copy or the contents of that?

A. Well, it was part of my file. You should have it. On the top of -- I received that.

MR. MCGOVERN: Stop. Wait for a question.

BY MR. ROSSI:

Q. Do you know as you sit here today whether or not you received it?

MR. MCGOVERN: Without looking at the document?

MR. ROSSI: Yes.

A. I received the document.

Q. Do you know whether not you received it before

Page 129

you filled out the questionnaire?

A. I don't recall.

Q. Had you ever insured the property before November 4, 2003?

A. That location?

Q. Yes.

A. I don't think so, no.

Q. Do you have any understanding as to what Vermont Mutual contends is an appropriate way to answer question number two?

MR. SEXTON: Objection.

MR. MCGOVERN: Objection.

A. No. I can't talk for Vermont Mutual. This is my answer.

Q. Have you ever had any communication with Vermont Mutual concerning question number two of the questionnaire?

A. On this particular case or in general?

Q. In general.

A. No.

Q. I would assume you didn't have it in this case either?

A. No.

Q. If you were to see Mrs. Petit today would you

Page 130

recognize her?

A. I've never met her.

Q. As of the time you filled out this questionnaire, did you have any knowledge what they did for a living?

A. I knew she was -- she worked at a lab. I don't know beyond that.

Q. Now, with regard to the information that you put in here concerning item 13 which is the class of tenants?

A. Yes.

Q. Did you intend to circle working class or both working class and professional?

A. I really don't make a distinction between the two if it's not student occupancy.

Q. So my question is did you intend to circle both or just one of those items?

A. She said her tenants are not students of working class so I circled --

Q. I didn't ask you what she said, sir. I'm asking you what you intended to circle when you made your mark on question number 13?

A. There was no intention to circle one or the other. To me that was non-student.

Page 131

Q. Did you intend to have the circle go around professional as well as working class?

A. I didn't make any intention of doing it. It was non-student so we circled that.

Q. I see. Now, what is your understanding of what constitutes working class?

A. They have a job. A full-time job.

Q. Any particular type of job?

A. I have not talked about it too much. As long as they have a full-time job, working class.

Q. So is it your understanding that they had to be working full time to be working class?

A. Okay. I agree.

Q. Actually, what I will start asking is what was your practice as of November of 2003 in filling out item 13 on the questionnaire regarding those people who had properties with tenants of people that were working less than full time?

A. We didn't ask full time or part time. The question that the insurance companies underwriting did not want -- it's not desirable for Vermont Mutual and a whole bunch of other companies, for that matter, students. If the tenant is a student, it's not an acceptable class

Page 132

of tenants. As long as they are not a student, we really didn't ask if they worked full time or part time or exactly what they did. It's not --

Q. So what was your practice, sir, then if you had an applicant that had apartments that had tenants that were working less than full time? What would you do?

A. I didn't ask the question if they are working less than full time or part time. The question that we ask is if they are students if you have any student tenants.

Q. Was that your practice in November of 2003?

A. Yes.

Q. So with regard to this questionnaire, did you have any knowledge as to why the item working class appears on this questionnaire?

MR. SEXTON: Objection.

MR. MCGOVERN: Objection.

A. No, I don't. It's a Vermont Mutual questionnaire.

Q. Do you have any information from Vermont Mutual concerning their definition of working class for the purpose of this questionnaire?

A. Not that I know of. Not that I am aware of.

Page 133

Q. Did you ever receive any communications or have any discussions with anyone at Vermont Mutual concerning this issue of what constitutes working class for the questionnaire ?

MR. SEXTON: Objection.

A. Not that I am aware of, no.

Q. Have you ever received any information from Vermont Mutual in terms of how to fill out this questionnaire?

A. It's not rocket science. It's pretty easy.

Q. I asked you if you ever received any information from Vermont Mutual on how to fill out this questionnaire?

A. I don't recall.

Q. Can you point me to any information that Dadgar Insurance has, whether it's in written documents or online or on its computers or anything, that reflects how to fill out this questionnaire?

A. How to fill it out?

Q. Yes.

A. I don't follow the question. You take a pen, you ask the questions and you fill it out. What do you mean how?

Page 134

Q. Well, in terms of how to determine which of the boxes, if any, need to be checked off.

A. I don't have any written policy or written instructions how to fill it out. As I said, it's pretty straightforward questions. What class of tenants reside in this building. It says student occupancy is not acceptable. So if I knew there are students here we don't even bother with this. It takes it to a different league.

Q. If the property that you are looking to insure and a tenant or two tenants were a husband and wife and the wife was a full-time student and the husband was working as a lawyer, how would you fill out section 13?

MR. SEXTON: Objection.

A. I would call my underwriter. I wouldn't make that determination. I would call my underwriter.

Q. Have you ever had occasion to do that?

A. On certain cases I'm sure we have called the underwriter. I'm not sure if it's been on dwelling fire or commercial. On commercial I'm positive we have had conversations with underwriters because then you are talking about maybe a 30-unit apartment building with maybe

Page 135

five students.

Q. How about on personal lines?

A. Personal lines will be dwelling fire policy. If we have gone to FAIR Plan or to writing commercial wholesalers we tell them that is really not an issue.

Q. Let me break this down for you. First of all, with regard to Vermont Mutual, have you ever had a conversation with anyone at that company as to whether in the situation where you had husband and wife tenants and the wife was a full-time student and the husband is full-time --

A. I'm sure --

Q. You have to let me finish the question first. Have you ever had a conversation with anyone at Vermont Mutual concerning whether or not or how that would be answerable on the questionnaire?

