Page 185

A.  No.

Q.  None whatsoever?

A.  No.

Q.  Okay.

A.  The insurance companies that we do business with, for example, Vermont Mutual, they will probably have that information; how many we wrote since 2003 with Vermont Mutual.

Q.  Does your Applied system have any date function at all with regard to entries that are made to it?

A.  The policy dates are all there but I cannot access Applied to ask it how many policies -- I don't think we can, how many policies we have written from 2003 to present. We have to have the name of the client. Then it will give you the whole history.

Q.  Now, do you keep paper files as well as to policies?

A.  Yes.

Q.  How are they filed?

A.  They are filed in folders in filing cabinets.

Q.  How are they arranged?

A.  Alphabetically.

Page 186

Q.  By customer name?

A.  Yes.

Q.  Now, with regard to those policies that have been issued years ago and not renewed, do you keep those?

A.  No.

Q.  What happens with those files?

A.  We have a warehouse that we box them. For example, in a box it could be 20 folders, A to C for example. It's all labeled.

Q.  Now, do you transport those and box those yourself or do you have an agency or company that does that?

A.  We do all of that ourselves. When my son was here he helped me a lot with it. He is not here now so I'm doing it myself.

Q.  How often do you box files to bring to your warehouse?

A.  Once every six months or so.

Q.  What is the criteria that your agency administers to determine which files go to the warehouse and which files stay in your offices?

A.  The files that clients have called us and -- we talked about it earlier -- we have

Page 187

information, we have application, we have a quote and they didn't buy from us or a policy that was cancelled for whatever reason, they closed the business, they sold the property, they moved to another insurance agent, we keep it for about a year and then after that we send it to the warehouse.

Q.  How many files do you currently have in your office?

A.  Probably three or 4,000.

Q.  Given the fact that you estimate that your company from day one has issued about 2000 policies, what would be in the three to 4,000 files in addition to the policies?

A.  It could be a client that has multi locations. We have clients that have 80 locations. Commercial clients.

Q.  And it was one policy?

A.  No. Sometimes it will be one policy, several policies. In some cases it could be 15 different policies. It just depends how it is set up.

Q.  Given the fact that your agency has only issued 2,000 policies --

A.  Well, 2,000 clients I want to say. Not

Page 188

necessarily policies.

Q.  Okay.

A.  That's what I probably meant.

Q.  Did you review the response to the request for production of documents that was served on your behalf before it was sent?

A.  With my attorney, yes.

Q.  As you reviewed that, were there any items here that you felt were inaccurate?

A.  No. We reviewed and answered everything together. I don't think it's inaccurate.

MR. ROSSI: I would like to mark that as Exhibit 10.

(Exhibit No. 10 marked for identification).

BY MR. ROSSI:

Q.  I would like to draw your attention to your response to request number 2C. It says, "Objection. This request is not reasonably calculated to lead to the discovery of admissible evidence, and a complete response would pose an undue burden on this defendant. Dadgar Insurance Agency estimates that it has in its records over 2,000 insurance policies and would be required to

Page 189

search through each file to determine if it contains an application responsive to this request." Did I read that accurately?

A. Yes.

Q. So in your request that you reviewed with your attorney and confirmed for accuracy you state that the agency has issued 2,000 policies?

MR. MCGOVERN: Objection.

BY MR. ROSSI:

Q. Is that correct?

A. Yes. It's policies.

Q. Did I read that correctly?

A. It's what it says.

Q. Now, are you saying that is not accurate?

A. It's three to 4,000 policies I would say.

Q. So you believe you issued three to 4,000 policies?

A. Yes.

Q. That you've issued since you've opened?

A. It's a rough estimate. Maybe even more since we opened but people don't stay. Right now I probably have three to 4,000 policies right now. Since we opened, maybe a lot more that are not with us anymore.

Page 190

Q. Well, you see, this is why it's important that we have these questions because previously you told me that your agency had issued 2,000 policies.

A. We meant clients.

Q. Well, it's important that we get the terminology correct.

A. I'm sorry.

Q. So is it your testimony that Dadgar Insurance Agency has served approximately 2,000 clients since it opened?

A. At least 2,000 clients since we opened in '81.

Q. Did you review some information that lead you to that conclusion?

A. I didn't review any information for this, but we receive stuff from insurance companies how many policies we have. Commerce, for example, that we write auto insurance with, they send us information how many policies. The policy count has gone up and down at the end of the year. I know we have probably about 1,000 or 1,100 clients with Commerce. Then with Vermont Mutual we probably have between 500 to 1,000 clients. Commercial is probably another 2,000 policies.

Page 191

So that's where I'm coming from, estimating what we have. I don't have the exact count. I'm estimating for you between three to 4,000 policies. Maybe 2,000 clients.

Q. With regard to the number of clients you have, what information do you have that indicates you have 2,000 clients that you reviewed?

A. Again, I don't have any particular information, but I know our setup is if you write somebody's restaurant insurance business there is a good chance you will write the home and the auto for that person. If you write somebody's apartment building or office building or business, there is a very good chance we write their home or yacht or boat or what have you. That's how I estimate that for.

Q. We are talking about customers now, right, not policies?

A. You are talking about both.

Q. Well, no. I'm talking about customers. It's important that you understand what I'm asking you about.

A. Okay.

Q. I'm asking you now about customers. In your

Page 192

previous answer that you estimate the agency has served about 2,000 customers, did I understand that correctly?

A. The agency right now has in excess of 2,000 customers.

Q. Now, is that customers of all time or just customers that are currently doing business with Dadgar?

A. Customers currently are doing business with Dadgar that we insure presently is in excess of 2,000.

Q. So when you stated or when it was stated here by your attorney that Dadgar Insurance Agency estimates it has in its records over 2,000 insurance policies and would be required to search through each file to determine if it contains an application responsive to this request, were you intending to state that you had over 2,000 policies or 2,000 customers or both?

A. Both. We are estimating more than 2,000 in both.

Q. How much more than 2,000?

MR. SEXTON: Objection.

MR. MCGOVERN: Objection.

Page 197

Q.  Because there may be times where an insurance company can make a mistake, would you agree with me?

MR. SEXTON:  Objection.

A.  Anybody can make a mistake.

Q.  Sure.  So you want to, as an agent, a full-service agent to make sure that all of your customers that are coming up for renewal are renewed, don't you?

A.  Yes.

Q.  Therefore, you maintain information in your office as to which customers are supposed to be renewed this month as well, don't you?

MR. MCGOVERN:  Objection.

A.  No.  Under personal lines we don't. Everything is with the insurance company.

Q.  So you --

A.  They send us the list.

Q.  So Dadgar Insurance Agency relies completely upon the insurance company list --

A.  No, we don't.

Q.  -- to verify renewals for its personal lines?

A.  That's not what I said.

MR. MCGOVERN:  Objection.

Page 198

A.  We don't rely on the insurance company.  They send us -- in the personal lines there is Vermont Mutual and there is Chop.  We do some high value homes with different wholesalers.  There is a little bit of Vermont Mutual.  With Commerce everything is automatic.

Q.  Let's focus on personal lines only that are coming up for renewal for fire dwelling policies.

A.  Okay.

Q.  With regard to Vermont Mutual's customer and your customers, do you receive a list from Vermont Mutual as to those policy holders that are coming up for renewal?

A.  Yes.

Q.  What do you do to make sure that list is accurate?

A.  We will check that against our client list in the computer.  We go name by name in our computer.

Q.  Now, what do you do to make sure that there are not any of your clients that are omitted from the Vermont Mutual renewal list?

A.  That I've got to ask.  I'm sure we access that in the computer.

Page 199

Q.  As the owner of the agency, Mr. Dadgar, would you agree with me that it's important to make sure that none of your customers are mistakenly eliminated from renewal by the insurance carrier?

