Page 1

Volume:  I
Pages:  1 to 139
Exhibits:  (See Index)

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

VERMONT MUTUAL INSURANCE COMPANY,        )
        Plaintiff/                        )
        Counterclaim Defendant,           )
                                          )
        vs.                               )
                                          )
MARY E. PETIT and FRANK PETIT,            )
TRUSTEES of the 93a HILLSIDE             )
STREET NOMINEE TRUST                      )
and                                       )
DADGAR INSURANCE AGENCY, INC.,            )
                                          )
        Defendants/                       )
        Counterclaim Plaintiffs.          )
*********************************          )  ·
                                          )
MARY E. PETIT and FRANK PETIT,            )
TRUSTEES of the 93A HILLSIDE             )
STREET NOMINEE TRUST,                     )
        Cross-Claim Plaintiffs,           )
                                          )
        vs.                               )
                                          )
DADGAR INSURANCE AGENCY, INC.             )
        Cross-Claim Defendant.            )
                                          )
*********************************          )
MARY E. PETIT and FRANK PETIT,            )
TRUSTEES of the 93A HILLSIDE             )
STREET NOMINEE TRUST,                     )
        Third-Party Plaintiffs,           )
                                          )
        vs.                               )
                                          )
ANOWSHIRVAN DADGAR,                       )
        Third-Party Defendant.            )
                                          )

Page 2

DEPOSITION OF GLEN J. McRAE, a witness called on behalf of the Dadgar Insurance Agency, Inc., and Anowshirvan Dadgar, taken pursuant to Rule 30 of the Federal Rules of Civil Procedure, before Valerie L. Shand-Salama, Professional Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the Offices of Tucker, Heifetz & Saltzman, LLP, 100 Franklin Street, Boston, Massachusetts, on Tuesday, January 15, 2008, commencing at 2:12 p.m.

Page 3

APPEARANCES:

Litchfield Cavo LLP
6 Kimball Lane, Suite 100
Lynnfield, MA 01940-2682
By: James W. Sexton, Esq.
Tel: 781-309-1513 - Fax: 781-246-0167
E-mail: sexton@litchfieldcavo.com
Attorney for the Plaintiffs.

Law Office of John F. Rossi
18 Tremont Street, Suite 900
Boston, MA 02108
By: John F. Rossi, Esq.
Tel: 617-742-5400
E-mail: johnrossi@johnrossi.com
Attorney for the Cross-Claim
Plaintiffs/Third-Party Plaintiffs

Tucker, Heifetz & Saltzman, LLP
100 Franklin Street
Boston, MA 02110
By: William P. McGovern, Jr., Esq.
Tel: 617-557-9696 - Fax: 617-227-9191
E-mail: mcgovern@ths-law.com
Website: www.ths-law.com
Attorney for the Defendant/Counterclaim
Plaintiff/Third Party Defendant

Melick, Porter & Shea, LPL
28 State Street
Boston, MA 02109
By: Kathleen A. Bugden, Esq.
Tel: 617-502-9686 - Fax: 617-502-9786
E-mail: kbugden@melicklaw.com
Attorney for the Deponent

* * * * *

Page 4

INDEX

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| GLEN J. McRAE | | | | |
| BY MR. McGOVERN | 6 | | | |
| BY MR. ROSSI | 91 | | 134 | |
| BY MR. SEXTON | 123 | | | |

* * *

EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Copy of a facsimile transmittal sheet dated 8/7/07 from Steve Shulman to Bill McGovern with attachments | 18 |
| 1A | Copy of a commercial insurance application, ACORD form, dated 5/16/03, nine pages | 32 |
| 2 | Copy of a letter dated 9/27/07 from Kathleen Bugden to Bill McGovern, with attachments | 18 |
| 2A | Copy of an e-mail dated November 28, 2006 | 93 |

2 (Pages 5 to 8)

Page 5

* * * * *

Page 6

PROCEEDINGS

Stipulation

It is stipulated by and between counsel for the respective parties that the deposition is to be read and signed under the pains and penalties of perjury; and that all objections, except as to form, and motions to strike are reserved to the time of trial.

GLEN J. McRAE

a witness called for examination by counsel for the Dadgar Insurance Agency, Inc., and Anowshirvan Dadgar, having been satisfactorily identified by the production of his driver's license and being first duly sworn by the Notary Public, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. McGOVERN:

Q.   Good afternoon. My name is Bill McGovern. I represent Anowshirvan Dadgar and Dadgar Insurance Agency. I've asked you to come here today to testify in a deposition.

Page 7

The woman sitting to my right and to your left is a stenographer. She is taking down everything that is said today on the record, and it will be reduced to a typewritten document.

For that reason, I would ask that when you respond to the questions that are asked of you today that you respond in words as opposed to gestures. It makes for a clearer record later on.

Additionally, I would ask that you wait until the question is complete before you begin your answer. And, again, it's for clarity when the transcript is produced.

A.   Okay.

Q.   You are represented today by counsel; is that correct?

A.   Yes.

Q.   And for that reason, if at any time during this deposition you wish to speak to your counsel in private, just let me know; and I'll be happy to allow you to do so.

If you wanted to take a break for any other reason as well, just let me know, and

Page 8

we can take a break. Okay?

A.   Okay.

Q.   Lastly, if there is a question that I ask you that you do not understand, please let me know; and I can try to say it in a different way.

A.   Okay.

Q.   When you respond to my questions, I want everyone to understand what it is that's being asked. And if you do not understand, I expect you to state that so I can clarify the question.

Okay?

A.   Okay.

Q.   All right. Please state your name.

A.   Glen McRae.

Q.   How do you spell your first name?

A.   G-l-e-n. Last name McRae, M as in Michael, R-a-e.

Q.   What is your residential address?

A.   160 Tyngsboro Road, T-y-n-g-s-b-o-r-o Road, No. 6B -- like boy -- North Chelmsford, Mass. 01863.

Q.   What is your date of birth?

Page 9

A.   2/19/59.
Q.   Briefly describe your educational background.  Did you complete high school?
A.   Yes.  Swampscott High, class of '77; Tufts University, class of '81.
Q.   Did you obtain a degree from Tufts?
A.   Yes.  A BA in sociology.
Q.   Have you had any other formal education after that?
A.   No.
Q.   Are you married?
A.   Yes.
Q.   Are you currently employed?
A.   Yes.
Q.   Who is your employer?
A.   Rodman Insurance.
Q.   Where is Rodman Insurance located?
A.   145 Rosemary Street, Building A -- like apple -- Needham, Mass. 02494.
Q.   And what's the full name of Rodman Insurance?
A.   Rodman Insurance Agency, Incorporated.
Q.   Do they have other locations other than the Rosemary Street address?

