Page 73

lines. If what you're going to have is more detailed than that, then you go to another screen which enables you to put in paragraphs if you'd like.

Q. So let me back up a little bit.
Which page in this Exhibit 2 are you referring to which shows your next conversation with her?

A. If you look at where it says "Customer Note Listing" --

Q. Okay.

A. -- which I believe is Page 2 on this exhibit.

Q. Yes.

A. Oh, where is it? Entered by me on 10/10/06. "Mary, insured, called. Wants surplus quote on new property."

MR. ROSSI: Can we hold on one second here? 10/10/06? Let me find that entry because I'm on the wrong page.

THE WITNESS: The blacked-out section, that second line (indicating).

MR. ROSSI: Just let me catch up to you here so I can read along. 10/10/06.

Page 74

MS. BUGDEN: And this is on the Customer Note Listing as opposed to the Customer Activities Listing.

MR. ROSSI: So that's a different sheet?

MR. McGOVERN: Yes.

MR. ROSSI: Is it in the same document or the same exhibit?

MR. SEXTON: It's the second page of Exhibit 2. It is this one (indicating).

MR. ROSSI: Oh, okay. Just give me a second.
Okay. Thank you.

BY MR. McGOVERN:

Q. All right. Mr. McRae, so you're referring to the Customer Note Listing?

A. Yes.

Q. And at the top of this page is an entry for 8/27/07, and then the next one down is dated 10/10/06.

A. Just to correct you?

Q. Yes.

A. This is more done by photocopy working from

Page 75

the bottom up.
For instance, the very last entry on the bottom is 10/8/03: "Insured called. Possible second location. See 10/8 memo to Kerry, underwriting," which refers to what we talked about earlier.

Q. Okay.

A. The next entry above that, that's for three years later. 10/3/06: Mary, insured, called. Voice mail. Said she has a new property" -- quote for quote -- "new property with unique circumstances. Said to call her back at 941-505-2830."

Q. Did you call her back?

A. Hold on.
10/4/06: "Got e-mail from insured. Gave it to ET" -- "ET" being Evan Tobasky, T-o-b-a-s-k-y, who is a producer on the account. Same entry. "Called Mary, insured. Voice mail. Wait to hear from ET before moving on this."

Q. All right. And then the next entry indicates that you talked to ET; is that correct?

Page 76

A. 10/25/06: "Talked to ET. Best in this case to tell insured it's best to stay with Vermont Mutual. Called Mary, insured. Okay."

Q. And did you make this entry?

A. Yes.

Q. And can you describe what it means?

A. I talked to Evan, the producer on the account. After showing him the e-mail that Mary had sent, given the circumstances as she referred to it herself as new property, unique circumstances, Evan had told me to call the insured back and tell her in this case, it's get best to stay with Vermont Mutual.

Q. Okay. Do you know what new property she was referring to?

A. 93A Hillside.

Q. And what was she asking you to do?

A. To insure it.

Q. And what were the unique circumstances?

A. I'd have to get a copy of that e-mail.

Q. Okay.

A. Okay. (Reviewing documents)

20 (Pages 77 to 80)

Page 77

The next page, a copy of an e-mail from Mary, Tuesday, October 3, '06, at 3:59 p.m. to me, Glen McRae.

Should I read it?

Q.  Why don't you read it to yourself and let me know when you're finished.  Then I'll ask you some questions.

A.  (Witness complies)  Okay.

Q.  All right.  So this e-mail dated October 3, 2006, is that the e-mail that's referred to on the Customer Note Listing?

A.  Yes.

Q.  All right.  And does this e-mail refresh your recollection as to what the unique circumstances were?

A.  Yes.

Q.  What were those unique circumstances?

A.  The inside was completely destroyed due to a large fire.  Not much information about electrical, plumbing, smoke detectors, and so on.  Basically, a boarded-up building that's uninhabitable.

Q.  And why was it that she was approaching you about this building?

Page 78

A.  To insure it.

Q.  Okay.  Did she have insurance on the building at the time?

A.  Well, she says here, I have a renewal notice from the existing insurance company but want to shop around because of the condition of the property.  And this is an e-mail that came in at 3:59 p.m.

So to my recollection, at that moment in time (reviewing documents) I had not yet talked to her.

10/4/06:  "Called Mary, insured.  Voice mail."

In other words, to let her know, yes, I got that.  I'll have to get back to you.

Q.  All right.  And so after you received this e-mail and left a voice mail with Mrs. Petit, did you talk to Evan?

A.  Yes.

10/5/06 -- I'm referring to the activities on the other page.

Q.  Yes.

A.  "Talked with ET" -- Evan.  "Best in this case to tell insured it's best to stay with

Page 79

Vermont Mutual."

So on 10/5, "Called Mary, insured.  Okay."  "Okay," meaning her response.

Q.  All right.  So did Evan tell you to tell Mrs. Petit that it was best to stay with Vermont Mutual?

A.  Yes.

Q.  Do you recall why?

A.  To my recollection, the reason he would say that is if, according to her e-mail, "I already have a renewal notice" from the existing insurance company, then Vermont Mutual not being an excess lines carrier, for us to insure an uninhabitable, boarded-up building that still has unrepaired fire damage and a completely destroyed inside, the reason would be obvious.  Why would you want to do that?

If you've got an standard carrier, if you go with anybody else, excess lines, which is going to be (A) difficult to insure, period, given -- as she put it -- the unique circumstances, it would be a lot more money.

Page 80

Q.  Okay.  And you communicated that to Mrs. Petit?

A.  Yes.  And that I have documented on that entry 10/5/06:  "Called Mary, insured."  Those quotes "okay" was her response.

Q.  Okay.  And did you have any subsequent communications with Mrs. Petit about the Hillside Street property?

A.  Again, I'm reading this.  "Mary, insured, called.  Vacant since 8/31.  Renovations being done, bathrooms, floors, doors, walls repainted.  Called Lisa at the company.  Okay.  Just let her know when they're occupied again."

Q.  Again, you're reading from the Customer Note Listing?

A.  Yes.

Q.  And the entry sort of in the middle of that page dated 10/10/06; is that correct?

A.  Right.

Q.  And does this indicate that Mrs. Petit called you on October 10th, 2006?

A.  Yes.

Q.  Do you recall why she was contacting you at

Page 81

that date?

