Page 1

VOLUME: I
PAGES: 1 - 65

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
C.A. No. 06-CA-11212-JLT
*********************************
VERMONT MUTUAL INSURANCE COMPANY,
    Plaintiff/Counterclaim Defendant,
vs.
MARY E. PETIT AND FRANK PETIT,
TRUSTEES OF 93A HILLSIDE STREET
NOMINEE TRUST
and
DADGAR INSURANCE AGENCY, INC.,
    Defendants/Counterclaim
    Plaintiffs.
*********************************
MARY E. PETIT AND FRANK PETIT,
TRUSTEES OF 93A HILLSIDE STREET
NOMINEE TRUST,
    Cross-claim Plaintiffs,

vs.

DADGAR INSURANCE AGENCY, INC.,
    Cross-claim Defendants.
*********************************
MARY E. PETIT AND FRANK PETIT,
TRUSTEES OF 93A HILLSIDE STREET
NOMINEE TRUST,
    Third-Party Plaintiffs,

vs.

ANOWSHIRVAN DADGAR,
    Third-Party Defendant.
*********************************

DEPOSITION OF HARLEYSVILLE INSURANCE COMPANY

through

Page 2

DEPOSITION OF HARLEYSVILLE INSURANCE COMPANY, through ROBERT G. ALEKNAS, taken on behalf of Dadgar Insurance AGency, Inc. and Anowshirvan Dadgar, pursuant to the applicable provisions of the Federal Rules of Civil Procedure, before Denise M. Rae, a Certified Shorthand Reporter and Notary Public within and for the Commonwealth of Massachusetts, at the Law Offices of John F. Rossi, 18 Tremont Street, Suite 900, Boston, Massachusetts, on Wednesday, January 23, 2008, commencing at 10:22 a.m.

- - - - -

Page 3

APPEARANCES:

Representing the Plaintiff/Counterclaim Defendant, Vermont Mutual Insurance Company;

LITCHFIELD CAVO, LLP
by PETER C. KOBER, ESQ.
   Six Kimball Lane, Suite 100
   Lynnfield, Massachusetts  01940
   Telephone No. (781) 309-1500
   kober@litchfieldcavo.com

Representing the Defendants/Counterclaim Plaintiffs, Cross-claim Plaintiffs, and Third-Party Plaintiffs;
   LAW OFFICE OF JOHN F. ROSSI
   by JOHN F. ROSSI, ESQ.
      18 Tremont Street, Suite 900
      Boston, Massachusetts  02108
      Telephone No. (617) 742-5400
      johnrossi@johnrossi.com

APPEARANCES, CONT'D.

Page 4

Representing the Defendants/Counterclaim Plaintiffs, Cross-claim Defendants, Dadgar Insurance Agency, Inc., and the Third-Party Defendant, Anowshirvan Dadgar;
   TUCKER, HEIFETZ & SALTZMAN, LLP
   by WILLIAM P. McGOVERN, JR., ESQ.
      100 Franklin Street
      Boston, Massachusetts  02110
      Telephone No. (617) 557-9696
      mcgovern@ths-law.com

Representing the Deponent;
   DONALD E. FEENER & ASSOCIATES
   by MICHAEL E. OKOLITA, ESQ.
      120 Front Street, Suite 310
      Worcester, Massachusetts  01608-1424
      Telephone No. (508) 798-0717

2 (Pages 5 to 8)

Page 5

INDEX

DEPONENT                    PAGE

ROBERT ALEKNAS

By Mr. McGovern          7
                        60

By Mr. Rossi            38

By Mr. Kober            50

EXHIBITS

No.                    Page

1   Re-Notice of Taking Deposition.   6

2   Letter dated January 7, 2008 with
    attached Harleysville Insurance
    documents.                        6

2-A  Three pages beginning with
     document entitled "Harleysville
     Insurance Companies, Habitational
     Survey for Agents."              39

Page 6

At the Law Offices of John F. Rossi:

(Re-Notice of Taking Deposition marked exhibit number 1 for identification.)

(Letter dated January 7, 2008 with attached Harleysville Insurance documents marked exhibit number 2 for identification.)

IT IS HEREBY STIPULATED AND AGREED by and between counsel for the respective parties that the Witness will read and sign the deposition transcript under the pains and penalties of perjury; and that the reading and signing is deemed waived if not accomplished within 30 days of transcript delivery.

It is further stipulated and agreed that all objections, except objections to the form of the questions, and motions to strike, will be reserved until the time of trial or pretrial hearing.

ROBERT ALEKNAS, a witness called for examination by counsel for the Dadgar

Page 7

Insurance Agency, Inc. and Anowshirvan Dadgar, having been satisfactorily identified by the production of his driver's license, being first sworn by the Notary Public, was examined and testified as follows:

DIRECT EXAMINATION

by MR. McGOVERN:

Q. Good morning, my name is Bill McGovern. I represent the Dadgar Insurance Agency and and Anowshirvan Dadgar in this litigation. I'm going to be asking you some questions today on the record. The woman sitting to my right is a stenographer. She is going to be taking down everything that's said today on the record. For that reason, I would ask that in responding to my questions, that you respond in words. I would also ask that you wait until my question is complete before you begin your answer. It will make for a clear transcript later on. If you wish to take a break at any time, let me know and I'll be happy to take the break. If you do not understand a question that I ask, it

Page 8

won't be the first. Just let me know and I can try to say it in a different way. It's important that we both understand each other and in the question and answer process.

Please state your name?