A. I don't recall the conversation, if I've had any or not. We have been in business so long. We have written insurance with Vermont Mutual for so long. I'm sure in the past there has been maybe a couple cases like that.

Q. Do you know whether or not Vermont Mutual had insured such a property where the tenants were a

Page 136

married couple, one of which was a full-time student?

A. I don't know.

Q. Do you know if any of your customers have any such properties with Vermont Mutual?

A. I don't know.

Q. Have you ever had a situation where you had a parent and child as two occupants in a potential customer's building where the child was a full-time student and the parent was not?

A. I don't recall.

Q. How would you answer section 13 on the Vermont Mutual questionnaire with that situation where two occupants of the building, father and son, father is working, son is a student?

MR. SEXTON: Objection.

A. Before I answer the question, again, I have to run it by my underwriter. If he approves it, then we will write exactly what you've said.

Q. Have you ever done that in your memory?

A. I don't recall.

Q. With regard to the opposite of what I just said, if the parent were the student and son were the full-time employee, would that make a

Page 137

difference in how you approach question 13?

MR. SEXTON: Objection.

A. The same thing. The fact that if the phrase student comes up as a tenant in a four-family or three-family or two-family dwelling fire policy in general, if it's questionable, like what you are talking about, we will make the call to the underwriter, run it by them, let them make the decision. We don't make the decision. I do not have underwriting authority for binding dwelling fire.

Q. What is your understanding of the definition of student as it's used in the Vermont Mutual questionnaire?

A. Somebody who goes to school.

Q. Does it make any difference as to what school they are going to?

A. I don't think so.

Q. So if you had a family occupying the premises where the children are in nursery school, would that constitute in your understanding the definition of student for the purpose of this questionnaire?

A. No. You have to use common sense.

Page 138

Q. Using your common sense, Mr. Dadgar, what is your working definition of the term student as you understand it to be used in this questionnaire?

MR. SEXTON: Objection.

MR. MCGOVERN: Objection.

A. A student is a student. Somebody who goes to school, to college, to high school. They are all the definition of student.

Q. So a family that has high-school-age students would be within the definition of a student as it appears in question 13 in your opinion?

MR. MCGOVERN: Objection.

A. No. If you want to -- generally speaking, the example that you just brought in, family, a mother and father who reside with their student son, whether he goes to high school or college, that's a family with a son that goes to school or college. I imagine the risk to the insurance company is less in that case because the parents live there with this person.

This person is not going to have a party with -- you know, typical students have a party with eight or more students and maybe drink. The

Page 139

horror stories that you hear on the news. Somebody gets hurt, intoxicated, property damage, liability exposure. So you have to use common sense.

Q. Do you have an understanding that student occupants are more risky in the insurance industry than non-student occupants?

A. That is the general understanding of the insurance companies, and we follow their opinion and their statistics.

Q. Upon what statistics are they based?

A. I don't have the statistics handy, but I imagine it's dictated by the user statistics. Not in one general area. It's a bigger scope. Liability claims that they pay or property damage claims that they pay.

Q. Have you seen any data that indicates that?

A. I have not seen any data but the fact that with Vermont Mutual and many other companies student occupancy is not an acceptable risk, especially on a small three-family or a four-family, I have to believe.

Q. I'm not asking you about that. Do you know of any data that supports that?

Page 140

A. I have not seen any data.

Q. Can you tell me the name of any source where such data has been issued that you are aware of?

A. Well, the reinsurers.

Q. Which reinsurers have this data?

A. There are a lot of reinsurers. General Re is one, American Re.

Q. General?

A. Yes. Re, R-E-

Q. American Re?

A. Yes. There is a whole list of them.

Q. Now, what is it that you've seen that General Re has?

A. I have not seen what they have. You asked me who --

Q. I'm asking you what information you can direct me to that specifically states that student occupants are a higher risk than non-student occupants?

MR. SEXTON: Objection.

MR. MCGOVERN: Objection. Asked and answered.

A. Other than what the insurance companies tell us?

Page 141

Q.  What has --
A.  The underwriting guidelines.
Q.  What has Vermont Mutual told you about this issue?
       MR. SEXTON:  Objection.
A.  They haven't told me anything about this issue.
Q.  What insurance company has told you anything about this issue?
A.  In the underwriting process, basically if there are student occupants or student housing, it's not a desirable risk for insurance companies.
Q.  Now, other than the designation on item 13, have you received any other document from Vermont Mutual indicating students are not an acceptable insurance risks?
A.  Not that I recall.
Q.  Would you agree with me that that certainly is not contained in their program manual?
A.  I agree I have to read the entire program manual which we shouldn't be doing right now.  I have not seen it.  The quick answer is I have not seen it.

Page 142

Q.  Well, where would you expect to see such an exclusion in the program manual if it existed?
A.  It's --
       MR. SEXTON:  Objection.
       MR. MCGOVERN:  Objection.
A.  It's an underwriting criteria.
Q.  Where would it be in the program manual?
       MR. MCGOVERN:  Objection.
A.  If there is a underwriting section.
Q.  Would you expect to see such an exclusion in the dwelling fire underwriting requirements and restrictions?
A.  If it's in the underwriting --
       MR. SEXTON:  Objection.  Move to strike.
       MR. ROSSI:  Move to strike the question?
       MR. SEXTON:  It was half an answer.
A.  It would be in the dwelling underwriting requirements.
Q.  Do you see it in Exhibit 5?
A.  I don't see it, no.
Q.  Is there anywhere else in the manual where you would expect to see it?