A.  Yes.

Q.  And that would be certainly one of your functions?

A.  Yes.

Q.  With regard to the representation in your response to 2D, that Dadgar Insurance Agency estimates it has produced over 800 policies for Vermont Mutual -- it's Exhibit 10 and response 2D -- what period of time do those 800 policies cover?

A.  800 would be one year from January to December.

Q.  So it has currently 800 policies in effect with Vermont Mutual?

A.  Again, this is an estimate on my part that I communicated with my attorney.

Q.  What information did you consult in order to come to that conclusion?

A.  Vermont Mutual, at the end of every year they send us policy count, how many policies you have,

Page 200

profitability for them and policy count is there. I believe it was 800 last time I looked.

Q.  How often do you get those reports?

A.  Once a year.

Q.  What do you do with those reports once you receive them?

A.  I think we keep it.  I have to look at the folders.

Q.  Are these documents that you would be readily able to find in your agency, these policy reports?

A.  I have a Vermont Mutual folder.  I am sure it's in there, yes.

Q.  How about other insurance companies with whom you do business?

A.  It's the same thing.  They pretty much all do that.  At the end of the year they send us stuff.

Q.  Are these reports that would be easily obtained by you?

A.  Some of them we keep.  Some of them we don't. We could ask the insurance company it to send us.

Q.  How about notices of cancellation, do you maintain the notices of cancellation that you receive on your personal lines from Vermont

Page 201

Mutual?

A.  For all lines we do.

Q.  **Were you going to say something about what you do with those reports?**

A.  Any company that sends a notice of cancellation to the client, we get cc'd on it. We piggyback on top of that and send our letter to the client, whether it's for nonpayment of premium or another issues.

Q.  **Is Dadgar Insurance Agency currently insured for any of the damage that it might be susceptible to in this present litigation?**

MR. SEXTON:  Objection.

MR. MCGOVERN:  Objection.

A.  Excuse me?

Q.  **Dadgar Insurance Agency, are they insured for any of the losses for which they may be subject to in the present litigation?**

MR. MCGOVERN:  Objection.

A.  If you are asking me if I have an errors and omission insurance, yes, I do.

Q.  **With whom is that policy?**

A.  Utica.

Q.  **What are the limits of coverage?**

Page 202

A.  I believe it's three million.

Q.  **Was that policy -- was that coverage with Utica in effect as of November 2003?**

A.  Yes.

Q.  **Was it also in effect as of March of 2006?**

A.  Yes.

MR. ROSSI:  At this time, based on the information that we received today about the need for IT references and potential additional documents, I'm going to suspend my questioning until we can resolve the issue of these other documents if they exist.

MR. MCGOVERN:  Is that with respect to everything else in your 30(b)(6)?  Are you finished?

MR. ROSSI:  Well, those documents reflect on the other 30(b((6) issues.

MR. MCGOVERN:  Well, tell me which documents you are talking about.

MR. ROSSI:  Okay.  Once again, referring to the request that is contained in Exhibit Number 1, 1B which would regard communications regarding the insurance application process concerning all applications

Page 203

for insurance involving the services of Dadgar Insurance Agency and or Anowshirvan Dadgar for the period commencing January 1, 2002 up through and including the present.

With regard to request 1D, with regard to all communications concerning the insurance questionnaire process concerning all applications for insurance involving the services of Dadgar Insurance Agency and or Anowshirvan Dadgar for the period commencing January 1, 2002 up through and including the present.  Rather than read them all in, why don't I just designate the letter.

MR. MCGOVERN:  That's fine.

MR. ROSSI:  1D I just mentioned.  1F, 1H, 1M.

MR. MCGOVERN:  M or N?

MR. ROSSI:  M as in Michael.  1P, 1Q, 1S, 2B, 2C, 2D, 2F, 2G, 2H, 2J, 2L, 2N.  That would be the complete list still at issue.

MR. MCGOVERN:  So the remaining topics that you intend to cover, if and when this deposition is resumed, will pertain to any additional documents that are produced in response to those items?

Page 204

MR. ROSSI:  Well, I'm not going to make a correlation to the 30(b)(6) designation because those documents are not necessarily intended mutually exclusive of the 30(b)(6) issues.

MR. MCGOVERN:  I am just asking about the scope of any additional questions that you have of my client.  I understand you're suspending today because you think that there are additional documents that are discoverable that have not been provided.  You want to have --

MR. ROSSI:  Well, there have also been representations made today that there are IT people and his wife involved in the data processing function with Quick Books that may be able to obtain information.

Now, for example, just because I'm interested in that data of processing information, it doesn't necessarily mean it's only because of the financial information in there, but there may very well be other fact information in there with regard to the categories or classifications used and the ability to identify things.

If you are familiar with Quick Books and it's

Page 205

software, one might conclude that that's a fairly reasonable process. When you make an entry into those programs there are different fields that you fill data into that can be called and get various reports from.

So the only reason I'm trying to be clear with you, Mr. McGovern, is that although the records might be records that appear to be related to finance or communications, they may contain information that would overlap the various 30(b)(6) designations and therefore whether there are certain documents coming back about that I would want to examine it.

I will give you an example I'm thinking of now. If this witness is not familiar with the input process for data for the agency, it may be necessary that you and I or that you may want to rethink whether or not there is another designee that should be made for any of these 30(b)(6) issues. If you choose not to, that's fine. This is a mutual -- I'm interested in making a conclusive discovery event here with regard with regard to these 30(b)(6) issues.

I was surprised to hear that the designee

Page 206

would not know how its information was stored and retrievable given our conversation a few days ago on discovery. So I don't want to say anything that will mislead you and unfairly restrain myself in terms of what I can inquire into given the fact that there were questions we went into today this witness did not feel qualified to answer, and rather than press the issue, I am happy to suspend now and see if there will be someone else with more information.

MR. MCGOVERN: Well, I do not think there are any topics in your 30(b)(6) that had to do with data. To the extent that you want to send out another notice with new topics, we can talk about that later on.

MR. ROSSI: Well, what I'm saying is a let's find out.

MR. MCGOVERN: You've completed the deposition with respect to the topics in your 30(b)(6) notice with the exception of additional questions that may arise out of the additional documents that may be produced.

MR. ROSSI: Except that I've asked questions about renewals and about information

Page 207

concerning the type of coverages they give out that this witness said he was unable to tell me in terms of degrees of specificity but did mention that there is an insurance program the agency uses or a computer program that might provide this information. Now, if as a result of that we find out that there are documents that you can produce in response to the document request that address that, I may not need to seek any further interrogation. On the other hand, depending on what these documents show or don't show, there may be a need to either re-notice, as you suggest, or perhaps come to an agreement as to these specific issues.

MR. MCGOVERN: Those would be questions that arise out of documents that are produced.

MR. ROSSI: Documents and also the issue of the designees. There is a designee that apparently controls some information for this agency that wasn't here today.

MR. MCGOVERN: On which topic I guess is my question?

MR. ROSSI: The questions that I

Page 208

posed concerning such issues as client identities, properties covered.

MR. MCGOVERN: Which topic in the notice?

MR. ROSSI: Two, four, six, eight, 11. No. Not 11. Excuse me. 13, 15, 16, 17, 19.

MR. MCGOVERN: All right. Well, I reserve the right to object to any further deposition of this witness.

MR. ROSSI: Sure. I reserve the right to go into other areas of the 30(b)(6) that I didn't just identify in the event we need to reconvene based upon the information and documents that may develop subsequently.

MR. SEXTON: I unfortunately have some questions. I know it's been a long day. I will try to be as quick as possible.

EXAMINATION BY MR. SEXTON:

Q. If I ask a question -- I think you've been told this already. If I ask you a question that you don't understand, please tell me that you don't understand it. I will do my best to rephrase it as best I can.

Page 209

A. Fine.

Q. If you still don't understand it, please tell me.

A. Fine.

Q. However, if you answer one of my questions, I'm going to assume that your answer is responsive to the question that I have asked you. Is that fair enough?