Page 10

A.   No.
Q.   For how long have you worked for Rodman Insurance Agency?
A.   February 2000, so next month, eight years.
Q.   So you began in February 2000?
A.   Yeah.
Q.   What is your current position at Rodman Insurance?
A.   Account executive, commercial lines.
Q.   For how long have you held that position?
A.   The last seven years.
Q.   So have you held any other positions at Rodman Insurance Agency?
A.   For the first year I was personal lines.
Q.   Were you an account executive, personal lines?
A.   CSR.
Q.   And for the record, what's a "CSR"?
A.   Customer service rep.
Q.   Do you hold any licenses or certificates?
A.   Yes.  CISR.
Q.   What is that?
A.   Certified insurance -- actually, I don't even know what the "SR" means.  I don't

Page 11

know.
Q.   Okay.
A.   I just don't know what the "SR" means.
Q.   Is that a license?
A.   Yeah.  It's a designation, they call it.
Q.   Okay.  And how long have you held that designation?
A.   The last five years.
Q.   Do you hold any other licenses or certificates?
A.   No -- well, I got my broker's license.  But other than that, no.
Q.   When did you get your broker's license?
A.   Oh, God.  January '82.
Q.   Describe your job duties as an account executive, commercial lines.
A.   I insure particularly small businesses.  They separate their, you know, claims and other things.  I handle incoming phone calls, insuring buildings, businesses, their cars, you know, like that.
Q.   When you say you "insure" them, you're an agent or a broker?
A.   Right.  Well, I handle the phone calls.  I

Page 12

place the applications to the companies, and I get it insured.
     (Cell phone ringing)
     THE WITNESS:  Excuse me.
     MR. McGOVERN:  Let's go off the record.
     (Discussion off the record)
     MR. McGOVERN:  On the record.
Q.   What you just told me was a description of your current duties.  Have those been your duties since you became an account exec, commercial lines?
A.   Right.
Q.   What were your duties when you were a CSR in personal lines?
A.   Pretty much the same thing, only not businesses.  Insuring their personal home, their personal auto.  Pretty much whatever they needed.
Q.   Okay.  Approximately how many employees does Rodman Insurance Agency have?
A.   I think about 50.
Q.   And about how many at the level of account executive, at your level?
A.   Let me see, there's two of us in small

4 (Pages 13 to 16)

Page 13

lines, and four of them -- no, six, I think, in large lines, insuring the larger businesses.

Q. Okay. Did you work in the insurance industry before you came to Rodman Insurance Agency in February 2000?

A. Yes. I started at -- working for Safety Insurance Company.

Q. What was your job at Safety Insurance?

A. They had a branch office, Congress Insurance. I was the office manager. That's July '81 until -- what was it? -- '87, I think.

Then I went to Farquhar & Black Insurance. It's an agency in Lynn.

Then I think in 1993, CJ McCarthy Insurance in Wilmington.

Then February 2000, Rodman Insurance -- actually, it was '97 at McCarthy Insurance.

Q. And when you say '97, you began in 1997 working for McCarthy Insurance?

A. 1997, right.

Q. And you worked there until 2000 approximately?

Page 14

A. Right.

Q. So what years did you work at Farquhar & Black?

A. Let's see. I think it was like March of '83 until '97.

Q. Okay. Then, so for Safety Insurance, you began in July of '81?

A. Yes.

Q. And you worked there until, what, would it be '83?

A. Yeah. The dates are -- it's been so long ago.

It was about five years for Safety and 12 for Farquhar & Black.

Q. Okay. And during this period of time, from July '81 until the present, was there any period of time where you were working for more than one of those employers?

A. No.

Q. Okay. You just testified a moment ago that you got a broker's license, I believe, in January of 1982?

A. Right.

Q. Did you act as an insurance broker during

Page 15

the time you worked at Safety Insurance Company?

A. No. I was just the office manager. They required it, a property and casualty license.

Q. I see. What was your position when you started at Farquhar & Black?

A. CSR.

Q. From the time you started at Farquhar & Black until the present, have you held positions as an insurance agent or broker?

A. Uh-huh -- no.

Q. At Farquhar & Black, did you have any other positions other than CSR?

A. No.

Q. At CJ McCarthy, what positions did you hold?

A. CSR.

Q. Any other positions at McCarthy?

A. No.

Q. What were your job duties at Farquhar & Black?

A. Oh, it was a big one-room office. Just handling customers as they walked in,

Page 16

handling their accounts. It was personal lines. Insuring their autos, boats, homes, and so on. Handling any questions they had and so on. Getting them covered. Claims, too.

Q. Okay. And that was exclusively personal lines?

A. Right.

Q. And what were your job duties at CJ McCarthy?

A. Oh, I was basically an assistant to the producers, getting them quotes, in contact with the company, get best price and so on.

I was also handling customer phone calls, handling their accounts, getting them whatever they needed.

Q. Okay. What kind of lines did you handle at CJ McCarthy?

A. Personal lines.

Q. Any commercial lines there?

A. No.

Q. What, if anything, have you done to prepare for today's deposition?

A. Basically, just talked to her (indicating)

Page 17

and going over the notes.

Q. Did you review any documents?

A. Yes.

Q. What documents did you review?

A. Mostly just printed out activities of what I put in the computer, notes back and forth to the company, and so on.

Q. Would the documents that you reviewed have been included in the business records of Rodman Insurance?

A. Uh-huh.

MR. McGOVERN: You have to answer --

A. Yes.

Q. Okay. I'll represent to you that earlier in this litigation, I subpoenaed some records from Rodman Insurance Agency. Did you have any role in responding to that subpoena?

A. Other than just making photocopies of what I had and talking to her (indicating attorney) about it. That's it. It was like a one-day meeting.

MR. ROSSI: Just for the record, when the witness refers to "her," he's

Page 18

referring to his attorney.

THE WITNESS: Oh, yes.

Q. Who was responsible for responding to the subpoena for records, if you know?

A. Steve Shulman, S-h-u-l-m-a-n. He's one of the producers at Rodman Insurance.

MR. McGOVERN: I'm going to have these two documents marked.

(Copy of a facsimile transmittal sheet dated 8/7/07 from Steve Shulman to Bill McGovern with attachments marked as McRae Exhibit 1 for identification)

(Copy of a letter dated 9/27/07 from Kathleen Bugden to Bill McGovern, with attachments marked as McRae Exhibit 2 for identification)

MR. McGOVERN: Thank you.

For purposes of identification, I have had marked as Exhibit No. 1 a copy of the response to the records subpoena I issued to Rodman Insurance Agency. The first page of this response is a

Page 19

facsimile transmittal sheet from Steve Shulman to myself. It's dated August 7, 2007.