A.   I think, if I can remember, after the conversation 10/5 when I told her it's best to stay with Vermont Mutual, she called back again five days later, on 10/10/06, in the hopes that telling me that the renovations are being done and repainted and to try again to add this on with the -- onto the Harleysville property as a second location.

Q.   And did you ever take any action to add this property to the Harleysville policy after October 2006?

A.   10/10/06: "Called the company. Okay," meaning that she said it's worth taking a look at. Just let her know when they're occupied again, when this is all done, and so on.

   And then after that -- I'd have to look at this again. It doesn't say it here, but 10/10/06, going up top here: "Mary, insured, called. Wants surplus quote on new property."

   I didn't detail it all, but that must

Page 82

have meant Lisa at Harleysville said no. I can't remember. Either that or she was getting impatient because the answer back from Harleysville was "When this is all done, maybe then" and so on.

   So she had called back and said, "Well, can you get me a surplus quote?"

Q.   Okay. Do you recall whether or not you got her a surplus quote after that?

A.   10/11/06: "Called Mary, insured, and left a message for her. Need specs again to requote" specs being the details on the property and all that.

   10/12/06: "Mary, insured, called. Gave me the specs on it. Sent to excess for quote."

   10/13/06: "I called and faxed the specs, new details about it, to Jim at Quaker" again who had given me the quote three years earlier.

   E-mail back from Jim at Quaker 10/24/06: "Questions before we can quote it."

Q.   All right.

Page 83

A.   11/9/06: "I ad faxed the insured" -- that's a fax through the system. You don't have to print out paper.

   "Ad faxed insured with questions. Does she still want the quote? See e-mail back from the insured." I don't know where that is, but...

Q.   About three pages down there's an e-mail.

A.   11/9/06. Okay. I don't know, three or four pages into it --

   MR. McGOVERN: This is in Exhibit 2, for the record.

A.   Exhibit 2. A photocopy of e-mail dated Thursday, November 9th, 2006, at 5:10 p.m. from Mary regarding 11-15 Copenger Street property.

   Okay. Halfway -- the first 1 through 9 is referring to details about what she already had insured.

Q.   Okay.

A.   Then she answered questions below that, below where it says No. 9, "RE: 93A Hillside Street property."

Q.   Okay.

Page 84

A.   Should I keep reading it?

Q.   No.

   Under where it says "93A Hillside Street property," Item No. 4 under that says "We still want a quote on insuring this building."

A.   Yes.

Q.   Did I read that correctly?

A.   Yes.

Q.   Okay. And did you do anything in response to receiving this e-mail?

A.   11/10/06: "Beck" -- meaning Becky Flagg, my supervisor -- "has the file. She told me don't do anything on this. She'll handle it."

Q.   Okay. And to your knowledge, has anyone at Rodman Insurance Agency done anything on this file since November 10, 2006?

A.   I can't remember. Wait a minute.

   (Reviewing documents)

   Oh, okay. Okay. At Page 4 of the activities on the right-hand side, entered 11/16/06: "From Jim A. at Quaker. No market due to condition of building,

22 (Pages 85 to 88)

Page 85

vacant, boarded up, and destroyed inside by fire. He has no markets interested. Since insured does have a renewal offer from Vermont Mutual, ask Evan" -- meaning Evan Tobasky -- "to call insured and let her know we could not do anything for her."

Q. Was this entry done by you or somebody else?

A. Me -- oh, wait a minute. Nope. I stand corrected.

If you look above the black outline, date entered, 11/16/06 --

Q. Yes.

A. -- e-mail. Type property, where it says OPBF, that would be Becky.

Q. "BF" meaning Becky Flagg?

A. Yes.

Q. Oh, all right.

A. So she had entered in that she had done was got the no from Quaker, went to the producer on the account, Evan, and said, Can you please call her and say we can't do anything for her.

Q. So, in effect, this is saying that even

Page 86

Quaker, the excess, or surplus, lines producer could not find a market for this building as it existed?

A. Yeah. That's pretty much about as far as a dead end as you can get, you know.

Q. And there's nothing else that Rodman Insurance could have done for her at that point?

A. Well, that's, yeah, traditional. You know, once excess says no and no markets, where else are you going to go?

Q. Okay. Going back to Harleysville's refusal to write the insurance for the Hillside Street property back in 2003, did Harleysville's refusal have anything to do with the geographic area of the Hillside Street property?

A. Not that I know of. I don't believe so.

Q. Are you aware of any limitations or restrictions that Harleysville has with respect to writing insurance in a particular geographic area?

A. Not that I know of, no.

Q. Did you tell Mrs. Petit that Harleysville

Page 87

refused coverage because of the geographic location of Hillside Street?

A. No. It was because of their tenants.

Q. Okay. Have you had any communications with Mrs. Petit about the Hillside Street property at any time after November of 2006?

A. Let me see. (Reviewing documents)

All right. The entry on the activity page dated 11/28/2006: "Bought business owner's policy" -- just sometimes in the activity, I'll detail what policy you're talking about. "E-mail from Mary, insured. Updates on occupancy."

I'd have to see what that e-mail was. (Reviewing documents)

Q. Well, let me ask you this question first: Does this refer to the Harleysville policy insuring the Copenger Street property?

A. I'm sorry. Say it again? I'm sorry. I was reading this.

Q. The Customer Activities Listing entry dated November 28, 2006, does that refer to the Copenger Street property?

Page 88

A. I'd have to read the e-mail. Hold on. (Reviewing document)

Yes. The first floor of the Copenger property is rented -- yes. This is her e-mail to me, Mary Petit's.

"The first floor of the Copenger property is rented for 1/2/07. The renters are three older students from Northeastern University. They work 50 percent of the year and have academics 50 percent of the year.

"The second floor is not yet finished with the renovations but is expected to be done the first full week in December."

She's just letting me know about vacancy issues and who's living there.