A. Robert G. Aleknas.

Q. Spell your last name, please.

A. A-l-e-k-n-a-s.

Q. What is your current residential address?

A. 7 Almont Ave., Worcester, Massachusetts.

Q. What is your date of birth?

A. September 12, 1958.

Q. Are you currently employed?

A. Yes, I am.

Q. Who is your employer?

A. Harleysville Insurance Company.

Q. And what is your position at Harleysville?

A. Commercial lines technical underwriting consultant.

Q. Okay, and how long have you been with Harleysville?

A. Just over a year and a half.

Q. And do you have previous experience in the insurance industry?

Page 9

A. Yes, I do.
Q. What other companies have you worked for in the industry?
A. I've worked for Travelers insurance, Hanover Insurance, Firemen's Fund Insurance Company.
Q. Okay. Any other companies in the insurance industry?
A. No.
Q. What years did you work for Travelers?
A. 1982 to 2001.
Q. What position did you hold when you stopped working for Travelers?
A. Senior commercial lines underwriter.
Q. What years did you work at Hanover?
A. 2001 until 2005.
Q. And what position did you hold there when you stopped working at Hanover?
A. Commercial lines senior underwriter, large accounts.
Q. What years did you work at Firemen's Fund?
A. I worked at Firemen's Fund from December of 2005 until June of 2006.
Q. And what position did you hold there in

Page 10

June, 2006?
A. Commercial lines territorial manager.
Q. Okay. Are you represented by counsel today?
A. Yes.
Q. All right. I'm going to show you a document that's been pre-marked as exhibit number 1 and I'll ask you to take a look at that. My question, after you've looked at it, is if you've seen that before. (Indicating.)
A. Yes.
Q. Okay. Are you the witness who has been designated to testify on behalf of Harleysville Insurance in this matter?
A. Yes.
Q. Okay. The last page of that exhibit has a schedule with I think it's five different subject matters. Do you see that?
A. Yes.
Q. And are you a person knowledgeable about each of those subject matters?
A. To the degree that it's contained in the underwriting file, I've reviewed.
Q. Okay. Let me show you a second document. This is I believe a 25-page document.

Page 11

There's a fax stamp at the top of this. It has been marked as exhibit number 2. (Indicating.)
Q. Do you recognize the documents in that exhibit?
A. Yes.
Q. Is that the underwriting file you just referred to?
A. Yes.
Q. Along with some additional cover letters, it would appear; is that correct?
A. Yes.
Q. Did you review the underwriting file prior to coming here today?
A. Yes, I did.
Q. Okay. Did you review any other documents in preparation for your deposition today, other than what's in the underwriting file?
A. No.
Q. Is Mary Petit an insured of Harleysville Insurance?
A. Yes.
Q. Is she presently insured with Harleysville?

Page 12

A. Yes.
Q. Is Frank Petit insured with Harleysville?
A. No.
Q. Is Lisa Russo, R-u-s-s-o, an insured of Harleysville?
A. Yes.
Q. How many policies has Harleysville or does Harleysville currently have in effect for which Mary Petit is an insured?
A. One.
Q. And what kind of policy is that?
A. A commercial business owner's policy.
Q. How many policies is Lisa Russo an insured for with Harleysville?
A. One.
Q. Is that the same policy?
A. Yes, it is.
Q. And the commercial business owner's policy, does that include property insurance coverage?
A. Yes.
Q. What property is insured under that policy?
MR. OKOLITA: Feel free to look at anything you need to get the correct

4 (Pages 13 to 16)

Page 13

answer.

MR. ROSSI: In that regard, I would ask, if there's a document that is refreshing his recollection, we simply identify it at the time he answers.

MR. OKOLITA: Sure.

A. 11-15 Copenger Street.

MR. OKOLITA: What was that document?

Q. These are numbered at the top right-hand corner.

A. Commercial policy change request, page 23 of 25.

MR. ROSSI: Thank you.

Q. Do you know when that policy was initiated?

A. May 22, 2003, and that's from ACORD insurance binder, page 15 of 25.

Q. Did you personally have any role in the underwriting process for the Copenger Street property?

A. No.

Q. Who at Harleysville did have personal involvement in underwriting that insurance?

A. Kerry Schabowski. K-e-r-r-y,

Page 14

S-c-h-a-b-o-w-s-k-i.

Q. Is Kerry a man or a woman?

A. A man.

Q. What is Kerry's position at Harleysville?

A. Kerry is a commercial lines underwriter.

Q. And where is that position in relation to yourself? Is he at the same level as you or above you or below you?

A. It's a subordinate position to mine.

Q. Are you his supervisor?

A. Not directly.

Q. Who is his supervisor, if you know?

A. Sandra Haley, H-a-l-e-y.

Q. What is Sandra's position?

A. Commercial lines underwriting manager.

Q. How did Harleysville originally get this business?

A. It was received in the form of an application.

Q. Okay, and was that through an agency?

A. Yes.

Q. Which agency?

A. Rodman Insurance Agency.

MR. OKOLITA: What document is that

Page 15

you just read from?

A. Commercial Policy Change Request, page 23 of 25.

Q. Does Harleysville have any agents of its own, in terms of --

MR. McGOVERN: Strike that.

Q. Does Harleysville directly sell insurance or does it sell all of its policies through agents?

A. Most of our policies and products are sold through agents. There are or may be certain types of products that are sold directly to the policyholder.

Q. What about commercial business owners' policies; are those sold through agents or directly from Harleysville to customers?

A. Through agents.

Q. Does Harleysville have an agency agreement with the Rodman Insurance Agency?

A. I don't know if that's the case, currently. I believe they do, but I'm not certain.

Q. Okay, and did they have one at one time?

A. I would assume they did, based on the fact that we've written business for them in the

Page 16

past.

Q. Okay. Do you know if they did as of May of 2003?

A. I can't say for certain.

Q. Do you know whether or not in May of 2003 Rodman Insurance had binding authority with respect to Harleysville insurance policies?