Page 143

A.  I imagine you should see it here.
Q.  Where is that?
A.  At the dwelling fire underwriting requirements and restrictions.
Q.  Would you agree with me that it's not there?
A.  It's not here.
Q.  I wasn't sure by your answer.  Was there any other place in the manual where you would look to find whether or not such an exclusion existed?
A.  I wouldn't.
Q.  If you didn't see it at the place we just looked it doesn't exist?
A.  No.
Q.  Okay.  Have you ever received a memo or any other form of notification from Vermont Mutual indicating that they did not insure student occupants other than the questionnaire?
A.  I don't recall.
Q.  So you can't recall any such communication?
A.  Memos?
Q.  Memos or letters or e-mails or anything.
A.  I can't.
Q.  With regard to their definition of students, would you agree with me you do not know what

Page 144

their definition of student is?
       MR. SEXTON:  Objection.
A.  No.  I know what the definition of student is.  It's a student who lives in a unit, goes to school, to a college or high school.
Q.  Would it have to be a full-time student?
A.  There is no distinction.
Q.  So if a lawyer who went to night school lived in the premises at a university and was a tenant, you would expect them to be designated as a student?
       MR. MCGOVERN:  Objection.
A.  Again, underwriting questions and common sense.
Q.  I'm simply asking about your last answer where you said it would not -- my understanding was you testified it would not make a difference if they were full or part-time students.  Did I understand you correctly?
A.  Correct.
Q.  So if one was a part-time student but fully employed in a profession, they would still be within your definition of the word student with regard to question 13?

Page 145

MR. SEXTON: Objection.

MR. MCGOVERN: Objection.

A. I have to clarify that with the insurance company. You know, my -- I don't think my personal opinion matters when the insurance company specifically has an underwriting guideline that they do not accept student occupancy. It's up to them to determine these definitions that you are asking me.

Q. Well, except, Mr. Dadgar, my questions are geared towards the person who is delegated the task of filling out the questionnaire. That was your task, was it not?

A. Correct.

Q. So to a certain degree you have to make determinations as to which boxes to check or not check on that questionnaire?

A. Correct.

MR. SEXTON: Objection.

MR. MCGOVERN: Objection.

BY MR. ROSSI:

Q. Therefore, I'm asking my questions about the process you used to determine how to answer this question on the questionnaire. That is why I'm

Page 146

asking your definition of the term student. You told me that it would include part-time as well as full-time students. So I'm now asking you questions to try to learn more about that answer. Now, what is your definition of a full-time student?

MR. MCGOVERN: Objection.

A. Somebody who goes to school. They take -- that's all. That's all they do. They go to school full time. I think it's four courses or five courses a semester that they take. That's full time. They do not do anything else.

Q. So, for example, if a student were taking a full-time course load, would they have to be at a college or university?

MR. MCGOVERN: Objection.

A. I don't want to guess.

Q. Just tell me you don't know.

A. I don't know.

Q. We are not trying to torture you here. We are trying to get to --

A. It feels like torture.

Q. I understand that it may feel like torture to you. We are not trying to torture you. With

Page 147

regard to being a student, I guess my first question is where would you have to be a student, at college or other places?

MR. SEXTON: Objection.

MR. MCGOVERN: Objection.

A. You can be a high school student. You can be a college student. That's my definition.

Q. Now, do you have any information whether or not Vermont Mutual would consider a high school student within the definition of student?

A. I have no information.

Q. With regard to a college or university, do you have any information as to whether they would require that it be a four-year or two-year institution?

A. I don't.

Q. Now, when you fill out this questionnaire though, has it been your practice that if a high school student were looking to be a tenant on these premises or was a tenant on these premises you would fill out student?

MR. MCGOVERN: Objection.

A. It depends. This is Boston. We have a lot of foreign students here. I came here right after

Page 148

high school but there is a lot of students that come to Boston, to this country when they are in high school. Rich parents overseas that they rent apartments for these student. So if it is a high school student, if the client tells me it's a student or if she makes that determination that it's a high school student, the next thing for me, common sense question to ask is does this high school student live with his or her parents in your unit or they live alone with roommates. You make that determination and communicate that with the insurance company.

Q. Do you have an understanding as to whether or not Vermont Mutual considers high school roommates to live together without parents within their definition of students as to relates to that questionnaire?

MR. SEXTON: Objection.

A. I can't talk for Vermont Mutual, but common sense again tells me if they do not accept students, what you just defined is under the student definition.

Q. That wasn't my question. My question is do you know whether or not Vermont Mutual considers

Page 149

that --

A. I don't know.

MR. MCGOVERN: Objection.

MR. SEXTON: Objection.

BY MR. ROSSI:

Q. With regard to the term students, do you know whether or not that refers to a co-op student?

A. A student is a student. That is my determination.

Q. What is your understanding as to what a co-op student is compared to other students?

A. Co-op is a student.

Q. What is their schedule with regard to school time versus other time?

MR. SEXTON: Objection.

A. I don't know.

Q. Okay.

A. I know a co-op student is a student who also as part of the school program they work.

Q. Do you know if they are working in their co-op position while they are still attending classes?

A. I do not know that.

Q. Do you know either way?

A. I don't know.

Page 150

Q. Do you know whether or not they go to school throughout the entire school year or they take -- Strike that.

Do you know whether or not they were attending classes throughout the entire school year as other traditional college students would or is there a different schedule they follow?