A. Yes.

Q. It's been a long day. I understand you may be tired. If you would like to take a break during my questioning, please feel free to say so. The only thing I would ask is that if I have a question before you that you answer the question before you take the break.

A. Fine.

Q. Now, there was just a long discussion concerning issues that I'm not too familiar with in this case but regarding all applications for insurance and all insurance questionnaires for all policies of insurance issued by your company or agency from 2002 up through and including the present. I just want to ask you one general question to start off with. I wish I could say I

Page 210

would like to ask you one question but to start off with, one question. How many similar claims have been lodged against you and or Dadgar Insurance Agency as the claim being made by Mr. and Mrs. Petit since 1981?

MR. MCGOVERN: Objection.

A. None.

Q. Is it fair to suggest that since 2000 the only claim against Dadgar Insurance Agency for negligence as a result of a loss not being covered where the allegation is that it was the fault of your agency is this case?

MR. MCGOVERN: Objection.

A. I'm sorry?

Q. Is it fair to suggest this is the only claim in the history of Dadgar Insurance Agency where it's alleged that your negligence caused a loss not to be covered by an insurer?

MR. MCGOVERN: Objection.

A. Yes.

Q. I may pause between questions because I have to go through my notes.

A. Sure.

Q. I believe you testified earlier that Vermont

Page 211

Mutual dwelling fire policies issued by Dadgar Insurance Agency are automatically renewed?

A. Yes.

Q. Is that only for personal lines?

A. No. Commercial lines policies with Vermont Mutual will automatically renew also.

Q. Is there a distinction between -- am I correct that a dwelling fire policy is only issued as a personal lines policy?

A. Yes.

Q. And if it was on a commercial side it would be a comprehensive package that included fire insurance?

A. It will be called either commercial package policy which includes fire insurance or a BOP, business owner policy.

Q. In either event, if it's a Vermont Mutual policy, either a commercial or personal line, the fire policy renews automatically?

A. Exactly.

Q. With regard to this particular policy -- I will do the best I can to restrict my questions to this particular policy and this particular underwriting. You testified earlier -- I will

Page 212

show you Exhibit 7J which you testified earlier were the notes that you took during your initial conversation with Mary Petit, is that correct?

A. Yes.

Q. Is it my understanding that when you were making these notes that at the same time you would have a blank insurance application and insurance questionnaire in front of you?

MR. ROSSI: Objection.

A. Yes.

Q. I will withdraw the question. When you were making your notes at that time, did you also have a blank insurance application and insurance questionnaire in front of you?

A. Yes.

Q. Which company's blank insurance application and questionnaire did you have in front of you?

A. Vermont Mutual.

Q. Is there any particular reason why in your first conversation with Mrs. Petit you had a Vermont Mutual questionnaire and application rather than some other commercial lines company's questionnaire?

A. If she qualified for Vermont Mutual dwelling

Page 213

fire, that would have been coverage wise, price wise the best that I could offer her. That's the reason. If she didn't qualify for Vermont Mutual, then ACORD will basically ask these same questions a lot less extensive.

Q. Was it your general practice back in 2003 when a customer called asking you to place insurance for them that you would make notes separately on a blank piece of paper based on the questions on the Vermont Mutual application and questionnaire?

A. To this day I still do.

Q. Is that when you are writing personal lines as in this case?

A. Commercial and personal lines.

Q. Do you first make the determination based upon your discussion with a potential customer whether or not the property or the risk is going to be either personal line coverage or commercial line coverage?

A. Well, the very first thing -- when they tell me a three-family or up to four-family dwelling with no commercial occupancy, strictly one to four-family, the best way to insure that for the benefit of the client is on a dwelling fire

Page 214

policy if it's tenant occupied. Then is it vacant, is it under renovation, is it in good shape. All these questions come into play to make the determination.

Q. You testified earlier that student occupancy was a big issue for Vermont Mutual, is that correct?

A. Yes.

Q. Was it your understanding at the time that you wrote the policy for the 93A Hillside Street Nominee Trust that if students occupied the property that Vermont Mutual would not write the dwelling fire policy?

A. Yes.

Q. You were asked questions earlier today about whether or not you have any information regarding the risk associated with student occupants, is that correct?

A. Yes.

Q. And why the risk was higher for student occupants, is that correct?

A. Yes.

Q. Now, back in 2003 and even at the present time you have approximately 26 years as an insurance

Page 215

broker and as an insurance agent?

A. Yes.

Q. In your experience as an insurance broker or insurance agent, is it true that the higher the premium the higher the insurance carrier views the risk?

MR. MCGOVERN: Objection to form.

BY MR. SEXTON:

Q. Did you understand my question?

MR. ROSSI: Objection.

A. Are you talking about one particular type of policy?

Q. In general is the premium for a certain type of coverage higher if the insurance company views that as a higher risk?

MR. MCGOVERN: Objection.

A. Yes and no. I mean, may I explain?

Q. Certainly.

A. Let's take this student occupancy with Vermont Mutual. Vermont Mutual just doesn't write on a dwelling fire student occupancy. They will not even write it on a commercial policy if we went to that for a CPP or a BOP that we earlier discussed. So they are not going to -- their

Page 216

rates are their rates. They will not charge a higher premium because it's student occupancy. It just doesn't fit into their underwriting guideline.

On a case like this, as I said, either FAIR Plan or a commercial policy with surplus wholesalers would have been the answer. They both will be a lot more expensive than Vermont Mutual writing that on a dwelling fire not knowing there is student occupancy.

Q. So based on your experience as an insurance agency, if an insurance company were to write the policy, a dwelling fire policy for commercial or personal lines and cover student occupants as a covered risk, would the premium be higher?

A. Absolutely. Middlesex Mutual is a very good example.

Q. Is that where you base your knowledge that student occupants are viewed as higher risks by insurance companies?

MR. ROSSI: Objection.

A. Part of it.

Q. What other part of it? What is the other part of it?

Page 217

A.  The fact that some don't write student occupancy and the fact that if you are exposed to the media and the news and what's happening around you, as early as maybe a year ago there was a student housing in Boston University that some students -- there was a casualty.  You hear these horror stories about when student are occupants.  You make these assumptions.  Our assumptions are what we are told by the insurance companies.

Q.  You have been writing personal lines dwelling fire policies on behalf of Vermont Mutual since 1981?

A.  No.  We signed up with Vermont Mutual maybe ten or over ten years ago.

Q.  1997?

A.  Yes.

Q.  In the ten years that you have been writing personal lines dwelling fire policies for Vermont Mutual, has Vermont Mutual ever issued dwelling a fire policy where student occupants were a covered risk?

A.  I don't recall.  There was one example that I know when we were reviewing somebody's renewal

Page 218

policy.  There was a client that had three or four dwelling fire policies with us with Vermont Mutual for the last ten years or eight years rather.  When we were reviewing it and talking about the rent increasing and so on and occupancy came up, he informed me that very recently he has changed the tenants to Tufts students.  He is getting students instead of working people.  When we learned that we told him that with Vermont Mutual that's not an occupancy that they like. We notified Vermont Mutual.  We quoted another insurance company that they do accept student occupancy.  They have a program and rates for student occupancy and we moved it out of Vermont Mutual.  So there has been cases if we are aware of it we will --

Q.  I guess my question is this, in the ten years that you've had an agency agreement with Vermont Mutual, has Vermont Mutual ever issued a policy to an insured of your agency where tenants were student occupants?

A.  Without Vermont Mutual knowing?

Q.  Right.

A.  Not that I know of, no.

Page 219

Q.  When you filled out your notes on Exhibit 7J, and particularly after reading from the entry where it says three-family, down from there?

A.  Wood frame?

Q.  Yes.  Would those notes that you have there be the answers that you were provided based on the questions you asked Mrs. Petit?