The second exhibit, Exhibit No. 2, is under a cover letter from Attorney Kathleen Bugden -- did I pronounce that correctly?

MS. BUGDEN: Yes.

MR. McGOVERN: -- dated September 27, 2007.

BY MR. McGOVERN:

Q. Mr. McRae, I'm going to ask you to put these two exhibits in front of you, and I'm going to ask you if you can identify these.

A. This appears to be from Steve Shulman, the producer at Rodman Insurance, back to you. It looks like Steve Shulman has faxed to you all the papers that we have in our file. I'm not... Yeah.

Q. There are a number of documents in there or a number of sheets in there. And without reading every single one of them, can you -- or does that appear to be the file that Rodman Insurance Agency has for

Page 20

Mary Petit?

A. Yes.

Q. Okay. Can you identify Exhibit No. 2, please.

A. It looks like a letter from you to Vermont -- to Kathleen Bugden, attorney from Melick, Porter & Shea, referring to documents that we had at Rodman that were sent to you.

Q. Okay. And the document or the sheets that are part of Exhibit No. 2, are they -- they also appear to be reports of the Rodman Insurance Agency?

A. Yes. Photocopies of activities, e-mails, and notes.

Q. Okay. Are you familiar with Mary Petit?

A. Yes.

Q. How do you know her?

A. She's insured at Rodman Insurance.

Q. Is she one of your customers?

A. Yes.

Q. When I say "you," I mean you personally as a Rodman Insurance --

A. I'm an account executive and I handle her

6 (Pages 21 to 24)

Page 21

account.

Q.    Okay. When did you first come into contact with Mrs. Petit?

A.    The first phone record I have of phone calls pertaining to this was October 2003. So it's difficult to remember the first time before that, because she has this other property that's still insured there now, and that goes back a couple of years, so it might have been -- actually, it was probably before that.

When she called about this, I was aware of who she was. So it must have been before October '03, first time that I handled her account or talked to her.

Q.    Okay. And when you say called about "this," what are you referring to?

A.    What's the property address? 93A Hillside is the property address.

She's got 11-15 Copenger Street in Boston insured here with us now.

Q.    All right. So was her first contact with you in relation to the Copenger Street address?

Page 22

A.    Probably not -- yes. I thought you were talking about the Hillside. Yes, Copenger.

Q.    Okay. Do you know when that was?

A.    The exact date, no. I mean, it had to be before October '03, because when she called in October 03 about 93A Hillside, she was already insured there.

So before that, you know, phone calls about bills, "What do I owe," things like that, "Am I up for renewal." That must have been -- if that was October 2003, any time during 2003 or 2002, a year or two before maybe.

Q.    All right. Would any of the documents in Exhibit 1 or Exhibit 2 refresh your recollection as to when she first contacted you in relation to Copenger Street?

A.    No. If I'd have known that, I would have brought that. What are you calling this, Document 2?

Q.    Yes.

A.    These are photocopies of activities, what we put in the computer. I only copied out the ones pertaining to 93A Hillside, so I'd

Page 23

have to look it up at the computer at work to see when was the actual first time she contacted us about Copenger Street.

MS. BUGDEN:  May I have go off the record for a moment? I just want to clarify something.

MR. McGOVERN:  Sure.

(A brief recess was taken)

MS. McGOVERN:  Back on the record.

BY MR. McGOVERN:

Q.    Mr. McRae, have you now had a chance to look through the documents that have been marked as Exhibit 1 and Exhibit 2?

A.    Yes.

Q.    Do they refresh your recollection as to when you first -- when your first contact with Mrs. Petit was?

A.    Again, I mean, these records go back -- the earliest documentation is, like, May of 2003.

Q.    Okay.

A.    I can't remember exactly when, but it appears to me that's when it must have been.

Page 24

Q.    Okay. And was that contact with respect to the Copenger Street property?

A.    Yes.

Q.    Do you remember what the initial communication was about specifically?

A.    No.

Q.    Was she seeking to insure that property?

A.    When you say "that property," Copenger Street?

Q.    Yes.

A.    I'd have to look it up. I mean, we take like 20 calls a day. To remember exactly the first conversation I had with one of them four years ago... I mean, I'd have to look it up, what the content was.

Q.    Let me refer you to -- I'll try to find something in Exhibit No. 1. If possible, I'd like to try to keep these in order just so it's easier to find things.

(Pause)

Okay. I've placed in front of you as part of Exhibit No. 1 a commercial insurance application. It's dated 5/16/03.

Page 25

A. (Nods head)
Q. Do you recognize this document?
A. Yes.
Q. What do you recognize this as?
A. It's an application for coverage for 11-15 Copenger Street, Boston.
Q. All right. And who is the application on behalf of?
A. Mary Petit.
Q. Is this document signed?
A. Yes.
Q. Does that appear to be Mary Petit's signature?
A. Yes -- as far as I know, yes.
Q. Did you have any role in preparing this application?
A. I printed it up and sent it to her for signature. I forwarded it to the insurance carrier for coverage.
Q. And who did you forward it to?
A. Harleysville Insurance.
Q. Does Rodman Insurance Agency have an agency agreement with Harleysville?
A. Yes.

Page 26

Q. Did they have one in May 2003?
A. Yes.
Q. Do you recall whether or not you met Mrs. Petit in person in connection with preparing this application?
A. I don't believe I did, no.
Q. Have you ever met her in person?
A. I don't believe so.
Q. What form have your communications taken?
A. Phone.
Q. Any e-mail communications with her?
A. Not that I remember. I'd have to look.
Q. Okay. And what type of insurance was she seeking with this application?
A. A two-unit apartment in Boston. She owns it and rented it out, I believe.
Q. All right. My question is what kind of insurance did this application seek.
A. Oh, building insurance, building and liability.
Q. And would you characterize building and liability insurance as commercial lines or personal lines?
A. In this case, commercial.

Page 27

Q. And was this insurance bound?
A. Yes.
Q. I'll direct your attention to this document. I've placed in front of you another sheet from Exhibit No. 1. Atop this sheet it says "Insurance Binder."
A. Yes.
Q. And this is also dated 5/16/03?
A. Yes.
Q. What is this document?
A. It is a binder, as a record to the insured, confirming coverage has been bound.
Q. Okay. Who generates this document?
A. I do -- or Rodman does as the agent.
Q. Okay. There's a signature at the bottom of this binder. Do you see that?
A. Yes, there is a signature there.
Q. Whose signature is that?
A. Andy Altman.
Q. Do you know who he is?
A. He is the president of Rodman Insurance.
Q. In May 2003 did Rodman have binding authority with respect to Harleysville Insurance?