Q. This is, again, concerning the Copenger Street property?

A. Uh-huh.

Q. I'd ask you to answer yes or no.

A. Yes.

Q. And you were reading from an e-mail dated November 28, 2006 --

A. Yes.

Page 89

Q.   -- from Mary Petit to you?

A.   Yes.

Q.   And at that point in time at least, the occupants of the Copenger Street property were three older students from Northeastern --

A.   Yes.

Q.   -- University; is that correct?

A.   Yes.

Q.   Okay.  Do you recall why she was providing you this information?

A.   I believe the insurance carrier asked for it.  Often when it's anything do with a vacancy and so on, the insurance carrier wants to know.

Q.   And did you provide this information to Harleysville?

A.   "See file, e-mail from insured."  I believe so, yeah.  I would have... (reviewing document)

Oh, looking at the -- at the activities 11/28/06, it says, "Send to company if they request" meaning what I'm referring to is information that the insurance -- the

Page 90

insured, Mary Petit, gave me on Copenger Street was information that I had asked Mary in anticipation of -- often the closer a policy gets to renewal -- this one being May to May -- then just in case so I'll have it -- because once the insurance carrier knows about vacancies and so on -- particularly closer to renewal, in reviewing the file -- they'll ask about that.

So I figured I'd jump the gun.  So I put down, "Send to company if they ask."

Q.   All right.  After that date did you have any communications with Mrs. Petit about the Hillside Street property?

A.   Well, "See file."  (Reviewing documents) "E-mailed insured 3/8/07."  Okay.

I don't believe so.  No.

MR. McGOVERN:  Okay.  I'm going to allow Mr. Rossi and Mr. Sexton to ask you questions now.

MR. ROSSI:  Mr. Sexton, go ahead.

MR. SEXTON:  Oh, I'll go after you.

MR. ROSSI:  Thank you very much.

Page 91

Off the record.

(Discussion off the record)

CROSS EXAMINATION

BY MR. ROSSI:

Q.   Mr. McRae, my name is John Rossi.  I represent Mary and Frank Petit in this matter.

There were a lot of questions put to you today about telephone conversations you've had with the Petits.  Some took place back in 2003.  Some took place in 2006 and other dates.

Would you agree with me that, as you sit here today, you have no personal recollection of exactly what Mrs. Petit said to you or what you said to her during any of those conversations?

MR. SEXTON:  Objection.

MS. BUGDEN:  You can answer.

MR. SEXTON:  You can answer.

A.   The bulk of it, the gist of it.  But exact details word for word, no.

Q.   And what words were said by whom, specific words, you don't have any specific personal

Page 92

recollection of that today, do you?

A.   The only thing I can remember about that is her calling about the Hillside property; it being difficult to insure; and her words referring to it as a -- how did she put it -- as a unique structure.  And that it was a problem.

Q.   That was in 2006, do you recall?

A.   Due to a fire, yeah.

Q.   And other than that conversation, you have no personal recollection of the words that were used; is that correct?

MR. McGOVERN:  Objection.

MR. SEXTON:  Objection.

MS. BUGDEN:  You can answer.  They may object.  You can just answer after they do that.

THE WITNESS:  Oh, okay.

A.   No, I don't have any personal recollection in any detail.

Q.   Now, there were some questions asked by Mr. McGovern about the e-mail that Ms. Petit sent you on November 28, 2006.

A.   (Reviewing document)

24 (Pages 93 to 96)

Page 93

Q.   And I'd like to direct your attention to that.

A.   Okay.

MR. ROSSI:  And to the extent that e-mail hasn't been identified as a subexhibit, I'd ask that we mark it as a subexhibit, whatever the next in line is.

And I'm not sure.  Is that from Exhibit 1 or Exhibit 2?

MR. McGOVERN:  2.

MR. ROSSI:  Did we mark any subexhibits from Exhibit 2 yet?

MR. McGOVERN:  No.

MR. ROSSI:  So I'd ask that we mark it as Exhibit 2A.

(Copy of an e-mail dated November 28, 2006, marked as McRae Exhibit 2A for identification)

(A brief recess was taken)

BY MR. ROSSI:

Q.   Of what significance, if any, Mr. McRae, did you give the statement in her e-mail

Page 94

that the renters were three older students from Northeastern University?

MR. SEXTON:  Objection.  You can answer.

MR. ROSSI:  He objects to all my questions.  You'll get used to this, Mr. McRae.

A.   The Copenger Street property we already had.  So my only feeling about it or my only concern about it at all was, if in reviewing the file, which Harleysville had not done yet, during the renewal -- as you can see in the activities I put down here, it says, "Keep this on file.  Send to company if they request it."

So to my knowledge, they never did.  The policy was renewed, no problem.  So that was the only concern I had.  I just wanted to document it in case the carrier wanted to know.

Q.   So would you agree with me that Mrs. Petit was forthright with you in describing the nature of the tenants in her Copenger Street property?

Page 95

MR. SEXTON:  Objection.  At what time?

Q.   At any of the times you were dealing with her.

A.   Yes.  She was very forthright.  Whatever I needed to know, she would respond and spell it out.

Q.   And based on your interactions with her, have you found her to be an honest and truthful customer?

A.   Yes.

Q.   Okay.  I'd like to go through now the chronology a bit, not the whole chronology again, but parts of the chronology, of your interactions with Mrs. Petit.

Going back to May of 2003, I'd like to direct your attention in that regard to the forms that your office filled out at that time -- I believe you've already testified to them -- in conjunction with the securing of insurance for the Copenger Street property.

A.   Okay.

Q.   And I'm going to ask you about some of these forms and ask you to help me

Page 96

understand what they are a little bit better.

The Habitational Survey for Agents --

A.   I don't have that in front of me.  Okay.

Q.   What is that form?

A.   Again, ACORD forms are a company-wide use in every company.  Often, an insurance carrier will have their own company-specific form.  This is specific to Harleysville Insurance Company.  They will often want to just, for their own records, focus in on particular information.

Q.   So is this considered part of the application for the insurance?

A.   Yes.

Q.   Okay.  Now, with regard to this form, is it one page only?

A.   Yes.

Q.   And the form I have in the exhibit here, I guess, is dated 5/16/03 and signed by an agent on the bottom?

A.   Yes.

Q.   And do you know whose signature that is?

A.   My guess is -- since he's the producer on

Page 97

the account -- Evan Tobasky.