A. I don't know.

Q. All right. You testified a moment ago that Harleysville initially received this business through an application submitted from the Rodman Insurance Agency. Is that application included in the underwriting file that's marked as exhibit number 2?

A. Yes.

Q. And can you identify the document?

A. Page 17 of 25.

Q. At the top of this page, does it say "Harleysville Worcester Insurance company, Deluxe Business Owners Quote"?

A. Yes.

Q. And how many pages is this particular document?

Page 17

A. Two.

Q. Other than this two-page application, did Harleysville receive any other documents along with it?

A. I don't know.

Q. And how was this sent to Harleysville? In other words, was it sent electronically or by regular mail or otherwise?

A. I would assume, electronically, based upon its format.

Q. Okay. Was this a computer form, if you will?

A. Yes.

Q. Is that the way that Harleysville typically received requests for insurance back in May of 2003?

A. I don't know.

Q. Is this application dated?

A. Yes.

Q. And what is the date that's on it?

A. May 15, 2003.

Q. Would that have been the date on which it was sent to Harleysville or is that --
         MR. McGOVERN: Strike that.

Page 18

Q. This document also contains a quote for a premium; is that correct?

A. Yes.

Q. Okay, and how much is the premium quoted?

A. $1,513.

Q. All right. Was that dollar figure generated by Harleysville or by Rodman Insurance Agency or someone else?

A. I don't know.

Q. The date located on this is May 15, 2003. Do you know what that date signifies? In other words, is that the date it was sent to Harleysville or is that a different point in time?

A. I don't know for sure. I would assume it was the day that was entered into a computer system.

Q. Okay. Let me ask you about a document that at least in the order of the documents that I have is right before this page and it's entitled "Habitational Survey for Agents." Do you see that?

A. Yes.

Q. Do you recognize this document?

Page 19

A. Yes.

Q. What is this document?

A. It's additional underwriting information on the particular location.

Q. Okay. Is the form of this document created by Harleysville?

A. Yes.

Q. Okay, and who completed the information that's been entered on this document, if you know?

A. I don't know.

Q. Do you know whether it was someone from Harleysville?

A. I wouldn't think so.

Q. Okay. Who do you believe it would have been?

A. It would normally, standard practice, would be for the agent and/or the insured to complete it.

Q. Okay, and is this a one-page document?

A. Yes.

Q. At the bottom, do you see there's a line that says "Agent's signature." Do you see that?

Page 20

A. Yes.

Q. There is a signature there. Do you recognize the signature?

A. No.

Q. Does Harleysville require that this Habitational Survey for Agents be submitted along with an application?

A. Yes.

Q. And do you believe that this was submitted along with application that we talked about a moment ago?

A. I would assume so.

Q. Okay. What is the purpose of obtaining this information?

A. To gain additional underwriting information about the specific subject of insurance being submitted.

Q. All right. Did Harleysville eventually issue the policy requested for this Copenger Street property?

A. Yes.

Q. And I think you testified earlier that that policy went into effect on May 22, 2003; is that correct?

6 (Pages 21 to 24)

Page 21

A. Yes.

Q. I'm going to refer you to this document which in my group is the page before the Habitational Survey for Agents. It's an insurance binder. Is this insurance binder dated at the top?

A. Yes.

Q. It says 5/16/03; is that correct?

A. Yes, it does.

Q. Who generated this insurance binder, if you know?

A. It would normally be the agent that generates the binder.

Q. Okay, and would this be something that's submitted along with application and the Habitational Survey?

A. That's standard practice.

Q. Okay. The page before this appears to be a memo dated also 5/16/03, and it has "Rodman Insurance Agency Inc." at the top left-hand corner. Do you see that?

A. Yes.

Q. Do you recognize this document?

A. Yes, I do.

Page 22

Q. What is this?

A. It's confirmation to the Harleysville underwriter that coverage has been bound.

Q. Okay, and does this document come from the Rodman Insurance Agency?

A. Yes.

Q. And it's directed to Kerry Schabowski; correct?

A. Yes.

Q. The typewritten information reads -- and this is near the center of the page -- "Please find attached our insurance binder/worksheet/habitational survey for the above named." Did I read that correctly?

A. Yes.

Q. And those three documents, the binder, the worksheet, and the habitational survey, are those the three documents that we just discussed?

A. Yes.

Q. And to your knowledge, were any other documents submitted at this time to Harleysville in order to initiate the business owner's policy?

Page 23

A. Not to my knowledge.

Q. Was any other information submitted to Harleysville in order to initiate this policy, other than what's found in these documents?

A. I don't know.

Q. On the same sheet, there's a handwritten notation. Do you see that?

A. Yes.

Q. Do you know or can you read what that says?

A. "Agent quoted through H net. Policy number assigned?"

Q. Does this note appear to be directed to Erika?

A. Yes.

Q. Do you know who Erika is?

A. I know of an Erika that's currently employed.

Q. Okay. Who is the Erika that you know?

A. Her name is Erika Cimino.

Q. How do you spell her last name?

A. C-i-m-i-n-o.

Q. Is she employed at Harleysville?

A. Yes.

Page 24

Q. What is her position?

A. Commercial lines underwriter.

Q. Does that note appear to be signed by Kerry?

A. Yes.

Q. Do you know what H net is?

A. Yes.

Q. What is H net?

A. It's a quoting system that agencies utilize.

Q. That's to generate a dollar figure for the premium?

A. Yes.

Q. Do you know what type of property Copenger Street is?

A. Yes.

Q. Okay, and what type of property is it?

A. It's a residential property.

Q. Okay, and what document are you referring to to get that information?

A. Harleysville Worcester Insurance Company, Deluxe Business Owners Quote, page 17 of 25.

Q. All right, and which particular part of this document indicates to you that it's a residential property?

Page 25

A. The information included under "Building Coverages."

Q. Okay. Specifically, you're referring to, under the description column, the item that says "Interest," and across from that, it says "Residence." Is that correct?