A. I don't know that.

Q. Do you know how many months out of the year they actually attend school as opposed to work full time?

MR. SEXTON: Objection.

A. I don't.

Q. Would that make a difference to you with regard to your definition as to students with regard to item number 13 in the questionnaire?

MR. MCGOVERN: Objection.

A. Are you asking me personally? It would not make any difference.

Q. How about professionally?

A. No. To me, a student is a student but I would again at the least, if that becomes an issue or a question from my client, I would give them the courtesy of calling my underwriter and discussing

Page 151

it with them.

Q. Does your agency insure any property in the vicinity of Northeastern University?

A. I'm sure we do.

Q. Are any of those properties residential income properties?

A. Mix.

Q. At least some of them are residential income properties?

A. Probably.

Q. Some of them are insured by Vermont Mutual?

A. I don't know.

Q. Are there any residential income properties that are insured through your agency that have students as tenants that are insured through Vermont Mutual?

MR. SEXTON: Objection.

A. I do not know.

Q. Is it possible?

MR. SEXTON: Objection.

MR. MCGOVERN: Objection.

A. Anything is possible but I do not know.

Q. Is it probable?

MR. SEXTON: Objection.

Page 152

MR. MCGOVERN: Objection.

A. I don't know.

Q. Isn't it a fact that you have quite a number of properties that you insure in that neighborhood?

MR. SEXTON: Objection.

A. I insure properties in Boston, yes.

Q. Specifically in the neighborhood of Northeastern University?

MR. SEXTON: Objection.

MR. MCGOVERN: Objection.

A. I have to look at my files, the addresses.

Q. How about Mission Hill?

MR. SEXTON: Objection.

A. Dorchester, Boston, Mission Hill.

Q. My question is Mission Hill. How about Mission Hill?

MR. SEXTON: Objection.

MR. MCGOVERN: Objection.

A. I'm sure we insure other clients.

Q. And it's a known fact that those neighborhoods basically have large numbers of students residing there, isn't it?

MR. SEXTON: Objection.

Page 153

MR. MCGOVERN: Objection.

A. Not that I know of.

Q. You don't know there is a large number of students living in the Mission Hill area?

MR. SEXTON: Objection.

MR. MCGOVERN: Objection.

A. I know there are a lot of students living in Boston, Mission Hill, all these places you name.

Q. I just named Mission Hill. That is where this property is, isn't it?

A. Yes.

Q. You rated a lot of properties in that neighborhood, right? You testified earlier that you did.

A. Not a lot of properties but because of the rating thing, we came to -- by talking to Vermont Mutual, rating A, B, C or D rating we use for Mission Hill.

Q. Mr. Dadgar, have you ever told anyone, anyone, that a co-op student would be considered working class for the purpose of an insurance questionnaire, whether it be Vermont Mutual or anyone else?

A. Not that I know of, no, I have not.

Page 154

Q. Well, have you ever?

A. No.

Q. When you say not that you know of, is it possible that you did it and forget?

MR. SEXTON: Objection.

MR. MCGOVERN: Objection.

A. Not that I know of.

Q. Does that mean you are 100 percent sure that you have never told anyone that?

MR. SEXTON: Objection.

MR. MCGOVERN: Objection.

A. I am one 100 percent sure.

Q. In your discussion with Mrs. Petit, did you ever explain to her your definition of student?

A. Not that I recall.

Q. Do you recall telling her anything and asking her whether or not there were any students living on the property?

A. It was one of the questions that I asked, and she said no, there are no students living there and that was pretty much enough. We didn't go into it.

Q. I didn't ask you what she said. I asked if you asked her anything else about whether or not

Page 155

there were students living there?

MR. SEXTON: Objection.

MR. MCGOVERN: Objection.

A. I asked her are there any students living there and she said no.

Q. Other than that did you ask her anything else about the issue of students?

A. No, I did not.

Q. Okay. Now, with regard to your understanding as to the nature of student occupancy and the risks it poses, can you point me to any source of authority or expertise on that issue?

MR. SEXTON: Objection.

A. In other words, who is qualified to determine all these examples you brought in, mother, student, daughter? No.

Q. Let me clarify my question. With regard to your contention that in the industry student occupancy is deemed more risky than non-student occupancy, can you point me to any source of authority on that issue or expertise?

A. Source of authority, no.

Q. Is there any underwriting data that you know of that exists to support the proposition that

Page 156

student occupancy is more risky than non-student occupancy?

MR. SEXTON: Objection.

A. Not that I know of but I'm sure they exist, which is available to the insurance companies.

Q. You are not aware of it?

A. I have not seen it but I'm sure it exists.

Q. You are not aware of it, whether you have seen it or not, to even tell me what it is?

A. No.

Q. Is it fair to say you actually don't know whether student occupants are more risky as insureds?

MR. MCGOVERN: Objection.

A. It's not fair to say.

Q. You know?

A. I know because of the insurance companies we deal with. The underwriting criteria is do not -- student occupancy is not a desirable risk.

Q. Now, when you say the underwriting criteria of insurance companies, you don't know what that underwriting criteria is based on, do you?

A. I'm sure it's based on claims that they have paid or the industry has paid. It's the same

Page 157

thing as maybe underwriting criteria coverage in Florida or hurricanes down the Cape or floods in Louisiana. They set the rates, underwriting guidelines by statistics.