A.  Yes.

Q.  Were those questions that you asked Mrs. Petit based on the insurance application -- Strike that.

Were those questions that you asked her questions that you took directly from the Vermont Mutual application and dwelling fire questionnaire?

MR. ROSSI:  Objection.

A.  Yes.

Q.  Much of your testimony this morning concerned the group of exhibits marked as Exhibits 7A through 7L.  I am going to put the whole package in front of you.  You can look at them if you find it necessary to in answering my questions. You were asked whether you had -- especially with response to Exhibit 7J you were asked whether you

Page 220

had a specific memory of the conversation that you had with Mrs. Petit when you first spoke to her, is that correct?

A.  Yes.

Q.  And you testified that you knew these conversations had taken place because of the nets that you have in front of the you, is that correct?

MR. ROSSI:  Objection.

BY MR. SEXTON:

Q.  Strike that.  Is it your testimony that you know that the conversations with Mrs. Petit took place based upon your notes?

MR. ROSSI:  Objection.

A.  Yes.

Q.  These documents that you have in front of you, in particular Exhibit 7J, was that document made contemporaneously with the phone call that you -- that first phone conversation that you had with her?

A.  At the same time I was on the phone with her I wrote the notes.

Q.  Did your business produce those documents that are marked Exhibit 7A through 7L?

Page 221

A. Yes.

Q. Are those records of the Dadgar Insurance Agency, Incorporated?

A. Yes. They are the file.

Q. Are those records that are normally made in the course of the business of Dadgar Insurance Agency?

A. Yes.

Q. Are they documents that are normally kept and maintained in the course of business of Dadgar Insurance Agency?

A. Absolutely.

Q. Are the documents accurate and reliable and truthful when made?

A. Yes.

Q. Are they kept in the ordinary course of business?

A. Yes.

Q. I want to clear up one thing. My question may be wrong but I believe that a response to Exhibit 7J at one point your testimony was that even though it wasn't dated you would have made those notes prior to binding the policy in March 2003. I thought that that was off. I believe the

Page 222

policy was actually bound in October or November of 2003.

A. Prior to binding the policy.

MR. ROSSI: Objection.

BY MR. SEXTON:

Q. The policy wasn't bound in March 2003?

A. I have to look.

MR. ROSSI: Objection.

MR. SEXTON: Can I ask the basis?

MR. ROSSI: Form. Leading.

BY MR. SEXTON:

Q. Was the policy bound in March 2003?

A. I have a copy of it. It just kept renewing.

Q. Why don't you look at Exhibit 7K. I'm sorry 7I. Down at the bottom there is a date, is that correct?

A. Yes.

Q. What is that date?

A. November 4, '03.

Q. Based on the date that is on the bottom of Exhibit 7I, do you believe that you bound the policy as early as March 2003?

MR. ROSSI: Objection.

A. No.

Page 223

Q. When was the policy bound based on your review of Exhibit --

A. November '03.

Q. Thank you. I'm going to put in front of you Exhibit 8. That's the dwelling fire questionnaire.

A. Okay.

Q. You were asked a number of questions about the answer that was written in response to question number one, "Is the insured known to you?"

A. Okay.

Q. There was much testimony about that earlier today. Have you ever had an application for insurance turned down because you or someone in your agency answered no to a similar question on an application or questionnaire?

A. No. My recollection is no.

Q. I'm going to give you Exhibit 5. You were asked a number of questions about this. This is the dwelling manual.

A. Yes.

Q. For Vermont Mutual.

A. Yes.

Q. You were asked about two pages that contain

Page 224

what is called underwriting requirements and restrictions.

A. Yes.

Q. And on Exhibit 8 you were asked -- there are a number of -- Strike that.

There were a number of questions earlier this afternoon about whether or not student occupancy was the only exclusion that didn't appear on the two pages for underwriting restrictions, is that correct?

A. Yes.

Q. Well, the answer on the dwelling questionnaire to question number six regarding smoke detectors, if the answer to that on the dwelling questionnaire was no and you submitted that questionnaire to Vermont Mutual Insurance Company, in your experience couldn't Vermont Mutual refuse to write the policy?

MR. MCGOVERN: Objection.

A. They would not have written it in my opinion.

Q. So that's a restriction that also doesn't appear in Exhibit 5 in those two pages, the lack of smoke detectors on the insured's premises?

A. You are right. I don't see it here.

Page 225

Q. So in addition to student occupancy, if the insured on the premises did not have smoke detectors Vermont Mutual could refuse to write the policy correct?

A. Yes.

Q. That would be an underwriting restriction?

A. Yes.

Q. Similarly, looking at Exhibit 8 again, question number nine asks whether there are two exits for all units, is that correct?

A. Yes.

Q. If that answer was no, could Vermont Mutual refuse to write the policy?

A. They could refuse.

Q. Would Vermont Mutual in your experience refuse to write the policy if there were not two exits for all units in a one to four-family building?

A. Yes, they would.

Q. Can you now take a look at Exhibit Number 5 again and tell me whether or not there is an underwriting restriction listed for the fact that all units must have two exits?

A. I don't see it.

Q. So that's a third underwriting restriction

Page 226

that is contained on the questionnaire that is not in those two pages of restrictions in the manual, is that correct?

A. Correct.

Q. Similarly, for number 11 on Exhibit Number 8 which refers to the conditions of the areas surrounding the subject property, is that correct?

A. Yes.

Q. If the conditions of the area surrounding the subject property were declining, would an insurer be inclined to refuse to underwrite that risk?

MR. ROSSI: Objection.

MR. MCGOVERN: Objection.

BY MR. SEXTON:

Q. Based on your experience?

A. They could.

Q. Do they have the ability to do so? Does an insurer have the ability to refuse to underwrite a policy if the area is declining?

A. They do have the ability, yes.

Q. Can you look at Exhibit 5 and tell me where on those two pages of the Vermont Mutual fire dwelling policy manual that it states that there

Page 227

is a restriction for declining --

A. It's not here.

Q. So that's now four restrictions not mentioned in the manual, is that correct?

A. Yes.

Q. Same with number 12, substandard fire exposure near the subject property, could Vermont Mutual or any insurer refuse to write a dwelling fire policy where there are substandard fire exposures near the subject property?

A. They can.

Q. Can you tell me where in Exhibit 5 on those two pages there is an underwriting restriction for substandard fire exposures to the subpoena property?

A. I don't see it.

Q. So that's now five underwriting restrictions that are not contained in the manual that -- four in addition to student occupancy?

MR. ROSSI: Objection.

A. Right.

Q. With respect to question number 14 on Exhibit 8, the dwelling questionnaire, are any business pursuits conducted on the premises, if the answer

Page 228

to that question is yes, could Vermont Mutual refuse to underwrite the policy?

A. They could.

Q. Can you tell me where in Exhibit 5 on those two pages on the list of underwriting requirements and restrictions that restriction appears?

A. I don't see it.

Q. So now we have --

A. Six.

Q. -- six in total and five in addition to student occupancy that are underwriting restrictions that Vermont Mutual could impose on a given risk --

A. Correct.

Q. -- on a dwelling fire policy?

A. Yes.

Q. Looking again at Exhibit Number 8, question 21, does the dwelling have any wood stoves or oil space heaters, if the answer to that question for oil space heaters was yes could Vermont Mutual refuse to underwrite and to issue the policy based on the fact that the property had oil space heaters?

Page 229

A. They could.

Q. Can you tell me where on the two pages of underwriting restrictions and requirements on Exhibit 5 does it indicate that any risk with oil space heaters appears?

A. I don't see it.

Q. So that's six in addition to student occupancy?

MR. ROSSI: Objection.

A. Yes.

Q. That's six underwriting restrictions that Vermont Mutual can refuse to write the policy for in addition to student occupancy?

MR. ROSSI: Objection.