Page 28

A. I believe so, yes.
Q. Was there a dollar limit with respect to the binding authority?
A. I believe so. I wouldn't know that. I am the account executive. The facts, figures, and details of how much -- on how much binding authority, I wouldn't know that. The producers do.
Q. Okay. Does this binder provide an effective date of the policy?
A. Yes.
Q. What was that date?
A. 5/22/03.
Q. Other than the ACORD form -- well, strike that. Let me ask you a couple more questions about the application there that I showed you a moment ago. How many pages is the application?
A. Well, the application itself is the two pages. Then beyond that there's supplemental application that's needed and -- one, two -- the liability application.

8 (Pages 29 to 32)

Page 29

Altogether, eight, nine pages maybe. There's a property section.

Q. And the other sheets that follow the ACORD form application, do those follow in this exhibit?

A. I'm sorry. I don't understand the question.

Q. Right. Well, you just described some additional materials that are submitted along with the ACORD form application; is that correct?

A. Yes.

Q. And are those the sheets that follow the application in this exhibit?

A. Yes.

Q. How many sheets are there?

A. There appears to only be one. Some of these pages are not part of the application that was sent to the company. This, for instance, is just for our records.

Q. Which --

A. New business transfer. This is irrelevant to the company. This is just for us. That

Page 30

goes in to the company.

Q. Well, hold on a second. The sheet that follows that has a heading "Habitational Survey for Agents"?

A. Yes.

Q. Does that get submitted to Harleysville?

A. Yes. The ACORD form is a general, generic form that every company uses. Often these companies require their own company-specific form as a supplement, you know, please give us this other information, and so on. These next two pages are just -- actually, three -- are just a copy of an in-house quote to get the price for what we can offer them, quote, in-house. This is also for our records only.

Q. When you say "in-house," do you mean that that's generated by Rodman Insurance Agency?

A. Yes. Rather than taking the extra time to get the insurance carrier to quote it, we're able to quote it at Rodman Agency.

Page 31

It has to be verified by the insurance carrier. But that's the next one, two, three, four, five, six -- the next six are the applications -- a copy of the application that went in to the insurance company.

And the next one titled "New Business Survey" is just handwritten, generic form for Rodman Insurance only. As the business gets written, the producer will write down the specs on it, so to speak, the details about it.

This last one appears to be a binder request from the mortgagee, which is Merrill Lynch, I believe, to us at Rodman Agency for us to provide a copy of the binder to them confirming coverage.

MR. SEXTON: May I just say for the record there appears to be two copies of the commercial insurance application dated May 16th, '03, in the exhibit. I'm not certain that they have the same exact order of sequence.

Therefore, you may want to mark

Page 32

what was just identified by the witness as a special sub exhibit.

MR. McGOVERN: We can do that. Let's go off the record.

(A brief recess was taken)

MR. McGOVERN: Back on the record. Let's mark this ACORD form and subsequent pages as Exhibit 1A, please.

(Copy of a commercial insurance application, ACORD form, dated 5/16/03, nine pages, marked as McRae Exhibit 1A for identification)

MR. McGOVERN: For the record, I've had marked as Exhibit 1A a copy of the commercial insurance application ACORD form and pages you just described that follow it. It's a nine-page exhibit.

BY MR. McGOVERN:

Q. Are all of the documents that are submitted to Harleysville in connection with that application included in Exhibit 1A?

A. There's the app. No. These are -- all right. The first one, two, three, four, five, six -- the first seven pages are the

Page 33

application that goes to the insurance carrier.

The next page entitled "New Business Survey" is just scratch pad notes for the producer, not necessary for the insurance carrier.

The last one is just a fax from the insured's mortgagee to us asking for a binder confirming coverage. Again, not necessary for the insurance carrier.

Q. Okay. So the last two pages are not submitted to Harleysville, correct?

A. No.

Q. Are there any other pages that are submitted along with the application?

A. Yes. The supplemental application that was over here (indicating).

Q. And was the supplemental application the ACORD form that was signed by Mrs. Petit?

A. What? I'm sorry. Say that again?

Q. Well, can you locate the supplemental application?

A. Yes. It's marked up top "Habitational Survey for Agents."

Page 34

Q. Okay. And how many pages is that?

A. One page.

Q. Okay. Other than that supplemental application and the materials in Exhibit 1A other than the two that you identified, are there any other materials that are submitted along with the application?

A. No.

Q. Okay. Can you describe the property at Copenger Street, if you know?

A. I'm not familiar -- I mean, it's a two-unit apartment, but I've never seen it. Other than that, I don't know.

Q. Okay. And is this a rental property?

A. I believe so, yes.

Q. Other than Harleysville, were there any other carriers to which you submitted information to obtain insurance for the property around May of 2003?

A. I wouldn't remember that. The job I do, they have a marketing team, meaning if someone has approached -- for instance, that scratch pad piece of paper wasn't mine. So I'm often just given files that

Page 35

someone else had placed with the insurance carrier.

Q. Okay. And is that what happened in this occasion?

A. I believe so. All these notes right here, that's not my writing and so on. I can't remember, but I believe so. That would have been the normal course of action.

Q. Okay.

A. Particularly with new business.

Q. All right. Now, was the Harleysville insurance policy renewed?

A. Yes.

Q. Is it still in effect today?

A. I believe so, yes. There's a copy here, I believe. (Reviewing documents)

Well, this is dated May 2006 to May 2007 -- yes. I believe she's still insured. Yeah.

Q. Have there been any changes to the policy terms from the time of initiation of this policy to the present?

A. Well, I'd have to look it up. I mean, I can't remember -- if it was started May of

Page 36

2003 and it's insured currently May 2007 to May 2008, that's four years. There's so many people insured in the office that I'd have to look it up to see if at all any changes were made.

Q. Okay. So you don't remember at all -- you don't know at all just based on your memory?

A. That would be impossible to do that.

Q. Okay. I know I asked you this earlier, but did you describe this Harleysville policy as a building insurance policy?

A. Yes.

Q. Why was this type of policy appropriate for the Copenger Street property?

A. When it's a rental property and it's rented out to other people, it now becomes a commercial building. I mean, if she was living there, she would have a homeowner's policy, a personal homeowner's.

But renting it out, that would require a commercial policy.

Q. Are there any restrictions you're aware of that Harleysville has for underwriting a

10 (Pages 37 to 40)

Page 37

building insurance property which is rented to students?

A.   It's a judgment call based on the insurance carrier.

Most insurance carriers are reluctant to do that. If sometimes it's a temporary situation or if the insured's been there for a long time and so on, they'll sometimes let it go. More often than not, they won't. They'd rather have us place it elsewhere.