Q. Do you recognize the handwriting on this form?

A. No. I mean, there's so many people and so many producers, I often don't recognize exactly who filled it out.

Q. Is there any item in this form that requests information as to who the tenants on the property are?

MR. SEXTON: Objection. The document speaks for itself.

A. The only thing that mentions the tenants is Question No. 2, tenants care for the property. In other words, the company asking us who cares for the property.

The type of tenants and such, no, it does not ask that.

Q. Okay. So would you agree with me that, as I look at this form, there is absolutely nothing on here that asks who the tenants are?

A. Right.

Q. Okay. Now, this is not the only form submitted, though, to Harleysville at the

Page 98

time she required insurance in May 2003; is that correct?

A. No, that's not the only form.

Q. Okay. And I believe another form that was submitted at that time was part of Exhibit 1A, which was the Commercial Insurance Application?

A. Yes.

Q. And that was dated May -- is it 16?

A. 5/16/03.

Q. '03.

And I'd ask you to look through that. And is that an application that you routinely used to secure insurance with Harleysville Insurance?

A. Oh, with all of them, yes.

Q. With all insurance companies?

A. Standard form.

Q. Is there any item in this form -- by the way, as I look at this form, it looks like a one-page document; is that correct?

A. The ACORD form? No.

Q. Okay. So, then, you want to go back to the unsigned one, right, which has the other

Page 99

pages involved as well.

And I believe earlier in your testimony you mentioned that the unsigned form appeared directly before this form in the documents that we marked as Exhibit 1?

A. I believe so, yeah.

Q. All right. If you'd give me a second, I'll try to find that.

Okay. With regard to the ACORD form itself, are there seven pages to that particular form?

A. One, two, three, four, five, six, seven, yes.

Q. Okay. Now, going through that form starting on the first page, the first area asks information about your agency and the type of information that's being sought?

A. Uh-huh.

Q. Would you agree with that, on the first section?

A. Yes.

Q. Is there anything in that first section that seeks any information about the identity of any tenants --

Page 100

A. No.

Q. -- on the insured's property?

A. No.

Q. Now, the next section -- I'm going by the little boxed-in sections on this form -- is Packaged Policy Information.

Is there anything in that section that seeks information as to who the tenants -- the identity of the tenants renting on that property?

A. No.

Q. With regard to the third section, Application Information, same question.

Is there any session of -- part of that section that seeks information as to the identity of the tenants on the property?

A. No.

Q. Okay. How about the next section, Premises Information?

A. No.

Q. Okay. The next section, Nature of Business/Description of Operations by Premises. Is there any section of that form that solicits information about the

26 (Pages 101 to 104)

Page 101

identity of the tenants?

A.   No.

Q.   Now, the next section, General Information, it has ten sections there and asks for an explanation if there were any yes responses.
      Is there any of those ten items that seeks information about who the tenants are or will be in the property?

A.   No.

Q.   Under Remarks of the application that was submitted for Mrs. Petit on the -- as of May 16th, 2003, is there any information that was included under Remarks at all?

A.   No. It's blank.

Q.   Okay. Now, on the second of those seven pages, is there any information on that second page of the ACORD form that provides any information about who the tenants of the property were or would be?

A.   No.

Q.   Is there any section on the form that seeks that information?

A.   Oh, no.

Page 102

Q.   Is the third page of that form entitled the Commercial General Liability Section?

A.   Yes.

Q.   With regard to that third page of the form, Commercial General Liability Section, is there any part of that page -- page of that form that seeks any information about who the tenants of the property would be?

A.   No.

Q.   On the fourth page of the form, which I believe is part of that same Commercial General Liability Section, is there any part of that form that seeks information as to who the tenants of the property are or will be?

A.   No.

Q.   And on the next page of that form which has a box at the top, Additional General Information/Remarks, is there anything in that form -- on that page of the form that asks any information about who the tenants of the property would be?

A.   No.

Q.   Was there any information on this page put

Page 103

on at all?

A.   No. It is blank.

Q.   Is the next page of that ACORD form entitled Property Section?

A.   Yes.

Q.   With regard to the page that has Property Section at the top of it, is there any place on that entire page that asks any information at all about who the tenants of the property would be?

A.   Additional Information... There's one that says "student" here (indicating), but -- but the blatant truth is often that section is left blank, as it is on this.

Q.   That's in the section entitled "Business Income with Extra Expense"?

A.   Right.

Q.   "Tuition fees, Students, Other Ed. Servicing"?

A.   Yes.

Q.   And is that where -- your understanding of that box, is that asking the nature of tenants on there, or is it asking the nature of business activity that would be

Page 104

performed on the insured premises?
      MR. McGOVERN: Objection.

A.   I don't think they're asking are there students there. I think that it is referring to business income.
      The honest answer, I never fill that section out, and it's never been asked of me to do it.

Q.   As we look at this section of the form, on the left side, Additional Information, Business Income/Extra Expense, do you have any knowledge as to what that means?

A.   Business income coverage is what a business -- if they're doing business -- often asks for as coverage for monies lost while they're restoring their business and so on.
      Should that be needed, often -- sometimes these things will be filled out to give the insurance carrier more information on what type of business it is and how much and so on.

Q.   And then starting on the left side just on the next line below, "Type of Business:

Page 105

Nonmanufacturing, Manufacturing, Mining."
Is that once again with regard to the nature of the income or the nature of the tenant?

A. It will help the insurance carrier determine how much business income is needed along with conversations with the agent and the insured to determine that. Again, that's not a section that I've ever even been asked to complete.

Q. So once again, as we go back to the fifth column there, "Tuition, Fees, Students, Other Ed. Service Income," is that regarding fees earned by the owner for tuition versus who --

A. My guess is if the type of business was such that the income that the customer was getting was from tuition fees, they'd want to know how much.

Q. So if Mrs. Petit had tenants who happened to be students at the time she was applying for insurance, your practice would not be to fill anything in under tuition and fees, would it?

Page 106

MR. SEXTON: Objection.

A. The truth is that I've never filled that section out; and after I've submitted it, no insurance carrier has ever asked me to do it.