A. Yes.

Q. And that indicates to you that the Copenger Street property was a residential use?

A. Yes, it does.

Q. Do you know whether this property was a rental property?

A. Yes.

Q. Okay, and what indicates to you that it was a rental property, as opposed to someone's home or the insured's home, I should say?

A. Under "Building Coverages," class 65138.

Q. What does 65138 mean?

A. Residence leased to others.

Q. Okay. Did Harleysville, at the time that this policy was issued, make any inquiry as to whether the tenants of Copenger Street were students?

A. I don't know for sure in this case. It

Page 26

would be standard practice for us to inquire about the tenant profile of a particular residence.

Q. Okay. How would that inquiry typically be done in the standard practice?

A. There would be a couple of ways. Either written correspondence or a verbal conversation.

Q. And who at Harleysville would make that inquiry?

A. It would be the underwriter.

Q. In this case, would that be Kerry?

A. Yes.

Q. If the inquiry had been done through written correspondence, would a copy of that correspondence be part of the underwriting file?

A. It should be.

Q. The written correspondence, who would that be directed to, standard practice?

A. It would be directed to the agent.

Q. And if the inquiry had been made through a verbal conversation, who would that conversation be with?

Page 27

A. It would be with the agent.

Q. Is this standard practice written down in any policies or procedures or other kind of manual that Harleysville Insurance has for its underwriters?

A. I really don't know.

Q. Does Harleysville have a manual stating its underwriting guidelines?

A. There are underwriting guidelines that are written down; not necessarily in manual form.

Q. Okay. Where are they written down?

A. Electronically.

Q. And are they -- are those guidelines updated periodically?

A. Yes.

Q. Is the program or file, does that have a title of some sort?

A. Harleysville underwriting guidelines.

Q. Okay. That's creative. Are those underwriting guidelines available to your underwriters for them to sort of check on any questions they might have, in terms of, to get guidance for underwriting a

Page 28

particular file?

A. Yes.

Q. What is Harleysville Insurance's position with respect to underwriting rental property that is rented to students?

A. It is our position to avoid insuring it.

Q. Is there any discretion given to your underwriters with respect to insuring a particular rental property that is rented to students?

A. Yes.

Q. Can you describe the discretion that they have?

A. If the occupancy is considered to be incidental, it can be considered.

Q. What do you mean? What is meant by "incidental"?

A. In general, our guideline for incidental is ten percent or less of the total exposure.

Q. All right. I just want to make sure I understand. If you received information from an agent or an insured seeking business owner's insurance for a rental property and they informed you that there were some

8 (Pages 29 to 32)

Page 29

students residing in the property, but it was less than ten percent of the total number of occupants, then your underwriters would have discretion to go ahead and issue a policy?

A. They may consider it.

Q. Okay, and if the level of student occupancy was greater than ten percent, would your underwriters have discretion to issue the policy?

A. They would still have some discretion, but it would be strongly discouraged to insure a property under those conditions.

Q. What is the purpose of this guideline?

A. To avoid losses.

Q. The policy for the Copenger Street property went into effect in May of 2003. I believe you testified earlier that that policy is still in effect. It's been renewed a few times, but it's still in effect; is that correct?

A. Yes.

Q. Has Harleysville done any subsequent inquiry as to the status of the occupants in this

Page 30

building?

A. I don't know.

Q. Is it standard practice for its underwriters to do any followup to determine the status of occupants of rental property such as this one?

A. It's encouraged that they do so.

Q. Did Harleysville receive a request to add another property to this policy?

A. Yes.

Q. Okay, and what document are you referring to?

A. It's titled "Memo," dated October 8, 2003, page 21 of 25.

Q. Okay, and who sent this memo, if you know?

A. Glen McRae.

Q. Is he at Rodman Insurance Agency, if you know?

A. I don't know.

Q. All right, and who descend it to?

A. Kerry Schabowski.

Q. All right. This document indicates that the insured, who would be Mary Petit, has a prospective second location; is that

Page 31

correct?

A. Yes.

Q. And then below that, it has an address 93A Hillside Street, Boston, Massachusetts. Do you see that?

A. Yes.

Q. And is it your understanding that the insured was seeking to add the Hillside Street property as a second location to the existing policy for the Copenger Street property?

A. Yes.

Q. Okay. Then there is additional information below the Hillside Street address in this memo. Do you see that?

A. Yes.

Q. Is this information the kind of information that is typically provided to your underwriters in order to add a location to a property?

A. Yes, it is.

Q. Is a separate application required by Harleysville to add a location to a business owner's policy?

Page 32

A. Yes.

Q. Among the information provided in this memorandum is a line that is -- well, it states "Tenants or college students." Do you see that?

A. Yes.

Q. And is this information that is being provided from Glen McRae to Kerry?

A. Yes.

Q. And what, if anything, did Kerry do in response to receiving this memo?

A. There's a handwritten note in the bottom of the memo dated October 10, 2003 and it says "Glen, we do not write has habitational when the majority of units are student occupied. Any questions, please give me a call. Thanks."