Q. Would you agree with me you are merely speculating about that?

MR. SEXTON: Objection.

MR. MCGOVERN: Objection.

A. Okay. I'm speculating.

Q. Okay. With regard to actual data, can you point me to any that the insurance companies relied on to support their position?

A. I can't point you to any data.

Q. So it's simply the fact that they have notified you that they are not acceptable tenants that leads you to conclude they are more risky, is that a fair statement?

MR. SEXTON: Objection.

MR. MCGOVERN: Objection.

A. It's the underwriting guidelines. It's their preference to take them or not.

Q. Can you tell me of any other underwriting guideline exclusion other than students that is not contained in the manual?

Page 158

MR. MCGOVERN: Objection.

A. History, for example. We asked if someone owns property for a few years and they switched from one company to us. We ask about that.

Q. That's referred to in the manual though, isn't it?

A. I don't know. For example, electrical circuit breakers versus fuses. Secondary means of egress is important. Hard-wire smoke detectors versus battery.

Q. May I stop you? You are mentioning things I believe that are in the manual. Maybe you didn't understand my question. My question is other than student occupancy, can you tell me any underwriting exclusion that Vermont Mutual has in their current underwriting process that is not mentioned in this program manual we have marked as number five?

MR. MCGOVERN: Why don't you show him the manual.

A. I don't see vacant. If a property is vacant and not occupied, that is something that I do not see here.

Q. Are you looking through the entire manual or

Page 159

just a portion of it?

A. For our sake, we are looking at the underwriting section that we talked about. That is what I'm looking at. Property under renovation, for example, it doesn't mention it here, but that is something that they would not write. Also on this underwriting requirements and restrictions, number four does refer to dwelling questionnaire for all one to four-families. So our discussions earlier, there is reference to the questionnaire.

Q. Well, that's required to be submitted it says, right?

A. Yes.

Q. But there is nothing in there -- what I'm asking you is does that articulate or identify any coverages that they would exclude?

MR. MCGOVERN: Objection.

BY MR. ROSSI:

Q. Does it fail to exclude any that you know they would not insure?

A. I really didn't think the intention of this manual is to go over everything that they can accept or reject.

Page 160

Q. Are there examples of things that they reject that they don't cover in that manual?

MR. MCGOVERN: Objection. Asked and answered.

A. I don't know.

MR. ROSSI: I'm not sure he completed his answer.

A. What you just asked me, for example, dogs, let's see if that is a question in this questionnaire. I don't see anything about dogs.

Q. My question is not whether or not the questionnaire doesn't have all those exclusions. My question to you is are there any exclusions you know of that are not mentioned in the manual other than student occupancy? You've mentioned vacant dwelling and renovations. Any others?

A. In here, no. That's it.

Q. I'm talking like across the board. Like, no properties with students or the stuff that you would normally ask when you are talking to your potential customer for their questionnaire. Are there any other items that you know would be across the board not accepted by Vermont Mutual that is not in that manual other than students?

Page 161

You mentioned vacant dwellings and renovations.

A. No. That's probably all.

Q. May I see that? I would like to direct your attention to item number 13 in Exhibit 5 under dwelling fire underwriting requirements and restrictions and ask if you can read that?

A. "Risks that are vacant or undergoing major renovations are not eligible risks. Undergoing partial renovations must be referred prior to binding."

Q. Would you agree me with regard to your previous answer, vacant dwellings and renovations are issues that are covered in this manual?

A. Right.

Q. Other than the issue of student occupancy, can you tell me any major material underwriting issue that is not covered that you know Vermont Mutual does not cover?

MR. MCGOVERN: Objection.

MR. SEXTON: Objection.

A. Right now I can't think of anything else.

Q. So would you agree with me that as we sit here now that student occupancy is the only exclusion that they contend they have that is not covered

Page 162

in this manual?

MR. SEXTON: Objection.

MR. MCGOVERN: Objection.

A. I don't see claim history here. That's one that comes to mind. It's here. I'm sorry.

MR. ROSSI: I would ask that you not point out items in the document which might be suggesting an answer or be misunderstood by me. I would ask that you not point to portions of the document while the witness is trying to answer.

A. I mentioned claim history might not be there but it is here. That is what he was pointing to.

Q. Okay. So is there anything other than student occupancy?

A. I can't think of anything right now.

Q. So student occupancy, in your understanding, is a big taboo with Vermont Mutual?

MR. SEXTON: Objection.

MR. MCGOVERN: Objection.

BY MR. ROSSI:

Q. In their personal residential dwelling lines?

A. It's the same with all our companies. Not just Vermont Mutual. A lot of companies are the same way. Some companies, they even have a

Page 163

special rating program for student occupancy.

Q. But with regard to Vermont Mutual, who is the company here that is contending they do not have to pay this claim because of student occupancy, in your experience dealing with them, that is a major across the board exclusion for them?

A. Yes.

Q. And of those types of exclusions, the only one that doesn't exist in their manual?

A. I didn't see it there, correct.

Q. Okay. Did you discuss the student occupancy issue with anyone other than Mrs. Petit in conjunction with the application for insurance for 93A Hillside Street?

MR. SEXTON: I'm sorry. Can you repeat that?

BY MR. ROSSI:

Q. Did you discuss the student occupancy issue with anyone other than Mary Petit in conjunction with the application process for 93A Hillside Street?