A. Yes.

Q. Exhibit Number 5 is in front of you. That's a document that is between Vermont Mutual and its agents, is that correct?

A. Yes.

Q. That doesn't -- do the potential insureds or customers ever see that?

A. No.

Q. In those two pages, the first of those two pages that we were just looking at, can you just

Page 230

look at the dwelling fire underwriting requirements and restrictions number four? Tell me if I read this correctly for the record, "Dwelling questionnaire for all one to four-family tenant occupied dwellings required on all new business."

A. Yes.

Q. Did I read that correctly?

A. Yes.

Q. Does that indicate that the questions on the -- Strike that.

Does that indicate to you that the questions on the dwelling questionnaire comprise underwriting restrictions in addition to those enumerated on those two pages?

MR. ROSSI: Objection.

A. Yes. They are making that a requirement along with the application.

Q. Okay. I think I heard today earlier the fact that -- I heard testimony on questions where you were asked about the exclusion of coverage for student occupancy, is that correct?

A. There is no exclusion. They either accept it or don't accept.

Page 231

Q. So it's either written or the policy is not written?

A. Right.

Q. It's not an exclusion?

A. It's not an exclusion, no.

Q. Prior to this denial of coverage -- Strike that.

Prior to October, November 2003, in dealing with Mrs. Petit, did you know what a co-op student was?

A. Yes.

Q. What is the basis of your familiarity of what a co-op student was?

A. We associate a co-op in Boston pretty much Northeastern students, and these are students that during the course of their studies through school they find jobs that are related to the major of their study.

Q. Does your agency write any other policies for fire insurance covering one to four-family dwellings or more than one to four-family dwellings where there are student occupants?

A. Dwelling fire policies, no, not that I know of.

Page 232

Q. Whether they are dwelling fire policies or commercial fire policies?

A. Commercial fire policies we must because we write a lot. We must have some large apartment complexes that there is some student occupancy there.

Q. Do you know whether those students are co-op students?

A. We don't make a distinction.

Q. At the time this application of insurance and the dwelling questionnaire were filled out, did you consider a co-op student to be a student occupant if such a student was a tenant?

A. I would consider a co-op student a student.

Q. It's your testimony that you directly asked Mrs. Petit whether or not there were any student occupants, and she told you there were no student occupants, correct?

MR. ROSSI: Objection.

A. Right.

Q. If Mrs. Petit had told you that there were students who occupied the property and that they were co-op students, what would you have done?

A. She seemed like a nice person. Even though I

Page 233

would have known Vermont Mutual wouldn't go for co-op students, the least I would have done is make a phone call to my underwriter and ask her, I have a situation that the client claims they are co-op students, she is arguing they are working class students, would you accept it and she would have said no. As a courtesy I would have come to Mary and told her no, we have to go to surplus plan.

Q. Since 1997 when you began writing Vermont Mutual policies, have you ever spoken to an underwriter at Vermont Mutual requesting to be allowed to bind a policy where there were student occupants?

A. Not that I recall.

Q. But --

A. On dwelling fire I don't recall.

Q. On commercial?

A. On commercial there might have been a 16-unit. For example, a 16-unit apartment building with two or three students, there is really no set -- our understanding was on larger ones, if student occupancy is less than 10 percent but that's a formula that is an unwritten formula.

Page 234

Q. In your experience has Vermont Mutual ever made an exception and issued a policy through your agency when there were -- a dwelling fire policy or commercial lines policy, fire policy when there were student occupants?

A. Not that I recall.

Q. Okay. Is it your understanding with Vermont Mutual they will not issue a commercial lines or personal lines dwelling fire policy if there are student occupants in the premises?

A. Yes.

Q. Is it your experience as an insurance agent that an insurance carrier or insurance company can refuse to write a policy of insurance for any legitimate reasons that it finds appropriate?

A. It's their choice to accept or reject.

Q. Short of certain discriminatory tactics --

A. Correct.

Q. -- can an insurer refuse to write insurance for a risk for any given reason?

MR. ROSSI: Objection.

A. Short of discrimination, yes.

Q. At the time that Mrs. Petit was applying for this dwelling fire policy, were there a number of

Page 235

other insurance -- I believe you testified -- Strike that.

I believe you testified that at the time that Mrs. Petit was applying for dwelling fire on this property that not only Vermont Mutual but there were number of other carriers who refused to write insurance if there were student occupants in the building, is that right?

A. Correct.

Q. And I believe at that time you were only writing personal lines dwelling fire policies through Vermont Mutual, is that correct?

A. Yes.

Q. What is the basis for your knowledge that there were a number of other carriers who refused to write dwelling fire policies where there were student occupants on the premises?

A. We represent companies that we write commercial insurance with but we don't write personal lines. For example, Arbella. We insure with Commerce Auto Insurance only but Commerce and Arbella are able to write homeowner and dwelling fire. It was pretty much an understanding in the industry about the student

Page 236

occupancy. I am part of this industry. On the commercial lines, pretty much the same thing with our commercial carriers that wrote larger risks. Student occupancy was always a question and a concern with carriers.

Q. I will place Exhibit Number 9 in front of you. I believe you testified they were notes that you prepared or had somebody prepare regarding telephone conversations you had regarding the claim arising out of the fire at 93A Hillside Street, is that correct?

A. Yes.

Q. Is it fair to suggest that that document is a memorialization of the conversations that you had that was made shortly after those conversations?

A. Yes, it is. The conversations -- these are the dates. I must have written date on a phone call that came in from Mary, the extent of the conversation. I called Vermont Mutual a couple times. I called Mary back. The intention of it was the dates and what conversation took place.

Q. When did you first become aware that there was a coverage issue because of student occupancy?

A. I believe when I talked to Mr. Fresco.

Page 237

Q. That would have been on May 6th?

A. Between May 5th and May 8th. Whether or not there was another conversation, you know, I don't know. I probably talked to him another time between this 5/5 and 5/8. Maybe that was it. I don't recall. It was pretty much he gave me the impression that was it.

Q. When you were contacted by Mr. Winnick on May 9th, the public adjustor, you have a note here that you say that he said the coverage issue he was pretty sure was due to student occupancy and that you should tell Vermont Mutual that these are co-op students, not regular students and they should be considered working class. Is that what it says?

A. Yes. That is the reason I started writing that.

Q. You responded to him that you were not aware of any co-op students and that it was up to Vermont Mutual to make that determination?

A. Correct.

Q. Were you aware prior to May 9th when you had that conversation that there was a coverage issue because of student occupants on the premises?

Page 238

A. I am pretty sure the conversation I had with Mr. Fresco brought that.

Q. Did you tell Mr. Winnick that you were not aware until speaking with Mr. Fresco or did you just say that you were not aware?

A. To Mr. Winnick I just said --

Q. Were you concerned after speaking with Mr. Winnick that there was a possible claim going to be made against you as a result of the fact that there were in fact student occupants?

A. Yes.

Q. Is that the reason that you prepared Exhibit 9.

A. Whether that's the reason, you know, or not, consciously maybe that was the reason, yes.

Q. I will show you Exhibit 2 again. It's fair to suggest that is a standard form issued by ACORD?

A. Yes.

Q. What does ACORD stand for, do you know?

A. I don't recall.

Q. In your experience an as insurance broker, there are a number of ACORD forms?

A. Yes.

Q. There's an ACORD notice of loss form, is there

Page 239

not?

A. Yes.

Q. It's fair to suggest there are a number of different ACORD forms?

A. Yes.

Q. They are made specifically for the insurance industry?

A. Yes.

Q. And for brokers in particular to report losses as well as to apply for insurance, is that correct?

A. Yes.

Q. I believe earlier you were asked to review Exhibit 2 and you testified that nowhere on Exhibit 2 did it say that there was any -- there was no question whether or not there were student occupants on the premises, correct?