Q.   All right. And what about Harleysville in particular? Did they have an underwriting policy --

A.   They can often be very flexible. But, again, if we tell them straight out that it's predominantly students, then more often than not, they'll ask us to pass on it.

But if we can convince them that it's a sound, sound property; they've been with us for a while and so on, what type of students -- you know, if it's a Ph.D. professional student, they don't mind. If

Page 38

it's a frat boy, you know, 20 years old and all that, that they'd rather not.

Or if a building has like nine units in it and only one is a student, they'll often forgive that.

It's a case-by-case judgment call for them.

Q.   Okay. And when you say "for them," you mean for Harleysville it's a judgment call?

A.   Harleysville, like any other carrier.

Q.   And do you know whether or not the persons renting the property at Copenger Street in May of 2003 were students?

A.   No. I'd have to look it up.

Q.   Where would you look that up?

A.   I don't think I wrote that down here. Where is that producer note? (Reviewing documents)

All right. I'm not sure whose handwriting this is, but I don't see any notes here saying students. It just says "two units."

Q.   Okay. And for the record, you're looking at Exhibit 1. Could you identify which

Page 39

page you're looking at?

A.   Top page, "New Business Survey" with written-by-hand scratch notes.

MR. SEXTON: I think that's also the second to the last page of Exhibit 1A.

THE WITNESS: Yes.

Q.   Okay. And these are producer's notes that are not necessarily submitted to the insurance carrier; is that correct?

A.   That's correct.

Q.   Did you fill out this particular form?

A.   No.

Q.   Who did, if you know?

A.   I don't know.

Q.   At the top of this there's a notation that looks like it says "B-a-s-h - 0-1."

Do you see that?

A.   Yeah. That...

Q.   Do you know what that refers to?

A.   My guess is that -- wait a minute.

All right. I'm looking at the New Business Transfer Sheet, which is just Rodman's own typed-up, new-business-has-started sheet.

Page 40

It says towards the bottom "upcoming coverages. Insure purchased property formerly insured by Joyce Bashour."

Bash-01 is a code word for how we put it in the computer to be able to look it up, Karen's account.

So, apparently, Bash-01, this Joyce Bashour, it appears to me, used to own it; and it also was insured at Rodman Insurance. Then Mary Petit bought it and thus this policy.

Q.   So going back to the New Business Survey sheet --

A.   Yup.

Q.   -- is it your testimony that had someone at Rodman been informed that students were occupying this building, that that would have been noted on this form?

A.   Sometimes they write it down; sometimes they don't.

Q.   Okay. Would that information have been communicated to Harleysville?

A.   Certainly.

Q.   And how would it have been communicated to

Page 41

Harleysville?

A.   Well, either on the application or often with new business to place that with the insurance carer, you have to call them. A lot of times it's just verbal over the phone, This is what we have, a two-unit building, and so on.

Q.   Okay. How much was the premium charged by Harleysville for the first term of this policy?

A.   I don't see a copy of the original policy. I wouldn't be able to tell you unless I had that in front of me -- actually, I think I saw a quote in here. (Reviewing documents) I'm looking at Delux Business Owner's quote. Now, this one says "Total Premium: 1513." The problem with this is this is what we do in-house at Rodman Insurance. Occasionally, it happens that the quote is done incorrectly, or wrong, or doesn't match exactly what the insurance carrier has or would like, so it gets updated. So if this is correct, 1513 would have been the premium, $1,513.

Page 42

Q.   Are you aware of any changes in the tenancy of Copenger Street that would change the insurance?

A.   Again, I'd have to look it up. I'm not aware of any, no.

Q.   Okay. Did you receive an inquiry from Mrs. Petit about insuring property on Hillside Street in Boston?

A.   Yes.

Q.   Do you know when your first communication about that property was?

A.   I've got notes. October 8, 2003.

Q.   Okay. And what are you referring to?

THE WITNESS:  Do you have those notes? Because the dates are -- without having something to look at...

MS. BUGDEN:  I think they would be in the Exhibit 2 if you want to look through those documents.

THE WITNESS:  Okay.

MR. McGOVERN:  And right here is Exhibit 2.

MS. BUGDEN:  There's more pages than that.

Page 43

THE WITNESS:  Is he still asking me questions?

MS. BUGDEN:  Yes, but you can look.

A.   Oh, October 8, 2003. That was the first time that she had called.

Q.   And what page of Exhibit 2 are you looking at?

A.   I don't know which exhibit this is. It's a copy of activities that we enter into our system.

Q.   Okay. Let me just take a look at this.

MS. BUGDEN:  Well, I believe it's Page 2 of Exhibit 2.

MR. McGOVERN:  Okay. Thank you.

Q.   And the top of this sheet, just for the record, says "Customer Note Listing" and then it says "Petit-1," correct?

A.   Yes.

Q.   And then it says, "On 9/20/2007 by Glen M., Page 1"; is that correct?

A.   Yes.

Q.   And is it your testimony that one of these entries represents the first communication you had with Ms. Petit about the Hillside

Page 44

Street property?

A.   Yeah. It's October 8th, '03.

Q.   And that's the last entry on this sheet; is that correct?

A.   Yes.

Q.   Incidentally, what is the "Customer Note Listing"?

A.   The Customer Note Listing is what we call activities. It's a way of documenting, diarying things that we -- just any activity on accounts. Someone called. We mailed a memo, we did this, we did that.

Q.   And what is your practice with respect to using this activity listing?

A.   You use your best judgment. Ideally, in a perfect world, you enter in every possible word ever said, but that's not possible.

Q.   Right.

A.   So you try to shoot for the jugular, so to speak, the most pertinent information as concise as you can put it in.

Q.   Okay. And is this information you are typing into the computer?

12 (Pages 45 to 48)

Page 45

A.  Yes.

Q.  After the entry is made, can it be changed or altered?

A.  They're called open and closed.  If they remain open, yes, you can alter them.  If they're closed, no, you can't.

Q.  All right.  Can you read into the record -- oh, strike that.

The entry dated 10/8/03 --

A.  Yes.

Q.  -- did you enter that?

A.  Yes.

Q.  And how do you know you entered it?

A.  Each individual person has their own way of talking, saying whatever, entering activities.  You can tell by the language that that's mine.  And not only that, but I handled her account.

Q.  Okay.  Can you read that entry into the record, please.

A.  So "10/8/03 insured called.  Possible second location.  See October 8th memo to Kerry, underwriting.  Faxed it in.  Per insured, this will close around 11/14/03,

Page 46

maybe sooner.  Can we add a second location?"