Q. Okay. Is there any other section on this page of the application that seeks the identity of any tenants of the property?

A. No.

Q. And the final page of that ACORD form which has "Premises Information" on the top left corner, is there any information there that seeks any -- is there anything on that page that seeks information about who the tenants of the property are or will be?

A. Am I missing the same page? (Reviewing document)
Oh, no.
(Cell phone ringing)
THE WITNESS: Sorry.
MR. ROSSI: Let's go off the record for a minute.
(Discussion off the record)
MR. ROSSI: Back on the record.

Page 107

BY MR. ROSSI:

Q. Other than -- in addition to this ACORD form and the Habitational Survey for Agents, were there any other forms submitted through your office to Harleysville Insurance at the time you first obtained insurance for the Petits on the Copenger Street property?

A. Not normally, no.
If anything, sometimes they'll ask for loss runs. But for 99 percent of it, that's it. That's all they would need to bind it.

Q. Okay. So as of May 16, 2003, Harleysville made no specific inquiry on its -- in its forms as to the type of tenants residing on the properties they insured; is that correct?

A. Not that I'm aware of, no.

Q. Okay. So at least as far as the forms were concerned, whether there were student tenants on the property or not was not an issue with regard to the insurance-binding process as of May 16, 2003?

Page 108

A. Right.

Q. Have the application forms changed -- has either of those forms changed since May of 2003?

A. No.

Q. So as we sit here today, there's still nothing on the Harleysville application form or the ACORD form that seeks the identity of who the tenants are on the residences they insure?

A. No. The only thing is on the first page -- I didn't fill this out -- was somebody checked off "owner" meaning this appears to say according to this -- unless it was a misprint, and sometimes just typing it in, it happens.
But if this is correct, this is stating that Mary Petit is the owner. And, normally, if it's rented out, it would say "two-unit apartment rented out." And that's not there.
MR. SEXTON: Can I just ask where the witness is referring?
MR. ROSSI: I think he's referring to

28 (Pages 109 to 112)

Page 109

the first page of Exhibit 1A.

MR. SEXTON: Okay. Thank you.

A.   Actually, no. That would just mean that she owns the building. But, normally -- it just struck my eye. "Two-unit apartment" -- most of the time, people would just put it "rented out."

Q.   Okay. Now, in the documents that were produced -- I believe they're part of Exhibit 1 -- there's another ACORD application form that is dated October 16th, 2003 (indicating).

Do you see that?

THE WITNESS: Where is that one?

MS. BUGDEN: It's somewhere in these documents (indicating).

(Discussion off the record)

THE WITNESS: Okay. I've got it.

Q.   Now, is that the same -- with regard to this ACORD form, this appears to relate to the 93A Hillside Street property?

A.   Yes.

Q.   Okay. Now, is there anything in this form -- which also runs one, two, three,

Page 110

four, five, six, seven pages -- is there anything in this form that asks the identity of the tenants residing at the 93A Hillside Ave. property?

MR. ROSSI: It says "Hillside Ave." there on the form. That's why I used the term "Ave." rather than "Street."

A.   Wait. (Reviewing documents) No.

Q.   Was this ACORD form ever submitted to Harleysville Insurance?

A.   I believe so.

Q.   Was it ever signed by Mrs. Petit?

A.   Actually, to answer the previous question, it may not have been. This is just a photocopy.

I'd have to look at the activities, because when I send the -- the memo to the insurance carrier and conversation with them is only if they're going to take it.

And the response back -- where are those notes -- back in May of 2003 with Harleysville saying on the fax no because of the students, then this would have been irrelevant to send in.

Page 111

Q.   Okay. Do you have any knowledge as to why this ACORD form was filled out on October 16th of 2003, some six days after the note from Harleysville indicating that they do not want -- or whatever that word is before habitational -- where the majority of units are student occupied?

A.   I'm not seeing where you're at.

Q.   The ACORD form I just asked you about was dated October 16th, 2003.

A.   Right.

Q.   The note you referred to that was put on the October 8th, '03, memo at the bottom --

A.   Right.

Q.   -- was dated October 10th, 2003.

A.   Oh, that was Kerry from underwriting responding saying no, due to the students, that scribbled note on it.

Q.   Yeah, I don't know. There's some signature on the bottom.

Is that Kerry from underwriting's signature?

A.   Yes.

Q.   There's some signature I can't recognize.

Page 112

A.   Yes, Kerry from underwriting at Harleysville.

This is dated 10/16/2003 because, as we tried to shop it, this would have been sent in to Quaker, in other words, to get this quote (indicating).

Q.   I see. So as of the time that the 10/16/03 ACORD form was filled out, you knew there were student occupants at the 93A Hillside Street property?

A.   Oh, yeah.

Q.   Is there any reason why you did not put that on the form, the ACORD form?

A.   It would not have been an issue with Quaker, because excess companies don't traditionally have a problem with students, which is why excess companies exist.

Q.   Okay. Now, the Copenger Street property, as we sit here today, is occupied totally by students; is that correct?

A.   Yes.

Q.   And it's been that way for some time?

A.   Yes.

Q.   And your agency is aware of that, correct?

Page 113

A. Yes.

Q. And yet the insurance has not been canceled or interrupted on that property, correct?

A. Yes.

Q. In fact, it's been renewed?

A. Right.

Q. All right. So there are instances where student-occupied properties are insured through private lines --

A. Yeah.

Q. -- through commercial lines.

A. It's a case-by-case basis.

For instance, the one on Copenger Street if you look at Mary's memo -- how did she word it? I can't find it. One of the copies of her e-mails back to me -- oh, where is it?

Q. Are you talking about the one we marked as 2A?

A. Yes.

When she put down on 11/28/06 as I was inquiring about the Copenger Street property, the way she put it down -- "the renters are three older students from

Page 114

Northeastern University. They work 50 percent of the year and have academics 50 percent of the year."

That response definitely would have been -- because normally when I ask about students, it being a case-by-case basis where you can occasionally convince the company to stay on it, if you get detailed with the insured, what type of students, professionals and college students sometimes they don't have too much of a problem with.

Q. So is the fact that these students were working 50 percent of the year a factor which you took into account --

A. Right.

Q. -- when you submitted this information to Harleysville Insurance?

A. Right.

MR. McGOVERN: Objection.