Q. Okay. Do you believe that to be Kerry's response?

A. I would assume it is Kerry's response.

Q. Do you recognize his handwriting?

A. No.

Q. Do you know what is meant by "habitational"?

Page 33

A. Yes.
Q. Describe what that means.
A. Residential property.
Q. And is this statement an accurate reflection of Harleysville's underwriting guidelines?
A. Yes.
Q. With respect to that particular issue, anyway.
A. Yes.
Q. Okay. Do you know if any other information was provided to Harleysville in connection with this request, other than this one page memo?
A. I don't know.
Q. Do you know if any application was ever submitted to Harleysville for the purpose of adding the Hillside Street property to the existing Copenger Street policy?
A. I don't know.
Q. If it had been, would that be a part of this underwriting file?
A. It should be.
Q. Okay. So based on this memorandum, is it your understanding that Harleysville did not

Page 34

issue a quote to add the Hillside Street property to the policy?
A. That would be my understanding.
Q. And in fact, it has not been added to the policy; correct?
A. It has not.
Q. Other than the student occupancy, was there any other reason that Harleysville declined the request to add this location?
A. Not that I can tell.
MR. ROSSI: Once again, if you're referring to a document, if you'd just identify the document.
A. Page 21 of 25.
Q. Does Harleysville write business owners insurance for the geographic area in which Hillside Street, Boston, Massachusetts is located?
A. Yes.
Q. Did the geographic location of the Hillside Street property have anything to do with the decision to decline this request?
A. I don't know.
Q. There's nothing in this memo that suggests

Page 35

that it did have something to do with the geographic location; is there?
A. That's right.
Q. Other than the business owner's policy that was issued for the Copenger Street property, what other types of insurance does Harleysville write?
A. We write workmen's compensation, commercial automobile, umbrella liability coverage.
MR. OKOLITA: This is just for Massachusetts now; right?
Q. That wasn't my question, but let me narrow the question. Let's just talk about the types of insurance that they write in Massachusetts. Would those three still be accurate, workers' compensation, commercial auto, and umbrella liability?
A. Yeah. Employment practices liability insurance, condominium directors and officers insurance, non-profit directors and officers insurance. That's all I can think of.
Q. Okay. After October of 2003, when this exchange took place, did Harleysville

Page 36

receive an inquiry at a later date with respect to adding the Hillside Street property to a policy?
A. I recall some information regarding that property in subsequent correspondence. I don't seem to have it in front of me.
MR. OKOLITA: This is the rest of exhibit 1. (Indicating.)
A. Page 11 of 25 includes some information on the 93A Hillside Street property.
Q. Is that an e-mail?
A. Yes.
Q. What is the date of the e-mail?
A. November 10, 2006.
Q. Okay, and this appears to be from Glen McRae to a Lisa Landgren; is that correct? L-a-n-d-g-r-e-n.
A. Yes.
Q. Who is Lisa Landgren?
A. Lisa is the commercial lines underwriter.
Q. At Harleysville?
A. Yes.
Q. There are two sets of numbered items in this e-mail. The first set appears to refer to

10 (Pages 37 to 40)

Page 37

the Copenger Street property; is that fair to say?

A. Yes, it does.

Q. Then the second set appears to refer to 93A Hillside Street property; is that fair to say?

A. Yes.

Q. And under the Hillside Street part of this e-mail, item number 4, which is on the second page --

A. Yes.

Q. -- it says "We still want a quote on insuring this building. Thanks. Mary Petit." Did I read that correctly?

A. Yes.

Q. Does that indicate to you that she sought to insure the Hillside Street property around November of 2006?

A. Yes.

Q. Okay, and did Harleysville issue a quote to add the Hillside Street property?

A. No.

Q. And why not?

A. I don't know.

Page 38

Q.

MR. McGOVERN: Those are all the questions I have. I'll pass you to Mr. Rossi and Mr. Kober.

CROSS-EXAMINATION

by MR. ROSSI:

Q. Good morning. I am John Rossi. I represent Mary and Frank Petit, Trustees of the 93A Hillside Street Nominee Trust. I'd like to direct your attention to your underwriting file marked exhibit 2. Is that your complete underwriting file at Harleysville Insurance concerning Mary and Frank Petit?

A. As far as I know, it is.

Q. Can you identify the application portion of that underwriting file, and if you would, I'd ask that you pull those pages out, because I'd like to mark that as a exhibit 2-A, if we could, the entire application portion of the underwriting file.

MR. OKOLITA: We've done that.

Q. Okay. So there are three pages, in total?

A. Yes.

MR. ROSSI: If we could mark that

Page 39

at this point.

(Three pages beginning with document entitled "Harleysville Insurance Companies, Habitational Survey for Agents" marked exhibit number 2-A for identification.)

MR. OKOLITA: I think, for the purpose of your record, you're going to want to identify which three documents are 2-A, because only one of them is marked.

MR. ROSSI: For the record, there's three pages to exhibit 2-A. The first is entitled "Harleysville Insurance Companies, Habitational Survey for Agents" and the second page is titled "Harleysville Worcester Insurance Company, Deluxe Business Owners Quote," and the third page appears to be in fact the second page of that Harleysville Worcester Insurance company Deluxe Business Owners Quote. Thank you.

Q. Why is there no ACORD application that's maintained as part of the underwriting file in this matter?

A. I don't know.

Page 40

Q. Does Harleysville normally maintain an accord application form, in addition to the three pages that we've marked as exhibit 2-A?

A. I believe, in some cases, yes.

Q. Do you know whether or not it received an ACORD application with regard to the Petits' application for insurance on this Copenger Street property in May of 2003?

A. I don't know.

Q. What is the purpose of an underwriting file?

A. To maintain a record of what's transpired on that particular account.

Q. What is Harleysville's general and customary business practice, as of May of 2003, with regard to its use of underwriting files?

A. I don't know.

Q. With regard to the documents that you have here today, starting with the Habitational Survey for Agents, is there any item on that form that seeks any information as to the identity or attributes of the tenants that would be residing on the insured's property?