A. Back in 2003 when we filled this application?

Q. Yes.

A. No. She was the only one who gave me the

Page 164

information.

Q. Have you discussed this issue with anyone at any time since November 2003?

MR. MCGOVERN: Other than me?

MR. ROSSI: With anyone.

A. Yes.

MR. MCGOVERN: Let me object.

MR. ROSSI: It's a yes or no question.

MR. MCGOVERN: Let me object and caution the witness not to discuss the content of any communications that you've had with me or my office.

BY MR. ROSSI:

Q. It's a yes or no question.

A. Yes.

Q. How many people have you discussed that with?

A. My attorney.

Q. Okay.

A. Mrs. Petit's public adjustor called my office.

Q. Do you recall who it was that called your office?

A. Paul Winnick is his name.

Q. Do you recall when he called your office?

Page 165

A. Right around the time he had learned that the $25,000 check was put a stop to it. They were not going to send it or Vermont Mutual had decided not to send it.

Q. What was said during that conversation?

A. He called my office, he introduced himself. He proceeded to tell me how a lot of people talk a lot of good things with me, and I have a very good reputation in the industry. I thanked him and asked him to please get to the point. Then he said that are you aware that Vermont Mutual has put a stop payment on that $25,000 advance check. I said yes, I am. He said do you know what the reason is. I said no, I don't know yet. I'm trying to find out for Mrs. Petit. He said well, you must know it's student occupancy and you know they are co-op students. Please call the claims adjustor at Vermont Mutual and tell them that these are co-op students and they work half the year, and tell them to send the advance check. At that point is when we really learned that there are students here. I proceeded to tell him excuse me. What do you mean co-op students. That's when he said, all right, let me

Page 166

talk to the Vermont Mutual adjustor myself. That was the conversation I had with him.

Q. Was that a one time only conversation?

A. One time only. He might have -- I don't think he faxed anything to our office. Otherwise, it would have been in the file. That was our conversation.

Q. Have you had discussions with anyone else other than your attorney and Mr. Winnick concerning the issue of student occupancy?

A. On this particular case?

Q. Yes.

A. With Vermont Mutual. When I called for Mrs. Petit I was told that it's an eligibility issue and we will get back to her.

Q. When did you place that call?

A. When Mrs. Petit called me to say how come the check is not here or how come they have maybe put a stop on it to find out what is going on.

Q. Did you make a notation about that call?

A. Yes.

Q. Where would the notation be?

A. In my file probably.

Q. Would this be a handwritten note or otherwise?

Page 167

A. Handwritten.

Q. I'll hand you what I have for the client file produced except for the exhibits which you have already pulled out which we will put on the table here as well. I think there was only one handwritten note, Exhibit 7J.

A. Here it is.

Q. Okay. So it's a typed out note?

A. Yes.

MR. ROSSI: Can we mark this please as Exhibit 9?

(Exhibit No. 9 marked for identification).

BY MR. ROSSI:

Q. I notice on Exhibit 9 there is an entry for May 9th, PA called. Who is PA?

A. Public adjustor.

Q. Is that Mr. Winnick?

A. Yes.

Q. "Called fishing for answers since Vermont Mutual didn't send the advance check. He said he is pretty sure it's due to student occupancy and I should tell Vermont Mutual these are co-op students, not regular students and they should be

Page 168

considered working class. I responded to him we were not aware of any co-op students here and it's up to Vermont Mutual to make that determination." February 8th there is a notation, "Called Mary back and told her the same."

MR. SEXTON: Objection.

BY MR. ROSSI:

Q. May 8th, "Called Mary back and told her the same."

MR. SEXTON: For the record, I just want the record to indicate that you read the note from 5/9 before you read the note from 5/8.

MR. ROSSI: I'm reading from current back. I wanted to clarify Mr. Winnick's reference first.

MR. SEXTON: I want to make sure the record is clear.

MR. ROSSI: This is an exhibit so it will speak for itself.

BY MR. ROSSI:

Q. May 8th, "Called Peter Fresco, asked if the letter of denial of coverage had gone out. Peter said not yet, to call Mary back and tell her

Page 169

there is eligibility issues and Vermont Mutual will be in touch with her this week." Mr. Dadgar, with regard to this entry of May 8, 2006, how did you know there would be letter denying coverage going out?

A. Can I see that?

Q. Sure.

A. Could have been a conversation I had with Peter Fresco prior to this or when Mary had called. The day Mary called maybe I got in touch with him.

Q. So there may have been a --

A. Another one, yes.

Q. So there may be a telephone conversation you had with Mr. Fresco, and that is not noted on Exhibit 9?

A. Could be.

Q. On May 5th you spoke with Mary Petit, "Called crying about her claim and her public adjustor informed her that Vermont Mutual put a stop on sending $25,000 advance. I told her I would call Vermont Mutual and get back to her on Monday." With the exception of the one possible conversation you may have had with Mr. Fresco

Page 170

that is not reflected on Exhibit 9, were there any other telephone communications you had with anyone concerning this claim?

A. Not that I recall, no.

Q. Now, when was this drafted, Exhibit 9?

A. This is in our claim folder. I drafted this so we don't lose the dates, the dates of the conversations we had with different people.

Q. When did you draft that?

A. I don't know. I drafted it for our attorney.

Q. So would you agree you drafted this sometime after May 2006?

MR. MCGOVERN: Objection.

A. We could have drafted it right here. We could have drafted it shortly after that. It could be May 2006.

Q. When did you first retain legal counsel in this matter?

MR. SEXTON: Objection.