A. Correct.

Q. Does the fact that there is no question on that ACORD form preclude the carrier from not writing insurance because there are in fact student occupants?

A. No. Everything is -- there is always another supplement. Even for Vermont Mutual we are now

Page 240

using dwelling fire apps, ACORD apps for Vermont Mutual which is we have to add the questionnaire along with it. Everyone has their own questionnaire.

Q. So every insurer has their own questionnaire and some carriers require the ACORD application?

A. Along with the questionnaire.

MR. SEXTON: I don't have any further questions.

EXAMINATION BY MR. ROSSI:

Q. Mr. Dadgar, Attorney Sexton asked you a question about whether you ever had a claim against you for negligence before today. I just want to direct your attention to that line of questioning. Has your agency ever had an experience with a customer where their claim for fire insurance has been denied because they had students occupying the premises before?

MR. SEXTON: Objection.

A. No.

Q. Is this the first time you are aware of where coverage has ever been denied based on the fact that there was student occupancy on the premises?

A. Yes.

Page 241

Q. Has your agency ever been involved with a customer that had a claim, a fire loss claim, denied for coverage related issues before?

A. I don't recall.

Q. So no specific instance?

A. No. Nothing comes to mind.

Q. So would this claim that we are here for today be the first time that you know of that your agency has had a client that submitted a fire loss claim that was denied based on coverage issues?

A. Yes.

Q. You made some mention in response to some of Mr. Sexton's questions concerning the increased risk of student occupancy to media events, and in particular, one BU student situation. What was the specific situation you were referring to then?

A. I believe there was a candle fire. The student -- I don't know the specific details. I know there was casualty. What had come out in the media was drinking and candle fire was associated with the loss.

Q. When was that incident?

Page 242

A. I don't recall. Over a year ago.

MR. SEXTON: Off the record.

(Discussion off the record).

BY MR. ROSSI:

Q. Was that incident within the past six months?

A. I believe it was.

Q. Okay. So you would agree with me that was an incident that happened after Ms. Petit put her application in for insurance?

A. Yes.

Q. Are you aware of any incidents that you can recall before she put her application in for insurance that involved student occupants in the media that you were relying on in answer to his questions?

A. There was an MIT student who passed away from drinking. This I believe was a couple of years ago it came out in the media. It was a party and he was a bright young man. One of the parties he had and he was drinking in excess. He was a freshman. We heard about that in the media.

Q. Did that involve an insurance loss for dwelling fire insurance?

A. I don't recall.

Page 243

Q. So are you contending that such an incident would be something an insurer would take into account in determining whether or not to insure a premises where students reside?

A. No. We were talking about the students and the risk factor.

Q. For insurance?

A. Yes.

Q. Right. So my question was are you contending that the incident with the MIT student is one that would relate to the increased risk factor for dwelling fire?

A. It could be. I am not the insurance company but it could be.

Q. Now, you read the papers regularly, I assume, based upon your previous answers?

A. Hm-mm.

Q. And there are many deaths in the City of Boston throughout the course of the year, would you agree with that?

MR. SEXTON: Objection.

MR. MCGOVERN: Objection.

A. Okay.

Q. And there are many fires in the City of Boston

Page 244

throughout the year?

MR. SEXTON: Objection.

MR. MCGOVERN: Objection.

A. Yes.

Q. Do you have any knowledge as to approximately how many fires occurred in the City of Boston to residential dwellings last year?

A. Number of fires, no.

Q. Do you have any knowledge with regard to the fires that exist to residential dwellings in the City of Boston how many involved dwellings that were student occupied?

A. No.

Q. Do you have any knowledge as to whether or not any of the fires that occurred in dwellings in the State of Massachusetts in the last year involved student occupancy?

A. No, I don't have knowledge.

Q. Do you have any knowledge as to whether or not there is an increased number of dwelling fires that have occurred within the last year in Massachusetts involving student occupied dwellings as compared to other types of dwellings?

Page 245

A. I don't know.

Q. Is it your understanding that those areas that involve housing in close proximity to universities and colleges have higher incidents of fires than dwellings in other areas?

MR. MCGOVERN: Objection.

A. No. That's not what I'm saying.

Q. With regard to your reference to the MIT student who had been drinking and drank himself to death, do you have any knowledge as to whether or not individuals aged 18 through 22 are more likely to be in school as students than not?

MR. SEXTON: Objection.

MR. MCGOVERN: Objection.

A. I have no knowledge.

Q. Do you have any knowledge as to whether students aged 18 through 22 have alcohol abuse problems if they are students as compared to those of that age that are not students?

MR. SEXTON: Objection.

MR. MCGOVERN: Objection.

A. No.

Q. Do you have any knowledge as to whether or not individuals who reside in apartments tend to have

Page 246

more electronic equipment based on whether they are students or not?

MR. SEXTON: Objection.

MR. MCGOVERN: Objection.

A. No.

Q. Do you have any knowledge as to whether or not students that live in apartment dwellings tend to be more risk prone with regard to candles than those who are not?

MR. SEXTON: Objection.

MR. MCGOVERN: Objection.

A. No, I don't.

Q. So with regard to your testimony in answer to Mr. Sexton's questions about your general understanding as to the risk factor of an insured's premises with students versus non students, would you agree that is based entirely on hearsay and speculation as far as you know?

MR. SEXTON: Objection.

MR. MCGOVERN: Objection.

A. No. I wouldn't make that comment.

Q. Do you have any knowledge other than hearsay or speculation that indicates to you that students are an increased risk to an apartment

Page 247

dwelling?

MR. SEXTON: Objection.

MR. MCGOVERN: Objection.

A. No.

Q. Now, Mr. Sexton also asked you some questions about the handbook and certain information that was in the handbook about underwriting.

MR. MCGOVERN: Just a clarification. The manual?

MR. ROSSI: Yes. I'm talking about the dwelling policy program manual.

BY MR. ROSSI:

Q. His questions to you were limited to the first few pages in the manual that had simply the listing of dwelling fire underwriting requirements and restrictions, is that correct?

A. Yes.

Q. So when you answered his questions, you were limiting yourself to two pages of that manual, is that correct?

A. Yes.

Q. Would you agree with me that this manual which you have produced is approximately 83 pages?

A. Yes.

Page 248

Q. Now, would you also agree with me that although not specifically listed in the dwelling fire insurance requirements and restrictions on pages CG1 and CG2 of that manual there may be entries in other parts of the manual that address the types of losses that he was asking you about?

A. I have to refer to all those pages. It's been a while since I have reviewed it, but I don't think there is any in there.

Q. So, for example, there was a question about business uses that I believe Mr. Sexton asked you about. Was your answer to the question that with regard to those lists that appear on those two pages in that manual there are no prohibitions about specific business uses listed in there?

A. In here it's not but by the same token, on question number four on this dwelling fire underwriting requirements and questions, number four references the questionnaire which does have business use.

Q. I understand that. Let's get even a little bit more specific. Within the manual itself, without going to the questionnaire, there is language that addresses limitation on business

Page 249

use, isn't there?

MR. SEXTON: Objection.

MR. MCGOVERN: Objection.

A. I don't know.

Q. I would like to direct your attention to section 304 of that manual. Can you find it? 304 appears on page DB12-14 of Exhibit 5. With regard to the right portion of that, permitted incidental occupants.

A. Yes.

Q. Section B.

A. I see it.

Q. Permitted incidental occupancies. Would you agree that that discusses the issue of businesses that are permitted as incidental occupancies?

A. Yes, I agree with you.

Q. I would also direct your attention to section 103 in that manual which I believe is DP3 which is the ninth page of that document.

A. DP11.

Q. DP3 is the page number and 103.

A. Okay.

Q. Would you agree with me that reading through section 103 in various sections such as coverage

Page 250

A on the dwelling building that this would be -- with the preface that dwelling policy may be issued to provide insurance under a coverage A on a dwelling building used solely for residential purposes except at certain incidental occupancies for up to five roomers or boarders are permitted?