Q.  All right.  What is the significance of the date 10/8/30?  Is that the date on which you entered this?

A.  Yes.  In this case the line that says "Entered by" and "Last entry," that's the date it was entered in.

Below that you can put in -- I tend to put in my own dates.

Q.  All right.  But with respect to this entry, it's the same date, October 8, 2003; is that correct?

A.  Yes.

Q.  Now, this entry refers to a memo to "Kerry, slash, underwriting."

A.  Yes.

Q.  Who is "Kerry"?

A.  I can't remember his last name now.  Kerry is the underwriter at -- I think it's Schobowski.  I honestly forget -- but the underwriter at Harleysville who is responsible for okaying or not okaying what we write.

Page 47

If I can find that memo, I can give you his last name.

Q.  I'll try to find it for you, because I think I have a copy of it in here.  Maybe it's in this exhibit. (Reviewing documents)

Okay.  Let me direct your attention to a memo that is part of Exhibit No. 1.  At the top of this it says "Memo, Page 1."  It's dated 10/8/03.  Do you see that?

A.  Yes.

Q.  Is this the memo that's referenced in the activity sheet?

A.  Yes.

Q.  All right.  Did you create this memo?

A.  Yes.

Q.  How many pages is the memo?

A.  One.

Q.  And was this created on 10/8/03?

A.  Date... Yes.

Q.  Near the top on the left side it says "Harleysville Insurance"?

A.  Yes.

Q.  Did you fax this or send this to someone at Harleysville Insurance?

Page 48

A.  Yes.

Q.  How was it sent?

A.  I faxed it in.

Q.  Okay.  And how can you tell it was faxed in?

A.  Because the page listing, all the activities, it says right there in the notes.  "See 10/8 memo to Kerry, underwriting.  Faxed it in."

Q.  In that box near the top of this sheet, it has policy information.  Do you see that?

A.  Yes.

Q.  Okay.  What policy does that information refer to?

A.  I believe it would be the one for Copenger Street, but let me check.

Yes.  Because we were attempting to add that on as a second location possibly to Copenger Street.

Q.  Okay.  And reading the information that's included in this memo, it says, "Insured has prospective second location."  Then it says, "93A Hillside Avenue, Boston, Mass."

Did I read that correctly?

Page 49

A.    Yes.

Q.    Below that is additional information.  Does that information describe the Hillside Street address?

A.    Yes.

Q.    Where did you get that information?

A.    From Mary Petit.

Q.    How did you get that from her?

A.    As an insured calls and wants to insure a location, you have to ask her about it to get the approval to underwrite it.

Q.    Okay.  Do you have a sort of checklist or some other kind of list of information that you will ask a prospective insured?

A.    Yes.

Q.    Is that list part of the records that are in this exhibit?

A.    No.
      More often than not, it's off the top of your head.  You know the pertinent questions to ask.  I have my own scratchpad notes and such that I will write it down at the desk.

Q.    Okay.  So when you say there's a list, is

Page 50

that list in your head or is that something that you've written down or is it something that's generated by somebody else?

A.    It is both.
      I mean, the ten points of information, basically, around the year built, the square footage, how long have you owned it, how much coverage do you want, who is occupying it, and so on.
      And most of that is just from memory from just doing the job.

Q.    So, essentially, you know which questions to ask and which questions are going to be significant to the underwriter?

A.    Exactly.

Q.    In the, I guess, sixth line from the bottom of the information on this 10/8/03 memo, it says "Tenants are college students."
      Do you see that?

A.    Yes.

Q.    And did you get that information from Mrs. Petit?

A.    Yes.

Q.    Did you ask her who the tenants of the

Page 51

Hillside Street property were?

A.    Yes.

Q.    Did she tell you anything other than they're college students?

A.    If she did, I can't remember.  If there was any pertinent information that I thought would be pertinent to the insurance carrier, I would have put it down.

Q.    Why did you ask her who the tenants of the building were?

A.    Again, on a rental property, the insurance carrier wants to know that.  And, again, they're often reluctant to rent out any building location, particularly if it's all rented out and also to students, just claims history with students and such.

Q.    Okay.  A couple of lines down, it says, "Insured wants $465,000 building coverage. All other coverages same as Location No. 1."

A.    Yes.

Q.    "Location No. 1" refers to the Copenger Street address?

A.    Yes.

Page 52

Q.    Okay.  Then the last line reads, "Please let me know if this can be added as second location to existing policy," correct?

A.    Yes.

Q.    What does that mean?

A.    If the policy for 11-15 Copenger Street -- often instead of writing a brand new policy, the insurance carrier will allow -- particularly with the same owners -- you to add on a second location on the same policy.

Q.    All right.  And, then, is that your signature at the bottom of this memo?

A.    Yes.

Q.    Did you receive a response to this submission?

A.    Yes.

Q.    And let me just back up a second.  Other than this one-page memo, was anything else sent to Harleysville --

A.    No.

Q.    -- Insurance about this on 10/8/03?

A.    No.

Q.    And what response did you receive from

14 (Pages 53 to 56)

Page 53

Harleysville?

A.   I don't know what exhibit this is. But if you look at the page before it, it's a copy -- a copy of a fax that Kerry in underwriting from Harleysville faxed back to me.
     There's handwritten notes from Kerry on the bottom. I can't really read that date. It looks like two zeros, but...
     "We do not write has habitational when the majority of units are student occupied. Any questions, please give me a call."

Q.   And after that notation, there's another note that's underlined.

A.   Oh, "Thanks."

Q.   Okay. Did you understand this to be the response from Kerry to the 10/8/03 memo?

A.   Yes. In fact, he wrote it on the memo that I sent him.

Q.   And how did this get back to you?

A.   Fax.

Q.   Do you know when it was faxed back to you?

A.   If I turn this page around, it's "10/8/03."

Q.   How do you know that?

Page 54

A.   If you look at the fax -- you actually have to turn it around. But this date up here (indicating).

Q.   Upside down at the bottom of this sheet --

A.   Actually, this (might) be the date that I -- where's the memo? You know, that might be just printed on -- no, strike that. Never mind.
     That 10/8/03, that's just -- the fax number (781) 444-0090, that's our fax number. That's just the fax machine confirming that I mailed it to him. He copied it and faxed it back with his handwritten note. This date is the date I would have gotten it.
     The only trouble is his handwriting is a little bit -- it looks like two zeros. So I don't know how long after 10/8/03 he did that.

     MS. BUGDEN: There's additionally another faxed line.

     THE WITNESS: Oh, what does this one say? Oh, October 10th, 2003.

Q.   Do you believe you received that response

Page 55

on October 10th of 2003?