Q. Thank you.

With regard to the application that you submitted for the 93A Hillside Street property in October of 2003, did you know

Page 115

what type of students were residing on that property at that time?

A. I don't recall, no.

Q. Okay. So you don't know whether they were co-op or not?

A. No.

Q. Okay. I'd like to address your attention to another document in Exhibit 1. It has not been specially marked. It's just part of Exhibit 1. It's entitled "Schedule Rating Plans Documentation Sheet."

MS. BUGDEN: What does that look like?

MR. ROSSI: It's this (indicating).

Q. It has Worcester Insurance on the upper left corner.

A. (Reviewing documents)

Q. My first question is what is this form?

A. (Reviewing document) I have not seen one of these very often at all. This had to have been something that Harleysville specifically asked for.

MS. BUGDEN: If you don't know, don't guess.

THE WITNESS: Okay.

Page 116

A. I don't know what this is for. I've never seen a schedule rating plan.

Q. Do you recognize -- do you recognize the writing on this?

A. When you say "recognize," you mean whose it is?

Q. Yeah.

A. No, I don't.

Q. Okay. The notation on the bottom of the form, "No documentation in file on why credit was taken. Only thing I can figure is we insured building for previous owner with Holyoke Mutual. Credit may have been taken to keep pricing line with previous..." And then it's cut off.

Is Holyoke Mutual a company that your agency was writing for back in May of 2003?

A. Yes.

Q. So do you know if that entry was put on by someone at Rodman versus someone in Worcester?

A. Oh, again, it's an educated guess, but --

MS. BUGDEN: Don't guess.

A. -- I don't know.

30 (Pages 117 to 120)

Page 117

Q. Did your firm provide insurance to the Copenger Street property before the Petits owned it?

A. I believe so just from the notes.

Q. And do you have any recollection of any discussion within Rodman of a credit on the premium or what have you to adjust the premium because of that fact?

A. No.

Q. Is that a function that you would have been involved with at that time?

A. No.

Q. I know. I'm mixing my forms up now, too, as we go on.

I'd like to direct your attention to the New Business Survey, which I believe is part of Exhibit 1A. I think it may be the next to the last page of that exhibit. (Reviewing documents)

MS. BUGDEN: I think it's in 1A.

THE WITNESS: Oh, okay.

Q. Is that the form you testified to earlier was -- is that a Rodman Insurance form that's filled out by the producer?

Page 118

A. Yes.

Q. Does your writing appear on that form?

A. Mine, no.

Q. Okay. Is there anything in the New Business Survey that asks about the identity of who tenants are on rental income properties?

A. No.

Q. And on this particular form as filled out, are there any notations on there that talk about who the tenants of that property are at Copenger Street as of the time this was filled out?

A. No.

MR. ROSSI: Could I just have a moment? I believe I'm close to the end.

(Pause)

Q. Oh, in -- I believe it's Exhibit 1 -- there's an e-mail from Ms. Petit to you dated September 17th, 2007.

A. (Reviewing documents) Where?

Q. I believe you already testified to it.

MR. McGOVERN: It's Exhibit 1. It's near the top.

Page 119

MR. SEXTON: Yeah, it's in there. I've seen it.

MR. McGOVERN: It should be in this stack here (indicating).

THE WITNESS: In that stack?

MS. BUGDEN: What's the date?

MR. ROSSI: February 17, 2007.

THE WITNESS: I don't see it here. (Reviewing documents)

MS. BUGDEN: Here it is (handing).

THE WITNESS: Okay. (Reviewing document)

BY MR. ROSSI:

Q. Okay. I have just a simple question on that.

As of that date, then, Mrs. Petit had told you that she intended to rent that second unit to students; is that correct?

A. Yes.

Q. And did you have any discussion with Ms. Petit about that issue at the time?

A. Oh, I would have. I would have just told her that to my knowledge to date the insurance carrier doesn't have a problem

Page 120

with it.

I'd have to look at the activities to see if I went further than that. But, obviously, it didn't end up being a problem because the policy is still in existence now.

Q. Okay. And with regard to the -- there's two documents that you referred to repeatedly, the Customer Note Listing and the Customer Activities Listing.

A. Yes.

Q. I'd just ask you, would you clarify -- I don't quite understand the difference between the purpose of these two types of documents.

Would you please just explain to me what each of these two types of documents is used for?

A. As you enter activities in the system, they're only designed for two quick lines. For instance, it's that page where it says "Customer Activity." And if you notice, all this -- there's not very much space.

So often if I suspect that something is

Page 121

going to be more detailed or particularly an ongoing thing, the beauty of the note screen is that you can go to another section, and it's all one page in front of you.

That way if something goes on and on and on, and you're constantly flipping back to activities, particularly for a year and all that, it's good to go to one page. Like, this is what it looks like. It's all right in front of you.

Q. Okay. So the Customer Note Listing is an expansion of information that would (indicating) not normally fit in the Customer Activities Listing; is that a fair assessment?

A. Exactly.

I don't know if I can find one right now, but -- oh, "Notes." For instance, if I even think it's going to be that long (demonstrating), I won't even put it on the activities. It just says, "Notes, new location." So that way I'll know those three entries right there dated on the

Page 122

activity list of 10/3/06, 10/10/06, and so on, that just lets me know don't look at the activities. Go to the notes instead.

Q. Oh, I see. Thank you.

Now, Mr. McGovern asked you some questions about communications entered on the Customer Note Listing for October 10, 2006.

A. Okay.

Q. "Mary, insured, called. Vacant since 8/31." And I thought I heard you mention that you thought that was regarding the 93A Hillside Street property.

I'm going to just ask you to review that again and then put this question to you: Is it possible that she was referring to the Copenger Street property in light of the e-mails that you have in the file that she sent to you?

A. Yeah, it might have been. Yeah. "Called Lisa, company," and Lisa is with Harleysville. So, yeah, it probably was for the Copenger Street one. Yeah.

Q. All right. So, once again, even as you

Page 123

look at these Note Listings and Customer Activities Listings, would you agree with me that your memory is still not completely refreshed as to the nature of all your discussions with Mrs. Petit?