Page 41

A. No.
Q. The Habitational Survey for Agents form is filled out at the time insurance is being applied for?
A. Yes.
Q. And as you testified, you considered it part of the application?
A. Yes.
Q. With regard to the other two pages of exhibit 2-A, can you point to any item in there --
MR. ROSSI: Actually, strike that question.
Q. Before that, with regard to the -- let me get my copy, too, so I can read along with you -- the Deluxe Business Owners Quote, is that document drafted before or after Harleysville reviews the application for insurance, or simultaneous to?
A. It would depend. It could either be before or simultaneous, would be the normal practice.
Q. Is there anything in the Deluxe Business Owners Quote that identifies the identity or

Page 42

any of the attributes of tenants that are or will be residing on the insured property?
A. No.
Q. Would you agree with me that neither of these documents that we've marked as exhibit 2-A seek any information about the tenants of the insured's property?
A. That's correct.
Q. As of May, 2003, what directives, if any, were issued by Harleysville Insurance Company to agents or prospective customers with regard to its guidelines concerning tenants who would be occupying the premises of its insureds' buildings?
A. I don't know.
Q. Okay. Is it possible that absolutely no such information was distributed by Harleysville?
A. I find that would be unlikely.
Q. Okay, and with regard to that conclusion, can you identify any facts upon which you base your conclusion that it would be unlikely?
A. Based upon conversations I've had with more

Page 43

senior people within Harleysville underwriting.
Q. Were these conversations conducted in May of 2003?
A. No.
Q. And when were these conversations conducted?
A. Within the last year and a half that I've been employed at Harleysville.
Q. Is there an ACORD application form that Harleysville now uses in conjunction with its application for insureds?
A. I'm not sure I understand the question.
Q. Let me rephrase it then. Are there any types of forms, other than the forms that we have just marked as exhibit 2-A, that Harleysville now uses as part of its application process for rental income residential property?
A. Yes.
Q. What additional forms does it now use?
A. There's a revised Habitational Survey for Agents.
Q. Does it use that revised Habitational Survey

Page 44

form for agents for renewals of pre-insured properties?
A. In some cases, yes, in some cases, no.
Q. And what determines which cases it would be used for, versus those which it is not used for?
A. That would be the underwriter's discretion.
Q. How many years has Harleysville been insuring the Copenger Street property?
A. Since May 22, 2003.
Q. Okay, and has it continuously insured that property since May of 2003?
A. Yes.
Q. So it would have renewed in May of 2004?
A. Yes.
Q. And May of 2005?
A. Yes.
Q. And May of 2006?
A. Yes.
Q. And May of 2007?
A. Yes.
Q. Four times?
A. Yes.
Q. Have there been any updated Habitational

12 (Pages 45 to 48)

Page 45

Survey for Agents forms sought for this property during that time?

A. Not that I can find in the underwriting file.

Q. Now, you were aware that that property was uninhabited for a period of time?

A. No.

Q. If I refer you to once again in exhibit 2, the e-mail dated --

MR. OKOLITA: If you have the page --

MR. ROSSI: My copies, Mike, don't have the pages numbered, unfortunately.

MR. McGOVERN: It might have been near the top. Mine aren't numbered either.

Q. Do you have before you now the e-mail dated November 10, 2006 from Glen McRae to Lisa Landgren?

A. Yes.

Q. When did Harleysville first receive that e-mail?

A. Let's see. The e-mail is dated November 10, 2006.

Q. And as you review the item number 1 under

Page 46

"Re: 11-15 Copenger Street property," does that refresh your recollection as to whether or not the property was ever vacated?

A. Number 1 states the units were vacated September 1, 2006.

Q. So would you agree with me that those units at Copenger Street were at some point vacated?

A. Yes.

Q. And re-occupied?

A. Hopefully, re-occupied.

Q. Okay. Would you agree with me that Harleysville did periodic reviews of the Copenger Street property to monitor the course of action on its re-occupancy?

A. I don't know that.

Q. So you don't know whether that's been done or not?

A. I don't know.

Q. If the agent at Rodman agency, Mr. McRae, testified that there were inquiries made on that issue, do you have any reason to believe that is incorrect?

A. No, I have no reason to believe that's

Page 47

incorrect.

Q. Do you know Mr. McRae?

A. No, I don't.

Q. Are you familiar with Rodman Insurance Agency?

A. I've heard of them.

Q. Do you know them to be a competent insurance agency?

A. They have a good reputation.

Q. Do you know them to be trustworthy and truthful in their professional reputation?

A. It's been my experience that they have a good regard in that respect.

Q. Okay. Now, with regard to Harleysville Insurance Company, do you currently insure any rental residential real estate that's fully occupied by students?

A. I don't know.

Q. Is it possible that you do?

A. The best way I can answer that is, anything is possible. It would be unlikely.

Q. Is it possible that you knowingly insured rental income residential properties that are occupied by students?

Page 48

A. Possible, but unlikely.

Q. But it is possible?

A. It's possible.

Q. Does underwriting participate at all in the claims review process once a claim has been filed by an insured?

A. In some cases.

Q. To your knowledge, has any claim by Harleysville ever been denied because student tenants occupied the premises at the time of the loss?

A. I don't know that.

Q. Okay. You may have answered this to Mr. McGovern's questions, but I just want to make sure I've asked and it's been answered. With regard to the insurance policy that's in effect for Copenger Street, is there anything in that policy that talks about an exclusion for premises occupied by student tenants?

A. As far as I know, there's no such exclusion.

Q. Is there anything in the application with regard to the Copenger Street property, that creates an exclusion for the existence of

Page 49

student tenants on the property?

A. Not that I know of.

Q. Do you know whether or not the current documentation used at Harleysville seeks any information about the nature of occupants of its premises?

A. Yes, it does.

Q. But that was never used for Copenger Street; is that correct?

A. As far as what I've seen in the file, the answer to that would be no.

Q. To your knowledge, has Mrs. Petit ever been the recipient of any inquiry from Harleysville as to the nature or identity or attributes of the tenants on any property, whether it be Copenger Street or 93A Hillside Street?