MR. MCGOVERN: Objection.

A. I don't recall. We have to look at the file.

Q. So you don't recall whether or not you -- when you say your counsel, are you referring to Mr. McGovern?

Page 171

A. Yes.

Q. He is the only attorney that you've retained in this matter?

A. Well, I have a relationship with Morrison Mahoney, Miller. They have done other things for us. Not this sort of thing. I had asked one of the attorneys over there to take a look at the whole case as well. Other than that it was just Mr. McGovern.

Q. Did you retain Mr. McGovern prior to being served with the complaint in this matter?

MR. SEXTON: Objection.

A. I don't think so. I don't recall.

Q. So if that were the case, would you agree with me this was drafted sometime after you received the complaint that was filed with the court in this matter?

MR. MCGOVERN: Objection.

A. I don't recall. I mean, this is the conversation that took place like in a week from May 5th to May 9th. I could have either handwritten or typed it.

Q. I'm asking you when you drafted this document we marked as Exhibit 9? You said you did this

Page 172

for your attorney. I'm asking you if you did this after or before you received a complaint that was filed in this matter by Vermont Mutual?

MR. SEXTON: Objection.

A. I don't recall. I didn't bring my file with me. If I looked in there I probably could see it.

Q. What information would there be in your claim file?

A. Everything is chronological. I could see when this was done.

Q. Have you produced your entire claim file?

A. Yes.

Q. So we have that here?

A. Right.

Q. So if you would like to review it, please do if that helps refresh your recollection.

MR. MCGOVERN: I think what he is saying is he can tell by the order in which the file was kept. You have already pulled out a bunch of his stuff from that claim file. Is that right?

THE WITNESS: Yes. We have two-hole punch.

Page 173

BY MR. ROSSI:

Q. Well, as you go through your claim file here what is the most recent document that you produced?

A. The last couple of weeks, the stuff that you wanted.

Q. Well, if I were to suggest to you this was part of your initial disclosure that was served by your attorney previously, would that help refresh your memory as to when this was drafted?

MR. SEXTON: Objection.

MR. MCGOVERN: Objection.

A. No. Do you have all the papers?

Q. The exhibit or the claim file? We have to be careful. These documents with yellow tags on them are exhibits. These without it are the claim file.

A. Can I see the rest of it?

Q. I believe I gave you --

MR. SEXTON: Can we go off the record?

MR. ROSSI: Sure.

(Discussion off the record).

BY MR. ROSSI:

Page 174

Q. After reviewing your claim records, are you able to refresh your memory at all when you drafted the document we have marked as Exhibit 9?

A. I don't know the exact date. No, I don't know, but it wasn't really anything drafted. It was the conversations that I had with different people. This is the best of my recollection what date we had these conversations and what was said. This was for the benefit of my attorney and you to see.

Q. So would you agree with me then that this document was typed up after suit was entered in this case?

MR. SEXTON: Objection.

MR. MCGOVERN: Objection.

A. No. I don't recall that. This document was typed out right around May 9, '06 or shortly after. I don't think the suit was at that time.

Q. So you retained an attorney before suit was filed in this matter?

MR. SEXTON: Objection.

MR. MCGOVERN: Objection.

A. I don't think so. I don't remember.

Q. I'm a bit confused then because you said you

Page 175

believed you drafted this for your attorney. I'm assuming that you had an attorney to draft it for when you did that then.

MR. SEXTON: Objection.

MR. MCGOVERN: Is that a question?

A. I don't know. To me, it's shortly after May 9th.

Q. But your recollection is that you drafted this for an attorney that you had retained?

MR. MCGOVERN: Objection.

A. No.

Q. You did not?

A. I had not had any attorney on May 9, '06.

Q. Okay. So when you say you drafted this for your attorney, you anticipated having an attorney in the future?

A. No.

MR. SEXTON: Objection.

A. These are the conversations that took place between me and Mary, me and Peter Fresco, me and Mary again and me and Paul Winnick. When I wrote or typed this up, I don't know, but we must have had these conversations on these dates. Maybe there was a note.

Page 176

Q. I'm not asking you whether you had the conversations, sir. If you can just answer my questions. My question is in follow up to your previous answer that you believe you drafted this for your attorney. Did you have an attorney retained as of May?

A. No.

MR. SEXTON: Objection.

BY MR. ROSSI:

Q. So at the time you drafted this document, is your memory that you did not yet have an attorney?

A. I did not have an attorney. There was no suit. There was no complaint against me to have an attorney.

Q. When you drafted it for an attorney, what was your intention at that point?

MR. SEXTON: Objection.

MR. MCGOVERN: Objection.

A. I had handwritten notes with these conversations probably that is sitting somewhere in my file or maybe it's not. I don't know. This was typed for the file that my attorney and you are benefiting from. These are the dates.

Page 177

Q. At the time you caused -- did you type this yourself?

A. I must have handwritten it and gave it to somebody in my office.

Q. So you asked someone in your office to type it up for you?

A. Yes.

Q. What was the reason you did that?

A. To have a better thing than my handwriting.

Q. Is that your usual practice at Dadgar Insurance, to change all of your phone notes and handwriting to a typewritten form?

MR. MCGOVERN: Objection.

A. No.

Q. Why did you do it in this case?

A. To have a nice clean file; to have a legible thing of what took place; for my own benefit, what took place when; in case it goes to a distance because of this last phone call that I had.