A. Yes.

Q. Section B, item two, used solely for residential purposes except in certain incidental occupancies for up to five roomers or boarders are permitted?

A. Hm-mm.

Q. Section C, coverage -- is that B, part two not used for business purposes except as permitted incidental occupancy or when rented to use as private garage?

A. Okay.

Q. Would you agree that there are instances in this manual that address the business use exclusion or exemption or requirement?

A. Yes.

Q. Would you agree with me there are also incidents in this manual that address the issue of egress, at least two for a fire or that has

Page 251

tenant occupants in it?

MR. MCGOVERN: Objection.

A. Again, I have to see it to agree or disagree with you. If it is here, please point it out to me. It's been a long time since I've reviewed this manual.

Q. Okay. Mr. Sexton ended his interrogation before I got to go through the remaining portions of the manual. Let me go through some other questions. We will come back to that. I will get that to you.

With regard to the questions that Mr. Sexton asked you about whether or not an insurance company has a right to refuse coverage for any non-discriminatory reason, are you aware of the legal requirements that the insurance companies face in Massachusetts concerning the issue of fire dwelling insurance?

A. Somewhat.

Q. That is to some degree covered by statute, isn't it?

A. Yes.

Q. That statute governs what the policy may or may not include. Would you agree with that?

Page 252

A. Yes.

Q. Would you agree that that includes many, many, many issues other than simply discrimination related issues?

A. For them to accept or -- okay. Yes.

Q. So the policies that are issued through your agency by these insurers in Massachusetts have to comply with Massachusetts law with regard to many of the provisions of that policy, is that right?

A. Okay. Yes.

THE WITNESS: Can I take a break?

MR. ROSSI: Sure.

(Break taken).

BY MR. ROSSI:

Q. Mr. Dadgar, are you familiar with the specific laws in Massachusetts regarding fire policies?

MR. SEXTON: Objection.

A. Somewhat.

Q. So once again, with regard to Mr. Sexton's questions, you don't really agree that an insurance company can refuse to issue insurance for any reason other than discrimination, do you?

MR. SEXTON: Objection.

MR. MCGOVERN: Objection.

Page 253

A. Yes, I do.

Q. So that if a policy -- if they wanted to devise a policy that would have a form substantially different than that required by Massachusetts law insofar as excluding coverages for things that the law provides must be covered for, that would be not permissible, would it?

MR. SEXTON: Objection.

MR. MCGOVERN: Objection.

A. No. Again, you are asking me questions to answer yes or no. I'm answering you yes or no but the insurance company can cancel a policy for nonpayment, could cancel a policy for increased liability exposure, hazard. A whole bunch of different reasons.

Q. Those would be reasons that are permissible within the confounds of the Massachusetts law, correct?

A. Yes.

Q. It would be in accordance with the contract that is issued with the insurance company and the insured that is consistent with that that is provided for in General Laws Chapter 175, Section 99?

Page 254

MR. SEXTON: Objection. Are you testifying or questioning?

MR. MCGOVERN: Objection.

MR. ROSSI: It's a question.

A. Yes.

Q. In fact, Massachusetts law controls such things as the size of the language that appears in the policy, the size of the printing, correct?

MR. SEXTON: Objection.

MR. MCGOVERN: Objection.

BY MR. ROSSI:

Q. If you know?

A. I don't know.

Q. Do you know whether or not -- do you know whether or not there are any provisions in the Massachusetts statute that govern the issue of cancellation?

MR. SEXTON: Objection.

MR. MCGOVERN: Objection.

A. I don't know.

Q. Do you know whether or not the Massachusetts law governs the issues as to whether or not student occupancy is permitted?

MR. SEXTON: Objection.

Page 255

A. I don't know.

Q. How about the issue of smoke detectors?

MR. SEXTON: Objection.

A. I don't know.

Q. By the way, with regard to the issue of smoke detectors, are you aware as to whether or not fire insurance must have provisions in it that state that the premises has to be in accordance with applicable state and local law?

A. Yes.

Q. Are you aware as to whether or not the existence of smoke detectors is one of the topics discovered by state or local law?

A. Yes.

Q. What is the provision of law saying with regard to smoke detectors in occupied dwellings?

MR. MCGOVERN: Objection.

A. Operational smoke detectors in all.

Q. So would you agree with me that is not necessarily a specific item that the insurance company would pick out in its underwriting but would rely on the fact that it's required by law?

MR. SEXTON: Objection.

MR. MCGOVERN: Objection.

Page 256

A. You are correct but that may be for a new purchase. For example, on an existing policy, smoke detectors could not be working. We have heard of fires that have caused extensive damage and life because of the smoke detectors not being in working order, batteries not being changed regularly.

Q. Sure. Now, do you know whether those were private dwelling homes or multiple dwelling homes?

MR. SEXTON: Objection.

A. I don't know the specifics.

Q. Do you know whether or not the law requires smoke detectors even in preexisting homes?

A. They do of course.

Q. Excuse me. Preexisting homes of multi-dwellings?

A. Yes.

MR. SEXTON: Objection.

BY MR. ROSSI:

Q. Are you aware of how long Vermont Mutual had the restriction of student occupants as part of its underwriting policy?

MR. SEXTON: Objection.

Page 257

A. No.

Q. Are you aware of when it first instituted that policy?

A. I'm not aware of when they first instituted that, no.

Q. To your knowledge, all companies that you know of that currently have this policy of not insuring premises with student occupants, did they all implement that policy at the same time?

A. I am not aware of that.

Q. How old is the questionnaire that Vermont Mutual uses and that you use that we have marked here as an exhibit? I mean the questionnaire form.

A. The questionnaire is 2003. In Mrs. Petit's case it was the same questionnaire that we used from 1997 that we were licensed with Vermont Mutual.

Q. So --

A. I think it's changed now.

Q. Do you know in what way it's changed?

A. I think they accept ACORD dwelling fire application and questionnaire. It's pretty much the same questions. I don't have a copy of it

Page 258

with me. It's the same.

Q. Do you know how long before 1997 Vermont Mutual was using this questionnaire?

A. I do not know.

Q. Would you agree with me there are items on this questionnaire that are no longer relevant to Vermont Mutual's underwriting policies?

MR. SEXTON: Objection.

MR. MCGOVERN: Objection.

A. I don't know what you are talking about.

Q. For example, would you agree with me the distinction of working class versus professional is no longer relevant, as far as you know, to the Vermont Mutual underwriting policies?

MR. SEXTON: Objection. John, I don't see how this late in the day he can testify to what's relevant or not to Vermont Mutual.

MR. MCGOVERN: Objection.

A. I can't answer for Vermont Mutual. I answered how I treat that question, and to me, working class and professional is the same.

Q. Do you have any information upon which you concluded Vermont Mutual might consider that relevant ?

Page 259

MR. SEXTON: Objection.

A. I don't.

Q. How about once again with regard to your answer to Mr. Sexton's question that you never knew of any insurance decline because number one was answered no? Do you know of what relevance underwriting Vermont Mutual makes of that question as we sit here today ?

MR. SEXTON: Objection.

MR. MCGOVERN: Objection.

A. No, I don't.

MR. ROSSI: Just subject to the previous comments I had on suspending, I have no further questions.

EXAMINATION BY MR. SEXTON:

Q. Are you generally aware based on your experience as an insurance broker and an insurance agent that a material misrepresentation in an application for an insurance policy can operate under the contract so that the insurer can deny coverage under the policy?

MR. ROSSI: Objection.

A. Yes.

Q. In general if a potential customer came to

Page 260

your agency and you asked her in the course of questioning that customer whether or not there were student occupants in the premises of a one to four-four family building and you were told no and it was later discovered that there were student occupants in that building, would you in your experience consider that to be a material misrepresentation under the policy?