A.   Oh, that's the fax right there, yeah. Yes.

Q.   And what, if anything, did you do upon receiving this response from Kerry at Harleysville?

A.   I told the insured that we couldn't place it with Harleysville.

Q.   Did you tell her why?

A.   I believe so, yeah. She would have asked. And the reason is right there. They don't want students.

Q.   Okay. And you told her that the reason that Harleysville refused to add the Hillside Street property to this policy was because the Hillside Street property was occupied by students?

A.   Right.

Q.   Did you send anything to Mrs. Petit in writing about that?

A.   No.

Q.   What was her response?

A.   I have to look at notes for a minute because I believe, if I remember right, after I told her that, that her response

Page 56

was -- I don't know how much you know about insurance language. There's standard carriers and excess carriers, Harleysville being a standard carrier. Excess carriers are insurance carriers, brokers, that are there to place coverage for those businesses, locations, and so on that are traditionally difficult to place elsewhere.

     MS. BUGDEN: I believe it's here, right in front.

     THE WITNESS: (Reviewing documents)

Q.   If I remember right, I told her that if we were going to place this, it would have to go with excess carriers, which are traditionally more expensive.
     And, yes, we did -- oh, never mind. That was later -- strike that.

     THE WITNESS: Where are those dates? Can I see that for a minute, the one that you showed me with the dates?

     MS. BUGDEN: Well, it should all be in the exhibit. You want to look through the exhibit.

     THE WITNESS: Okay. (Reviewing

Page 57

documents)

A. At the time she said, "Yes. Go ahead and approach excess carriers."

MR. SEXTON: Slow down.

A. And I believe the response we got back even from them was that they couldn't find one. And then --

MR. SEXTON: Hold on. Wait. I'm sorry to interrupt.

I just want to know, did the witness refer to some document when he said, She said, Yes, approach other carriers?

MR. McGOVERN: Let me ask him that.

MR. SEXTON: Sorry, Bill.

Q. Mr. McRae, let me ask you some additional questions about that. As I understood your earlier testimony, you told Mrs. Petit --

A. Here it is (indicating).

Q. Hold on a second.

A. I'm sorry.

Q. You told Mrs. Petit that Harleysville was not going to add the Hillside Street property to their policy, correct?

Page 58

A. Yes.

Q. And then you told her that you would have to go to an excess carrier and that those are typically more expensive; is that correct?

A. Yes.

Q. And what was her response to that?

A. Wait. Hold on. (Reviewing document) Her response was yes, go ahead and try the excess carrier.

Q. Okay. And is that something that you recall, or are you referring to a document to refresh your recollection?

A. I recall it and I'm looking at activities I had put in the system. "Faxed in quote to Quaker. Fax from Jim at Quaker. Does the property have loss runs? Does the property have porches?" And so on.

Q. Let me interrupt you. You're referring to the activity sheet in Exhibit No. 2; is that correct?

A. Yes. Up top it says, "Page 2."

Q. Okay. And which entry in particular?

A. As you go down the right side, where it

Page 59

says "Entered," it's those dates, going backwards. Here are the chain of events.

"10/8/03 Mary, insured, called about possible second location. 10/10/03 Kerry at underwriting called. No. Harleysville will not insure second location to college students."

Q. All right. Let me stop you there for a second. The one you just read was entered on 10/10/2003?

A. Correct. Going back to the page --

Q. Well, wait. I want to ask you about the 10/10/03 entry first. Was this an entry that you made?

A. Yes.

Q. And in the note portion of this entry, it says "VM." What does that mean?

A. Voice mail.

Q. Okay. And then it says, "No. Worcester/Harleysville will not insure second location due to college students"?

A. Yes.

Q. And that's what we just talked about, that Harleysville was not going to insure

Page 60

because of the college students living there, correct?

A. Yes.

MR. ROSSI: Can you please show me the document with the 10/10/2003 on it? For some reason I don't see it here.

MR. SEXTON: Off the record?

MR. McGOVERN: Sure.

(Discussion off the record)

MR. McGOVERN: Back on the record.

Q. Then the next part of this note says, "See Becky." Who is Becky?

A. Becky is my boss.

Q. And what is Becky's last name?

A. Flagg, F-l-a-g-g.

Q. And what is her position?

A. She's the marketing manager and manager of commercial lines.

Q. And then after that it says he also "faxed no response"?

A. Yes.

Q. Does that refer to Kerry's response to you?

A. Kerry from underwriting, yes.

Q. The notation, "See Becky," is that notation

16 (Pages 61 to 64)

Page 61

for you to go see Becky about this?

A. Yes.

Q. Okay. Why did you need to go see her?

A. Because when something is difficult to place, she -- most of the marketing is done by her. And whenever I need to find a place to -- you know, who is going to insure this, what is the best thing to do, she would advise me on it.

Q. And it's this notation on 10/10/2003 that confirms that you told Mrs. Petit that Harleysville would not insure this property due to college students; is that fair to say?

A. Well, that particular entry from 10/10/03 is just an entry confirming that Kerry from underwriting called and that they're not going to insure the second location and go see Becky.

That particular entry does not refer to me talking to Mrs. Petit.

Q. Is there an entry that says you talked to Mrs. Petit about this?

A. The next entry down, 10/15/03, "Per Becky,

Page 62

try Quaker, but call insured first. Want a surplus quote."

Often in a busy day, you know, you'll put that in. It doesn't say there yes, I called her. But the subsequent entries after that wouldn't be there unless she said to go ahead and call and try to get a quote.

Q. Okay. In order to have authority to get a surplus quote, you would need that permission from Mrs. Petit, correct?

A. Yes. In particular because they're more expensive.

You can't, you know, have a client paying $1,500 for one property and then having her suspect that she's going to get a pretty much ballpark quote or maybe a little more because there's more floors to it or whatever and then all of a sudden hit her up where you're going to be paying four grand or five grand, you know.

Q. Okay. And this 10/15/2003 entry says "Try Quaker."

A. Yes.

Page 63

Q. Who is Quaker?

A. Quaker is an excess surplus lines carrier that we go through. They're an outside broker that finds the company for us on a split commission sort of plan.

Q. And in fact did you try Quaker?

A. Yes, we did.

Q. Okay. I'm going to refer you to another document in Exhibit No. 1. This is a sheet which is a memo dated 10/16/03, and it appears to be addressed to Quaker, Special Risk?

A. Yes.

Q. And is this the information you submitted to Quaker?

A. Yes.

Q. Was this submitted on -- to Quaker on October 16, 2003?

A. Yes.

Q. And, again, part of this submission states that the tenants are college students; is that correct?

A. Yes.

Q. And did you receive a response to this

Page 64

memo?