A. Yeah. It's mostly there, but there's certainly going to be gaps in memory thinking about something that was two, three years ago, conversations that you had with an insured.

I mean, we get 20 calls a day, you know. I mean, you're just not going to remember that.

Q. Certainly.

MR. ROSSI: Thank you. I have no further questions.

MR. SEXTON: Now it's my turn.

CROSS EXAMINATION

BY MR. SEXTON:

Q. Mr. McRae, we met earlier. My name is Jim Sexton.

Were you involved in the initial contact between Rodman Insurance Agency and Mary Petit?

Page 124

A. No.

Q. Okay. At some point was this file transferred to you?

A. As the producer/marketing team have discussions with the insured and get the quotes and such, the file is given to me.

Q. Okay. Back in 2003, if a -- strike that.

When the initial call comes from a customer or a new customer to Rodman Insurance, would the account exec -- you as an account exec -- handle the call?

A. I would certainly receive the first call.

Q. Would you immediately turn it over to the producer?

A. Half the time, I do; but half the time, if I have time to do it, I'll at least get all the information down on it.

Q. Okay. Does the fact that none of the applications for the 11-15 Copenger Street, Boston, property do not refer to students indicate to you that questions were not asked by Rodman personnel whether or not students occupied the property?

A. Well, not having done that, I wouldn't know

32 (Pages 125 to 128)

Page 125

whether that was asked or not.

Q.  Okay.  Is it an indication to you that Rodman didn't ask any questions as to whether or not there were students on the property?

A.  Again, often the producer doesn't write down every word they say.  I don't know whether he did or didn't ask about it.

Q.  In situations or in instances where you take the information from a prospective new client regarding residential rental premises --

A.  Right.

Q.  -- is it your method of operation to ask the potential insured whether or not students will occupy the property?

A.  Oh, yes, that's definitely my course of action.

Q.  Okay.  How long has that been part of your process of gathering information from a potential insured?

A.  I got the job in February 2000.  At that point in time, I had never done commercial lines.  So it didn't take long to find out

Page 126

about an insurance carrier's reluctance to write for students.

So I'd say about no more than a year into it, I started asking that as a matter of course.

Q.  And why did you start asking that as a matter of course?

A.  Because if you go to the trouble of writing up a policy, then get the quote, talk with the insured, sign this, sign that, send it in to the company and have a company inspect it and thereafter any time say you didn't let us know there were students and all that and potentially cancel or ask us to write it somewhere else, to put it -- no other way to say it, it's a pain in the butt.

So I want to sidestep that completely.  And if I feel there's any issues that the insurance carrier might be reluctant about, I'll get on the phone first before it can go any further.

Q.  Do you know if it's a policy -- currently a policy of Rodman Insurance Agency to have

Page 127

all of their account execs and producers ask potential insureds whether or not students occupy potential rental premises that they're seeking insurance for?

A.  Yes.  That's the policy of the account execs.

Q.  Is that a corporate policy?

A.  Rodman policy, yeah.

Q.  All right.  Now, you testified earlier, I believe -- and I don't in any way, shape, or form mean to mischaracterize your testimony.  So if what I say that I think you testified to is not right, please correct me.

I believe you testified earlier this Avenue that if students were occupying residential rental property and the owner was not occupying it, in some cases you could convince a carrier to write the insurance for that property; is that correct?

MR. ROSSI:  Objection as to form.

A.  Yes.  And in fact --

MR. SEXTON:  No.  I will withdraw it.

Page 128

A.  Oh, all right.

Q.  Did you testify earlier today that it has been your experience that in some cases where students occupy a residential rental property, that you can convince the carrier to -- that would not normally write insurance for that type of a risk to write that insurance?

A.  Yes.

MR. ROSSI:  Objection as to form.

MR. SEXTON:  I'm sorry?

A.  Yes.  There are cases where you can do that.

Q.  In your experience as a commercial lines account executive, are you aware of any commercial lines/dwelling/fire carriers, or companies that write insurance for those types of risk, that absolutely refuse to write insurance where students are occupying residential rental property?

MR. ROSSI:  Objection as to form.

A.  I'm not aware of one.

MR. SEXTON:  What was the form of the question that you object to, Mr. Rossi?

Page 129

MR. ROSSI: With all candor, Mr. Sexton, I couldn't repeat the question. I think that you lost me at about the third conjunction.

Q. Did you understand the question?

A. Am I aware of any carriers that absolutely under no circumstances will write the location if they're aware that there are students there.

And, no, I'm not aware of any carrier that will do that. I mean, pretty much every one of them you can bargain with. They'll say no many times. But I don't know of one that's a flat, no, don't even try.

Q. Does Rodman Insurance Agency write for Vermont Mutual Insurance Company?

A. No. I don't think so, no.

Q. All right. Has Rodman Insurance Agency ever written for Vermont Mutual Insurance Company?

A. I've been there since 2000. I don't think so.

Q. If Mary Petit had informed Rodman Insurance

Page 130

Agency in May of 2003 that students were occupying the property at 11-15 Copenger Street in Boston, would that have been included on the applications that were submitted on the information that was submitted to the Harleysville Insurance Company?

A. Well, in a perfect world, yes, that's supposed to be in there.

Oftentimes, because it's often done with conversation with the carrier, Look. We have this particular location. There's students there. Is that okay?

Once the okay is done verbally, often you don't type it up. It's already been okayed.

Q. In your experience, is it generally the rule in your industry that residential rental properties where there are student tenants are insured by excess, or surplus lines, carriers as opposed to commercial lines carriers?

A. Meaning do excess lines carriers not object to having students?

Page 131

Q. Is it more --

MR. SEXTON: Let me withdraw that question.

Q. In your experience, is it more likely that a building where students reside as tenants is more likely to be insured by an excess, or surplus, lines carrier than by a commercial lines carrier?

A. It's a real 50:50 bet. There isn't one situation over the other.

Because if that tenant issue is pretty much the only issue and it's a great building, a great structure, the agent has had that insured for a long time, those situations, then you can usually bargain with the standard carrier as opposed to having that one issue, students, immediately kick into excess lines.