A. I don't know that.

Q. Has Harleysville had any direct communication with either Mary or Frank Petit with regard to the insurance it provides on Copenger Street?

A. Based on what I find in our underwriting file, I would say no.

Page 50

Q. Has Harleysville ever had any direct communication with either Mary or Frank Petit concerning any property, whether it be properties that Harleysville insured or properties that it was asked to consider insuring?

A. Again, I can't say for certain that is the case, but based upon what I see in the file, I would say no.

Q. Can you point to any such communication?

A. No.

Q. Can you identify any such communication?

A. No.

MR. ROSSI: I have nothing further. Thank you.

CROSS-EXAMINATION

by MR. KOBER:

Q. My name is Peter Kober and I represent Vermont Mutual Insurance Company. If I heard you correctly, you testified that your present position with Harleysville is commercial lines technical underwriting consultant?

A. Yes.

Page 51

Q. Could you tell me what your duties and responsibilities are in that capacity?

A. Yes.

Q. What are they?

A. Program and product development, drafting of coverage forms, consultation with junior underwriting staff, and referral property underwriter for the northeastern region.

Q. I'm sorry?

A. Referral property underwriter for the northeastern region.

Q. What does that mean?

A. Essentially, it means I have sign-off responsibilities when certain types of properties or property values exceed an individual underwriter's authority.

Q. Are you a CPCU?

A. No, I'm not.

Q. Do you hold any license or certificate with respect to underwriting?

A. No, I don't.

Q. What were your duties and responsibilities when you left Travelers as senior commercial lines underwriter?

Page 52

A. I was an underwriter for middle market premium-sized accounts, the definition of which is fifty thousand dollars in annual premium to five hundred thousand dollars in annual premium, account size, underwriting property, general liability, commercial auto, workmen's compensation, and umbrella coverages.

Q. When you left Hanover as a commercial lines senior underwriter, what were your duties and responsibilities?

A. I had direct responsibility for the northeastern and New York territories for underwriting and marketing, account premium sizes of a hundred thousand dollars to a million dollars annually, property line, general liability, commercial auto, workmen's compensation and commercial umbrella.

Q. When you left Firemen's Fund as a commercial lines territorial manager, what were your duties and responsibilities?

A. Marketing and underwriting the New England territory, as well as business development

14 (Pages 53 to 56)

Page 53

responsibilities, which entailed appointing new agents for Firemen's Fund.

Q. Did you have any underwriting duties?

A. Yes, I did.

Q. What were your duties, as far as underwriting business?

A. Underwriting property, general liability, commercial auto, workmen's compensation and umbrella from fifty thousand dollars in premium size to a million dollars in premium size.

Q. I believe you had testified in response to a question from Mr. Rossi that it was possible, but unlikely, that Harleysville insured, presently, any property that was fully occupied by students. What is the basis for that statement?

A. We found it in our overall experience that properties occupied by students have a higher incidence of claims activity.

Q. When you say "we found in our overall experience," who is the "we"?

A. Harleysville.

Q. Okay. How far back -- when you say "in

Page 54

our experience," how far back does that experience go or did that experience go?

A. At least a year and a half that I've been there.

Q. Okay. To your knowledge --

MR. KOBER: Strike that.

Q. You had mentioned that you had spoken with other senior underwriters with respect to whether there were directives issued to underwriters in order to explore the identity of tenants, whether they were students or otherwise. What conversations do you recall having with senior underwriters on that subject? Did you understand my question? It was a little bit garbled.

A. No. If you could rephrase it, I'd appreciate it.

Q. I believe you had testified that you had conversations with senior underwriters with respect to whether there were directives issued to underwriters at Harleysville in order to determine the identity of tenants or to determine further information about

Page 55

tenants who were living in a property that was going to be insured or possibly insured by Harleysville. Can you tell me anything that you recall about conversations with those underwriters that you had with respect to such directives?

A. Just in terms of what would be a generally acceptable prospective insured and what would be a generally unacceptable prospective insured.

Q. Is Mr. Schabowski still an employee of Harleysville?

A. Yes.

Q. And he's still in the underwriting department?

A. Yes.

Q. Did you speak to him prior to this deposition?

A. No, I have not.

Q. Do you know whether anyone at Harleysville has spoken to him in connection with what he knows or doesn't know with respect to properties that Harleysville insured or was asked to insure that were owned by Mr. And

Page 56

Mrs. Petit?

A. I don't know.

Q. With respect to the underwriting guideline that Harleysville has with respect to not insuring or discouraging insuring properties where the tenants are students, how far back, to your knowledge, does that underwriting guideline go?

A. I can't cite a specific time line on it.

Q. Is it your understanding that that was the guideline that was in place at Harleysville in 2003?

A. I believe that to be the case.

Q. Are you aware of any statute in Massachusetts which prohibits an insurance company from not insuring a building in which students are tenants?

MR. ROSSI: I'm going to object to that question just because I want to guide Judge Tauro's order, and my understanding of the discovery orders that we operate under in this case is that fact-only depositions are to be conducted. There will be no expert witness depositions, and the

Page 57

question, as I understand it, relates not with what happened with regard to the Copenger Street property or applications for Hillside Street, but is now trying to make this witness into some sort of an expert witness to give an opinion as to what the interpretations are of statutes on the issue of student occupancy in general. I'm not going to seek a protective order at this time, but I do want to voice the objection to give fair notice that I intend to try my best to abide by Judge Tauro's discovery orders here.

MR. KOBER: That's fine.

Q. Now, do you understand the question?

A. No. Could you repeat it, please?

(The previous question was read back by the court reporter.)

A. No, I'm not aware of any statute to that effect.

Q. It's fair to say that Harleysville Insurance wouldn't be knowingly violating any statute in Massachusetts with respect to any policies that it writes?