Q. Is there anything particular about the Mary Petit claim that lead you to believe you should type these up and make it cleaner?

A. The fact that Paul Winnick called me and the

Page 178

fact that Vermont Mutual put a stop on the check and the fact that place had student occupancy that we didn't know.

Q. Is that something you do as a matter of course in your business whenever there is a stop payment on a check, a benefits check?

MR. SEXTON: Objection.

A. Say that again.

Q. Do you normally type up your phone notes, if you have any phone notes --

A. No.

Q. Let me finish the question. Do you normally type up your phone notes whenever you have a case where a payment is not made or is stopped for --

A. No, I don't. I might even find those handwritten phone notes. This was again for my own benefit to reference the dates.

Q. If you still have those handwritten phone notes, wouldn't they be in your claim file?

A. If there is, I will find it.

Q. You've produced your entire claim file, haven't you?

A. Yes.

Q. Where else might they be if they are not in

Page 179

the claim file you produced?

A. Then they are not. They are gone.

Q. Are you saying it's possible there may be documents or papers in your claim file that you have not produced here today?

MR. MCGOVERN: Objection.

A. No.

MR. SEXTON: Can we take a break.

MR. ROSSI: Yes.

(Break taken).

BY MR. ROSSI:

Q. Mr. Dadgar, have you reviewed any documents in preparation for today's deposition?

A. With my attorney.

Q. What documents have you reviewed?

A. The file.

Q. When you say the file, are you referring to the claim file that you produced as part of your initial disclosure?

A. Everything, yes.

Q. Now, with regard to the ACORD file we talked about earlier and I believe -- here it is. Would you agree with me that on the ACORD application that we have marked as Exhibit 2 there are no

Page 180

entries on that form that indicates the class of occupants on any residential dwelling?

A. I don't see it, no.

Q. Now, when you go to the top of the second page of Exhibit 2 you will notice there are a lot of questions about the property.

A. Okay.

Q. A lot of underwriting questions that are similar but perhaps not identical to the underwriting requirements and restrictions that we see in program manual such as Exhibit 5.

A. Okay.

Q. Do you know of any reason why the issue of the class of occupants of the premises would not be included on that ACORD form?

A. Because at least we use this ACORD form for dwelling fire when we go to a wholesaler to obtain dwelling fire coverage and they have a question similar to what Vermont Mutual would have with their set of questions and concerns.

Q. Is it your understanding that all of the questionnaires from the companies you deal with that issue personal lines have questions about student occupants?

Page 181

A. There isn't all the companies. The only other company that we deal with for dwelling fire directly is Holyoke Mutual which we have had with them for about a year, year and a half. They have a questionnaire, yes.

Q. Were you aware of what Holyoke's questionnaire looked like as of November 2003?

A. No.

Q. Now, if you find that you have a customer like Mary Petit with occupants that are students -- this is as of November 2003 -- what would be the process that you would follow with regard to their coverage, including, if you do use, this ACORD form?

MR. MCGOVERN: Objection.

A. What is the procedure that I follow?

Q. Yes. As of November 2003.

A. I fill out the ACORD form, we will call one of the wholesalers that they offer dwelling fire, ask for their questionnaire, fill out the questionnaire and the ACORD form, fax it to them to get a quote.

Q. Are these wholesalers always finding commercial lines for you in instances where

Page 182

student occupants exist?

A. For the most part, whole -- there was one wholesaler -- I don't remember the name -- in 2003 that they offered dwelling fire. For the most part, a lot of them are commercial policies.

Q. Okay.

A. That was one of the other two options. FAIR Plan is always another option and writing three-family on a commercial package policy will be another option.

Q. Do they use questionnaires with regard to the commercial lines?

A. Some they do, some they don't.

Q. Do you know how often, what percentage of them do?

A. If it's a larger complex, mostly all of them use their own questionnaire that is exclusive to them. If it's a smaller one like this three-family, if it's a commercial policy, there are different kinds of ACORD. Commercial ACORD will be sufficient.

Q. I just want to review with you the request for production of documents that accompanied the notice of taking deposition which I believe we

Page 183

have marked as Exhibit 1. There has been a request for response filed by your attorney to that request so I don't intend to go through all the arguments of the objections and all that has been raised. But I want to sort of take an inventory as to whether or not these documents exist. In terms of the insurance application process concerning any application for fire dwelling insurance which involved your agency from January 1, 2002 up and through the present, do you have any understanding as to how many applications your agency has processed?

A. I don't. I don't know.

Q. Now, would you agree with me that in most instances in the case of fire dwelling policies when they are renewed by a company which is not obtained through a wholesaler or the FAIR Plan that there is not another application that needs to be filled out?

A. Right.

Q. In the response that was filed on your behalf there was a representation made that you believe your agency has issued approximately 2,000 policies. Is that since January 1, 2002 up and

Page 184

through the present?

A. No. We are talking about how many policies the agency has enforced from 1981 that we were in business to present day.

Q. Okay.

A. It might be even more than 2000 policies.

Q. Is that during the life of the agency?

A. Yes.

Q. How many policies have you put in effect or serviced since 2002?

A. I don't know.

Q. Now, your agency has records that would indicate that?

A. Client files we keep, yes.

Q. Well, also don't you have financial records that would indicate how many policies your agency issued during a period of time?

A. My financial records talk about our income and expenses. It doesn't include how many policies we have produced.

Q. So are you contending that there are no documents that the agency maintains that would tell you how many policies you've issued in the course of a year?