MR. MCGOVERN: Objection.

MR. ROSSI: Objection.

A. Yes, I will, if the tenancy hasn't changed. If it's the same at the time she told me no or he told me no and two weeks later I find out at the time she had students, that would be yes.

Q. What if you were told at the time that the policy was applied for and consistently up until the time of a loss that there were no student occupants consistently throughout that three-year time period, would you consider that as being a material misrepresentation at the time the insurance was applied for?

MR. MCGOVERN: Objection.

A. Say that again.

Q. Let's say that you ask when someone applies

Page 261

for insurance -- this is just asking you in your general experience. If you asked the question whether or not there were student occupants on the premises and you were told no and that some three years later there were a fire loss on the premises and you then determined that consistently from the time that that person applied, entirely for that full three years there were always student occupants, would you consider that a material representation under the terms of the policy?

A. Yes.

MR. ROSSI: Objection.

MR. MCGOVERN: Objection.

MR. SEXTON: Thank you.

EXAMINATION BY MR. ROSSI:

Q. What is your definition of a material misrepresentation, Mr. Dadgar?

A. A material misrepresentation on this particular question that you are addressing is either yes or no. The answer to that question in here was no. Are there any student occupancy. I didn't ask whether it was co-op. I didn't ask whether the student has a father who works. I

Page 262

just asked are there any student occupants. The answer was no. That's to me a material misrepresentation.

Q. Now, what is it that makes one misrepresentation material versus one that is not material?

A. Say that again.

Q. Focus on the word material. What is it about a misrepresentation with regard to insurance that makes it material versus immaterial?

MR. MCGOVERN: Objection?

MR. SEXTON: Objection.

A. I don't understand the question to answer it.

Q. Do you understand the definition of the word material as it's used in the term material misrepresentation?

MR. SEXTON: Objection.

A. Information. To me it's information, yes.

Q. Do you understand the word material?

A. I know what material is.

Q. As you understand it, in the term material misrepresentation what does the term material mean?

A. Information that is given to us.

Page 263

Q. Given that answer, is all information given to you what you consider to be material information?

MR. MCGOVERN: Objection.

A. What is important is material information. What is not relevant is not material.

Q. When you say not relevant, what is the difference that makes it relevant?

MR. SEXTON: Objection.

MR. MCGOVERN: Objection.

MR. SEXTON: Should we send him to law school so we can continue the deposition?

MR. ROSSI: You asked him the question.

MR. SEXTON: I asked him in the context of an insurance policy.

MR. ROSSI: That's what I'm asking.

MR. SEXTON: You're asking him generally.

A. What is not relevant?

Q. Let me rephrase the question then because Mr. Sexton brings up a good point. In the context of an insurance policy, what makes a representation material versus immaterial?

MR. MCGOVERN: Objection.

Page 264

A. I don't know.

Q. So would you agree with me with regard to the issue of a material misrepresentation in an insurance policy context you really don't know what that definition is?

MR. MCGOVERN: Objection.

A. No. I don't agree with you. The information that we -- we are looking for information. If the information is not true, that's misrepresentation. If information is true, then it's --

Q. Mr. Dadgar, we are not simply talking misrepresentation. We are talking about material misrepresentation. Is there a difference in your mind between --

A. It's --

Q. Let me finish the question. With regard to the context of an insurance policy, is there a difference in your opinion as to misrepresentation as compared to material misrepresentation?

MR. MCGOVERN: Objection.

MR. SEXTON: Objection.

A. Misrepresentation and material

Page 265

misrepresentation to me is the same. It's the information that --

Q. It's the same?

A. Information that to me and the underwriting at an insurance company makes a judgment to take this risk or not.

Q. Are you telling me that in your opinion the meaning of misrepresentation as compared to material misrepresentation in the context of an insurance policy is the same?

MR. SEXTON: Objection.

MR. MCGOVERN: Objection.

A. No, I'm not.

Q. I am just going by your words. In the answer to my last question you are saying it's the same.

MR. MCGOVERN: Objection.

BY MR. ROSSI:

Q. So what is it, the same or not the same?

MR. SEXTON: Objection.

MR. MCGOVERN: Objection.

A. I don't know.

Q. You don't know?

A. No.

Q. You don't know whether it's the same or not

Page 266

the same?

A. No.

MR. MCGOVERN: Objection. ?

MR. SEXTON: Objection.

BY MR. ROSSI:

Q. Are you familiar with any legal basis upon which an insurance company has been excused from providing coverage for fire dwelling loss where student occupancy existed?

MR. MCGOVERN: Objection.

A. No.

Q. Are you aware as to whether or not in your industry that there are bulletins or journals or writings that come down from time to time to explain how the courts have handled fire loss issues?

A. Correct.

Q. How often do you get those bulletins or journals in your agency?

A. It's called standard publication. It's monthly publication and they have case studies, different cases. We get that. Other publications that we get sometimes, they talk about different case studies.

Page 267

Q. In any of those publications, have you observed anything in Massachusetts that addressed the issue of whether or not a student occupancy status is a material representation in an insurance policy?

MR. SEXTON: Objection.

MR. MCGOVERN: Objection.

A. I don't recall.

Q. Do you recall reading about any cases where a company rightfully was able to not make a payment based on student occupancy in Massachusetts?

MR. SEXTON: Objection.

MR. MCGOVERN: Objection.

A. I don't recall.

MR. ROSSI: No further questions.

(Whereupon the deposition suspended at 5:30 p.m.).

Page 268

ERRATA SHEET DISTRIBUTION INFORMATION

DEPONENT'S ERRATA & SIGNATURE INSTRUCTIONS

ERRATA SHEET DISTRIBUTION INFORMATION

The original of the Errata Sheet has been delivered to William P. McGovern, Esquire. When the Errata Sheet has been completed by the deponent and signed, a copy thereof should be delivered to each party of record and the ORIGINAL forwarded to John Rossi, Esquire, to whom the original deposition was delivered.

INSTRUCTIONS TO DEPONENT

After reading this volume of your deposition, please indicate any corrections or changes to your testimony and the reasons therefor on the Errata Sheet supplied to you and sign it. Do NOT make marks or notations on the transcript volume itself. Add additional sheets if necessary. Please refer to the above instructions for Errata Sheet distribution information.

Page 269

ATTACH TO THE DEPOSITION OF: Anowshirvan Dadgar

CASE: Vermont Mutual Insurance vs. Mary E. Petit, et al          DATE TAKEN: 7/13/07

ERRATA SHEET

Please refer to page 268 for Errata Sheet instructions and distribution instructions.

PAGE      LINE                CORRECTION

I have read the foregoing transcript of my deposition and except for any corrections or changes noted above, I hereby subscribe to the transcript as an accurate record of the statements made by me.

Executed this_____ day of _____, 2007.

_____
Anowshirvan Dadgar

Page 270

COMMONWEALTH OF MASSACHUSETTS
COUNTY OF PLYMOUTH

I, Kim M. Romaine, a Professional Shorthand Reporter and Notary Public and for the Commonwealth of Massachusetts, do hereby certify that the foregoing deposition was taken before me on July 13, 2007.

The said witness, was duly sworn before the commencement of his testimony; that the said testimony was taken stenographically by myself and then transcribed. To the best of my knowledge, the within transcript is a true and accurate record of said testimony.

I am not connected by blood or marriage with any of the said parties, nor interested directly or indirectly in the matter on controversy.

Page 271

In witness whereof, I have hereunto set my hand and Notarial Seal this 8th day of August 2007.

Kim M. Romaine, Notary Public
In and for the Commonwealth of
Massachusetts
My Commission Expires:
August 31, 2012

PLEASE NOTE:

THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME BY ANY MEANS UNLESS UNDER THE DIRECT CONTROL AND/OR DIRECTION OF THE CERTIFYING REPORTER.