A. Yes.

"10/17/03 faxed in quote to Quaker for second location. Called Jim on 10/22/03. Fax from Quaker, 10/23/03. Do we have loss runs?" Meaning a record of prior claims, whatever. "Does property have porches?"

In other words, questions from Quaker back to us, which they often do.

Q. Let me stop you there. So you were just reading again from the activity log, part of Exhibit 2?

A. Yes. The one entered on 10/23/03.

Q. All right. Bear with me for a second. I'll show you this page from Exhibit No. 1. And this appears to be an e-mail that is dated October 22, 2003, from Jim Andreoli to Glen McRae.

Do you see that?

A. Yes.

Q. Is this the communication you referred to in your activity log in which Quaker was seeking additional information?

A. Yes.

Page 65

Q. And then did you eventually -- well, strike that.
   At the bottom of this page there is handwritten information. Is this your response to Quaker's request?
A. Yes.
Q. And as part of your response, does that say, "Please rush quote"?
A. Yes.
Q. And did they give you a response?
A. Again, I'm reading here from the notes, this being four years ago.
   Entered 10/24/03: "Got fax from Jim A. at Quaker. $5,627.24 including terror. Called him back. VM. Does this include tenant relocation and business income rents?"
Q. Okay. Let me show you this document, which is part of Exhibit No. 1. This is entitled "Quaker Special Risk," and it's dated October 23, 2003.
A. Yes.
Q. And is this the quote that you received from Quaker?

Page 66

A. Yes.
Q. And to clarify, this is the quote for the Hillside Street property?
A. Yes.
Q. How much would the premium have been for this insurance?
A. $5,627.24.
Q. And what kind of insurance was this quote for?
A. For the building, 93A Hillside.
Q. Okay. But was it --
   MR. SEXTON: I'm sorry to interrupt. I just want to find the document, Bill.
   Is that in 1 or 2?
   MR. McGOVERN: No. 1.
   MS. BUGDEN: 1, I believe.
   MR. McGOVERN: It should be -- they're kind of in reverse order, I think, so...
   MR. SEXTON: I'm kind of slow on the uptake, but I...
   MS. BUGDEN: There you go (indicating).
   MR. SEXTON: So that's a three-page document dated October 23, '03, or is

Page 67

that the one he was referring to before?
   MR. McGOVERN: No. That's the right one.
   MR. SEXTON: Thank you. I'm sorry, Bill.
   MR. McGOVERN: That's okay.
BY MR. McGOVERN:
Q. Mr. McRae, the Quaker Special Risk quote, is that also for building insurance?
A. Building coverage, yes.
Q. That's a commercial line?
A. Yes.
Q. Okay. And was this quote communicated to Mrs. Petit?
A. Again I'm reading from notes, activity, the bottom one, entered 10/24/03: "Bill Brown from New England Metro Reality called." This isn't written down, but that would be the mortgagee on this property, asking me to provide proof, is it covered yet.
   At -- I don't know if you want the phone number -- 860-919-0815. "Told him I called insured and gave Frank, husband, the

Page 68

quote. Waiting to hear from insured."
Q. Okay. This indicates that you told Bill Brown that you called the husband of Mrs. Petit?
A. Yes.
   If the mortgagee calls and says can you send me a binder confirming coverage, you have to tell him the obvious thing, it isn't covered yet.
   I told him I had talked to Frank, the insured, which is Mary Petit's husband. And I told him I can't do anything until I hear back from the insured about what the insured wanted.
Q. Okay. Did you hear back from the insured?
A. Again reading from notes. Now I'm on Page 3. "Called Frank, husband" -- at 10/24/03, which is the second one down.
   "Called Frank, husband. Gave him Quaker quote. Told him 30 percent minimum earned," which is insurance language meaning no matter when the policy cancels, they're going to have to keep a third of the premium even if they cancel three days

18 (Pages 69 to 72)

Page 69

into it.

Q. Okay.

A. About fifty-nine -- well, that's a misprint. It says $59,000, but it's "$5900 with terror. Agreed to wait to hear from him."

Q. Okay. This entry again suggests that you had given Frank Petit information about the Quaker quote, and you were waiting to hear back from him?

A. Yes. Specifically 10/24/03: "Called Frank, husband. Gave him Quaker quote."

Q. And then did you hear back from the insured after that?

A. Yes. The next entry down below entered 10/24/03, the same day: "Mary, insured, called. Found another carrier for second location and said not to bother."

Q. Okay. Is that a phone conversation that you had with Mary Petit?

A. Yes.

Q. And that was on 10/24/2003?

A. Yes.

Page 70

Q. And in response to that, you called Jim at Quaker?

A. "Called Jim at Quaker. Voice mail. Told him to close it."

Q. Do you know what insurance Mrs. Petit found for that property?

A. I can't remember.

Q. Do you recall whether or not she told you about it?

A. I can't recall. Often when they're happy and, listen. You can forget about the quote. I found somebody else -- sometimes if you're not too busy, you know, If you don't mind me asking, who did you go with? And other times, you'll say, Okay. You want me to close it? Okay. Done. Phone call over.

Q. And do you recall this particular conversation with Mrs. Petit?

A. Not word for word, no. It was four years ago.

Q. Do you recall anything about it?

A. Just that. That I had called her -- I mean, actually that she had called me on

Page 71

the 24th. The only thing I can recall is on the same day -- and this is just from reading the entries here -- "Called Frank, husband." Then she had called back and says, Never mind. Forget it.

Q. Do you recall if you asked her how much the premium was going to be with the other carrier?

A. No.

Q. Is that something that you typically would ask?

A. Again, if you're not that busy, then you'll ask, If you don't mind me asking, where did you go and why and so on. But if it's a very busy day, often you'll just say okay. I mean, she already had Copenger Street insured with us. So if she was happy and content -- I mean, often they're busy, too. And sometimes they're fussy, and they just get reluctant to answer questions like that. They'll get polite and "It's none of your business," you know, like that. So you sense it out and feel it out and

Page 72

just say, Okay. As long as you're happy, that's good.

Q. Okay. Do you recall whether or not you discussed if the other carrier was an excess lines versus a --

A. I don't recall. I probably didn't.

MR. SEXTON: Would this be a good place to take a break?

MR. McGOVERN: Sure.

(A brief recess was taken)

MR. McGOVERN: Back on the record.

BY MR. McGOVERN:

Q. Mr. McRae, after you had that conversation with Mary Petit on October 24, 2003 --

A. Right.

Q. -- did you have any further conversation with her about the property at Hillside Street?

A. To the best of my recollection from the notes, it wasn't until three years later. I believe it was on 10/3/06. The activity just reads "Notes in location." These activities as you enter it into the computer are often just built for two