I mean, you try the standard carriers first only because of the price difference. You don't want to just bypass and assume that the standard carriers are going to say no, because you don't want to pass on -- you want the business. You don't want to

Page 132

have to tell them, "Sorry. You're going to have to spend three grand more."

Q. And, again, it's -- you're not aware of any commercial lines carriers that will absolutely refuse to insure student tenants?

A. If there is one out there, I'm not aware of it. I've bargained with all of them. Gotten "no" a lot, but I've gotten "yes" a lot, too.

Q. Have you ever bargained with Vermont Mutual, or have you ever written for them?

A. Not through Rodman, no.

Q. Through Farquhar & Black?

A. McCarthy Insurance.

Q. Have you ever had any insured while you were at McCarthy Insurance that had student tenants?

A. Oh, again, relying on memory like more than seven years ago, I think Dana Hudson was the underwriter at Vermont Mutual then; and I had a pretty good relationship with him.

So I'd have to say probably, but I can't recall.

34 (Pages 133 to 136)

Page 133

Q.   So you have no memory one way or the other?

A.   Right.

Q.   And when you were at CJ McCarthy, you were involved only in personal lines; that's correct?

A.   Yes.

Q.   So insurance for a building with tenants, a commercial building -- a rented-out building, that becomes commercialized; is that right?

A.   Right.

Q.   All right. So you would not have been involved, then --

A.   Right.

Q.   -- in that type of insurance at CJ McCarthy?

A.   Right.

MR. SEXTON:  No further questions.

MR. McGOVERN:  I have nothing else.

MR. ROSSI:  Let me just ask one more based on Mr. Sexton's questions.  I just want to try to neaten it up a bit.

Page 134

RECROSS EXAMINATION

BY MR. ROSSI:

Q.   Are there currently properties you provide insurance for, rental income properties, non-owner-occupied that have students residing in them as tenants other than the property at Copenger Street owned by the Petits?

A.   You mean is she the only one?

Q.   Yes.

A.   No. We have other policies, clients that have tenants?

Q.   Are all those other policies excess lines policies?

A.   Again, some of them are, only because I believe probably there were other issues with it.

I'd say half and half.  Most of them are standard carrier.  You know, I mean, you get good at charming the hell out of an underwriter.

MR. ROSSI:  Okay. Thank you. No further questions.

MR. McGOVERN:  All right. I have

Page 135

nothing further.  Thank you.

MR. SEXTON:  Thank you.

MS. BUGDEN:  We're good.

(Whereupon, the deposition was concluded at 5:12 p.m.)

Page 136

JURAT

I, GLEN J. McRAE, do hereby certify that I have read the foregoing transcript of my testimony, and further certify under the pains and penalties of perjury that said transcript (with/without) suggested corrections is a true and accurate record of said testimony.

Dated at _____, this _____ day of _____, 2008.

_____

Page 137

CERTIFICATE

COMMONWEALTH OF MASSACHUSETTS)
SUFFOLK, SS.            )

I, Valerie L. Shand-Salama,
Professional Shorthand Reporter and Notary
Public in and for the Commonwealth of
Massachusetts, hereby certify that:

GLEN J. McRAE, the person whose
deposition is hereinbefore set forth, was
by me satisfactorily identified by means of
a Massachusetts driver's license, and was
duly sworn to testify to the truth and
nothing but the truth by me and that the
foregoing transcript is a true and accurate
transcription of my stenotype notes to the
best of my knowledge, skill, and ability.

I further certify that I am not
related to any of the parties in this
matter by blood or marriage and that I am
in no way interested in the outcome of this
matter.

IN WITNESS WHEREOF, I have hereunto
set my hand and affixed my notarial seal
this 29th day of January 2008.

_____
Notary Public
My commission expires 12/15/2011

*********************

THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES
NOT APPLY TO ANY REPRODUCTION OF THE SAME BY ANY
MEANS UNLESS UNDER THE DIRECT CONTROL AND/OR ·

Page 138

DEPONENT'S ERRATA SHEET
and SIGNATURE INSTRUCTIONS

The original of the Errata Sheet has been
delivered to GLEN J. McRAE.
When the Errata Sheet has been completed by
the Deponent and signed, a copy thereof should be
delivered to each party of record and the original
delivered to William P. McGovern, Jr., Esq., to whom
the original deposition transcript was delivered.

*******

INSTRUCTIONS TO DEPONENT

After reading this volume of your
deposition, indicate any corrections or changes to
your testimony and the reasons therefor on the
Errata Sheet supplied to you and sign it.

DO NOT make marks or notations on the
transcript volume itself.

REPLACE THIS PAGE OF THE TRANSCRIPT WITH THE
COMPLETED AND SIGNED ERRATA SHEET WHEN RECEIVED.

Page 139

ERRATA SHEET
ATTACH TO THE DEPOSITION OF GLEN J. McRAE
CASE NAME: Vermont Mutual Insurance Company v. Mary
E. Petit, et al.
INSTRUCTIONS: After reading the transcript of your
deposition, note any change or correction to your
testimony and the reason therefor on this sheet.
DO NOT make any marks or notations on the transcript
volume itself. Sign and date this Errata Sheet
(before a Notary Public, if required).
PAGE LINE
____ ____        CHANGE: _____
         REASON: _____
____ ____        CHANGE: _____
         REASON: _____
____ ____        CHANGE: _____
         REASON: _____
____ ____        CHANGE: _____
         REASON: _____
____ ____        CHANGE: _____
         REASON: _____
____ ____        CHANGE: _____
         REASON: _____
____ ____        CHANGE: _____
         REASON: _____
____ ____        CHANGE: _____
         REASON: _____
____ ____        CHANGE: _____
         REASON: _____
____ ____        CHANGE: _____
         REASON: _____
____ ____        CHANGE: _____
         REASON: _____
____ ____        CHANGE: _____
         REASON: _____
    I have read the foregoing transcript of my
deposition and, except for any corrections or
changes noted above, I hereby subscribe to the
transcript as an accurate record of the statements
made by me.
    Signed under the pains and penalties of
perjury this _____ day of_____ 2008.
    _____

G&M COURT REPORTERS, LTD.
1.800.655.3663 - www.gmcourtreporters.com