Page 58

A. We do our best to not knowingly violate any statutes. We try not to violate statutes.

MR. ROSSI: That's a good thing.

Q. That is a good thing. When you were an underwriter at Travelers, to your knowledge, did Travelers have a similar policy or guideline with respect to not insuring residential properties where students were tenants?

MR. ROSSI: I'm going to voice the same objection at this time. I don't see the relevance of Travelers underwriting policies to the present case, unless Mr. Kober is trying to make this witness have the foundation of some sort of an expert witness, and I, therefore, object on the basis that it appears to violate Judge Tauro's discovery orders.

MR. OKOLITA: You can answer.

A. When I was at Travelers, the writing of residential property with student occupancy was discouraged.

Q. How about when you were at Hanover?

MR. ROSSI: I have the same

Page 59

objection with regard to Judge Tauro's discovery orders. In saying these objections, I don't mean to waive the others that we reserved until the time of trial, but I feel the obligation at least to put on the record at this time my concern that Mr. Kober is either flirting with the edge of the ordinary or crossing the border into prohibiting territory as per Judge Tauro's orders.

MR. KOBER: Silence does not denote assent.

Q. Please go ahead.

A. When I was at Hanover, the writing of residential property with student occupancy was discouraged.

Q. You had testified earlier in response to a question from Mr. McGovern that the purpose of the guideline is to avoid losses. What did you mean by that?

MR. ROSSI: I have the same objection once again. Clearly, Mr. Kober appears to be trying to create some sort of an opinion from this witness that would be

Page 60

clearly expert opinion, not related to the Copenger Street property or any of the coverages that are at issue in this case.

MR. KOBER: That's preposterous, but please go ahead and answer the question, if you can?

A. Okay.

Q. What did you mean by the purpose of the guideline was to avoid losses?

A. In terms of an insurance company's loss experience, we find that business with certain characteristics has a higher probability of claims than some others. The guidelines are in place to identify those type of hazards and to avoid them.

MR. KOBER: I have nothing further. Thank you.

MR. McGOVERN: I have a followup question.

REDIRECT EXAMINATION
by MR. McGOVERN:

Q. As to your answer to one of Mr. Rossi's questions, I believe he asked you if current documentation used by Harleysville Insurance

16 (Pages 61 to 64)

Page 61

inquires as to whether or not occupants of a rental property are students. Was that your testimony?

A. Yes.

Q. And what is that current documentation?

A. It's the habitational survey for agents.

Q. So is that an updated version of the form that appears as part of exhibit 2? (Indicating.)

MR. ROSSI: It's actually part of 2-A.

A. Yes, it is.

Q. What is the question that's now on this habitational survey that relates to student occupants?

A. I can't state it specifically. There's a question in that regard, but without having it in front of me, I don't want to just let a recollection fly off the top of my head.

Q. Okay, and when was that question or information added to the form?

A. I don't know that.

MR. McGOVERN: No further questions.

Page 62

MR. ROSSI: No questions.

MR. KOBER: Nothing further. Thank you.

(Whereupon, at 11:45 a.m., the deposition was closed.)

Page 63

DEPONENT'S ERRATA SHEET AND SIGNATURE INSTRUCTIONS

The original of the Errata Sheet has been delivered to Atty. McGovern to arrange for signature.

When the Errata Sheet has been completed by the deponent and signed, a copy thereof should be delivered to each party of record and the ORIGINAL returned to Atty. McGovern, to whom the original deposition transcript was delivered.

INSTRUCTIONS TO DEPONENT

After reading this volume of your deposition, indicate any corrections or changes to your testimony and the reasons therefore on the Errata Sheet supplied to you and sign it. DO NOT make marks or notations on the transcript volume itself.

REPLACE THIS page OF THE TRANSCRIPT WITH THE COMPLETED AND SIGNED ERRATA SHEET WHEN RECEIVED.

Page 64

ATTACH TO DEPOSITION OF: ROBERT G. ALEKNAS
CASE: VERMONT MUTUAL INS. CO.
vs. PETIT, et als.

ERRATA SHEET
INSTRUCTIONS: After reading the transcript of your deposition, note any change or correction to your testimony and the reason therefore on this sheet. DO NOT make any marks or notations on the transcript volume itself. Sign and date this errata sheet (before a Notary Public, if required). Refer to page 63 of the transcript for errata sheet distribution instructions.

Page    Line
_____  _____  CHANGE: _____
              REASON: _____
_____  _____  CHANGE: _____
              REASON: _____
_____  _____  CHANGE: _____
              REASON: _____
_____  _____  CHANGE: _____
              REASON: _____
_____  _____  CHANGE: _____
              REASON: _____
_____  _____  CHANGE: _____
              REASON: _____
_____  _____  CHANGE: _____
              REASON: _____
_____  _____  CHANGE: _____
              REASON: _____

I have read the foregoing transcript of my testimony, and except for any corrections or changes noted above, I hereby subscribe to the transcript as an accurate record of the statements made by me.

Signed under the pains and penalties of perjury this _____ day of _____, 2007.

_____
ROBERT ALEKNAS

G&M COURT REPORTERS, LTD.
1.800.655.3663 - www.gmcourtreporters.com

Page 65

CERTIFICATE

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, SS.

I, Denise M. Rae, a Certified Shorthand Reporter and Notary Public duly commissioned and qualified within and for the Commonwealth of Massachusetts, do hereby certify:

That ROBERT ALEKNAS, the witness whose deposition is hereinbefore set forth, was duly sworn by me, and that such deposition is a true record of the testimony given by the witness to the best of my skill, knowledge, and ability.

IN WITNESS WHEREOF, I have hereunto set my hand and my affixed notarial seal this 28th day of January, 2008.

_____

Denise M. Rae
Notary Public

My commission expires:
January 16, 2009